## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JOSEPH ADDI and JULIEA ADDI, 8515 Summit Rd., Pasadena, Anne Arundel County, MD 21122; KYLIE BOWERS and ANTOINE BOWERS, individually and as next friend for their minor child, A.B., 2925 Long Loop Unit D, Fort Meade, Anne Arundel County, MD 20755; DEREK BUITRAGO and SANDRA BUITRAGO, individually and as next friend for their minor children, M.S. and D.B., 753 Tallman Cir., Apt #2, Midway Park, NC 28544; DANIEL CHUBB and CASEY CHUBB, individually and as next friend for their minor children, C.C., L.C., E.C., and K.C., 145 Old Log-House Rd., East Berlin, PA 17316; SCOTT GERBER and SANDY GERBER, 6918 Winners Cir., Fairfax Station, VA 22309; ANDREW GIL-LILAND and SHANNON GILLILAND, 2481 Warm Spring Way, Odenton, Anne Arundel County, MD 21113; ALEXANDER NUNEZ and LIZA NUNEZ, individually and as next friend for their minor children, M.N. and E.N., 210 Falcon Ct., Hampton, VA 23655; YOUN PASCAL and NOREEN PASCAL, individually and as next friend for their minor children, Y.P. and K.P., 7445 Cedar Grove Ln., Elk Ridge, Howard County, MD 21075; TYQUAN SCULLARK and CHAUNTAY SCULLARK, individually and as next friend for their minor children I.S, T.S., L.S, and N.S., 563 Oliver Way, Newport News, VA 23602; and ANDREW ZIEMANN and KELLY ZIEMANN, individually and as next friend for their minor children M.S, A.Z., and S.Z., 4937 Hayden Dr., Fort Meade, Anne Arundel County, MD 20755; for themselves and on behalf of all others similarly situated,

          Plaintiffs,

     v.

CORVIAS MANAGEMENT-ARMY, LLC, 1209 Orange St., Wilmington, DE 19801; and MEADE COMMUNITIES, LLC, 4463 Leonard Wood Ave., Fort Meade, Anne Arundel County, MD 20755,

          Defendants.

No. _____

**(JURY TRIAL DEMANDED)**

**COMPLAINT FOR DAMAGES**

**CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF**

## INTRODUCTION

1.　　Yesterday was Veterans Day, a national holiday to honor the men and women who serve and have served our Nation's armed forces. We also honor their families for the daily sacrifices that they make so that their loved ones can serve.

2.　　While we as a Nation honor our servicemembers and their families, on U.S. Army Installation Fort George G. Meade, Defendants—the related private companies that are supposed to operate and maintain the on-base housing in a manner befitting the bravery of the men and women who reside there—have instead subjected these servicemembers to appalling housing conditions and cavalier treatment.

3.　　On Fort Meade, Defendants have exposed our servicemembers and their families to rampant mold infestation, resulting in serious health issues and damage to and loss of personal property.

4.　　Requests for maintenance have been ignored. Repair efforts, when made, have been substandard and slipshod attempts at cosmetic fixes that have not resolved the problems. All the while, Defendants have collected the full amount of the servicemembers' housing allowances, preventing them from moving off-base.

5.　　 Plaintiffs, active duty servicemembers and their families who live and have lived on Fort Meade, bring this action for damages to hold Defendants liable for the outrageous conditions under which they have had to live while serving the United States of America. Plaintiffs also bring a class action for injunctive relief to ensure that their fellow servicemembers will not be subjected to the same conditions.

## PARTIES

### A.    Plaintiffs

6.     Plaintiffs, described more fully below, are active-duty servicemembers and their families who live and have lived in housing on Fort Meade managed by Defendants.

### B.    Defendants

7.     Defendants, described more fully below, are a group of related entities responsible for the construction and maintenance of housing on Fort Meade.

## JURISDICTION

8.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because Fort Meade is a federal enclave.[1]

9.     This Court also has jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because this is an action in which members of the class of plaintiffs are citizens of a State different from that of a defendant and the matter in controversy exceeds the value of $5,000,000, exclusive of interest and costs.

## VENUE

10.     Venue is appropriate under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

---

[1] Except where noted otherwise, Maryland law applies to Plaintiffs' claims. *See* 28 U.S.C. § 5001(b) ("In a civil action brought to recover on account of an injury sustained in [a place subject to the exclusive jurisdiction of the United States within a State], the rights of the parties shall be governed by the law of the State in which the place is located.").

## BACKGROUND

### A.    Privatization of Housing on Fort Meade

11.    In 1996, Congress passed the National Defense Authorization Act for Fiscal Year 1997, which authorized the development of the Military Housing Privatization Initiative ("MHPI"). The goal was to improve existing military housing by outsourcing construction and maintenance of military housing to private contractors.

12.    Under the privatization initiative, private developers can receive long-term lease arrangements for existing and planned housing. Developers receive both federal direct loans and guaranteed rental income via direct payment of the service-member's basic allowance for housing ("BAH"), a tax-free housing allowance based on average rental prices in a given geographic area.

13.    Fort Meade, home to a major Army installation, the National Security Agency, and multiple other commands, participates in this privatized housing initiative. As discussed more fully below, Defendants operate and manage the housing on Fort Meade.

### B.    The Corvias Entities

14.    On April 20, 2002, the United States of America by the Secretary of the Army signed a 50-year ground lease for land only with Defendant Meade Communities, LLC to operate the military base housing at Fort Meade in "good order and in a clean, safe condition" at its expense.

15.    Meade Communities, LLC is a Delaware limited liability corporation with its principal place of business in Maryland. John Picerne is the president and CEO of Meade Communities, LLC.

16.     The Ground Lease requires Meade Communities to operate the Project as a "first class residence rental development for Permitted Tenants." This includes five neighborhoods of 500–700 homes, one smaller neighborhood of 112 historic homes, and the commitment to construct additional housing on base.

17.     In the Ground Lease, Meade Communities covenanted to faithfully observe and comply at all times and at its sole cost and expense with all applicable Federal, State and local laws, rules, regulations, ordinances, and other governmental standards and requirements.

18.     The Ground Lease requires Meade Communities to exercise due care in the protection of property against fire or damage from "any and all other causes," which includes water damage and mold.

19.     Under the Ground Lease, Meade Communities committed to professional management and maintenance of the neighborhoods "consistent with the standards of a market rate residential rental development in the Baltimore/Washington metropolitan area" and to have neighborhood management offices with on-call staff and emergency maintenance personnel to meet residents' immediate needs.

20.     On May 1, 2002, Defendant Meade Communities, LLC signed a property management agreement with Picerne Management/FM, LLC ("Picerne Management") to manage the housing on Fort Meade.

21.     At that time, Picerne Management was a Delaware limited liability corporation with its principal place of business in Maryland.

22.     On information and belief, Picerne Management merged into Defendant Corvias Management-Army LLC ("Corvias") in 2013.

23.     Corvias is a Delaware limited liability corporation with its principal place of business in Delaware. On information and belief, John Picerne is also the president and/or CEO of Corvias.

24.     John Picerne is also the president and CEO of Picerne Management. Thus, the contract between Meade Communities, LLC and Picerne Management (now Corvias) for property management was signed by Picerne on behalf of both entities.

25.     Under the terms of the property management agreement, Corvias must operate the Project in a "manner consistent with the standards of practice followed by first class professional property managers of projects of a similar type and quality in accordance with the requirements and standards set out in the Community Development and Management Plan."

26.     Corvias must also maintain and repair the Project in accordance with military, federal, state and local codes to ensure that all of the houses are "in a condition at all times reasonably acceptable to Owner, including, but not limited to cleaning, painting, decorating, plumbing, electrical, HVAC, appliances, carpentry, grounds-care, and such other maintenance and repair work as may be necessary."

27.     Defendants use "Corvias" as the outward-facing, brand name for their property management services.

28.     According to Defendants: "Corvias is rooted in the Latin phrase 'by way of the heart.' It represents the commitment we make to our partners. The passion we

bring to making a real difference in the world. And serves as our daily reminder to lead with our hearts, speak from our conscience, and improve local communities—and society at large—through every one of our partnerships."[2]

29.    Defendants operate all on-base housing at Fort Meade.

30.    Defendants lease properties on Fort Meade to servicemembers via Resident Occupancy Agreements ("ROA"). The ROA is a contract between the servicemember and Meade Communities (which owns the property), with Corvias signing the agreement as Meade Communities' agent and being designated as the property manager.

31.    Defendants' arrangement on Fort Meade is very lucrative. In addition to securing funding directly from the federal government, Defendants receive, by direct deposit, the BAH of servicemembers residing on Fort Meade.

32.    The "rent" for the property is the servicemember's full basic allowance of housing, or BAH, which is deposited directly into Defendants' accounts. There is no ability for a servicemember to negotiate the price of housing. A servicemember must forfeit his or her entire BAH upon acceptance of housing on base at Fort Meade.

33.    The BAH program provides an in-kind, tax-free benefit to servicemembers in recognition of the fact that the average military assignment of three years makes purchasing a home or settling down in a community untenable. But on Fort

---

[2] https://www.corvias.com/about ("A Company Built On Commitment and Care").

Meade, Defendants have transformed the BAH into a guaranteed revenue stream for themselves.

34.     For servicemembers and their families who live on base at Fort Meade, properties run by Defendants are their only option. There is no other alternative or competitive market on base that would drive Defendants to pay extra attention to customer satisfaction.[3]

35.     For a servicemember moving to a new base upon receiving orders to do so, the main priority is to start the new assignment as expeditiously as possible. This is particularly challenging for servicemembers who serve as part of high operations-tempo units vital to national security or those who need to quickly integrate into pre-deployment training. And for servicemembers relocating across the country or from overseas, there is often little to no time to meaningfully review housing options at the new duty station before arriving on base.

36.     Families are provided on-base housing based on rank and are given available quarters. This generally means that whatever inventory is available, a family will be assigned. There are often very few options to choose from, as overlapping changes of duty station and deployment cycles dictate inventory.

---

[3] Defendants have to attain only a 70% satisfaction approval rating to receive a bonus from the Army. A recent Army Inspector General report indicates that Defendants may be cheating to meet this standard, finding that private housing providers were changing responses on customer satisfaction surveys to hit the bonus mark. *See* https://www.army.mil/e2/downloads/rv7/families/releaseable-housing-inspection.pdf.

37.     Servicemembers with children generally prefer to live on-base because the high cost of living in the area adjacent to Fort Meade makes finding a house of adequate size off-base unaffordable.

38.     On-base housing should be beneficial to servicemembers and their families by giving them access to a safe community near work, thereby reducing one area of stress for people who have volunteered to serve our Nation.

39.     Unfortunately, at Fort Meade, the on-base housing has been a tremendous source of stress and harm to these servicemembers and their families as a result of Defendants actions and inactions.

40.     Defendants, on the other hand, have profited substantially from this arrangement.

41.     Given the direct conduit of the servicemembers' BAH directly to Defendants' bank accounts, the only way that Defendants would not reap tremendous profits would be if Defendants had to expend significant funds on housing maintenance and repair.

42.     But, on information and belief, Defendants have been spending far less on maintenance and repair than what they budgeted would be required, thereby further increasing their profit margins.

**C.    Mold and its Toxic Effects**

43.     Molds are part of the natural environment, and can be found both indoors and outdoors. Mold can grow on virtually any organic substance such as paper, cloth, wood, plant material, and even soil.

44.     Molds reproduce by means of tiny spores, which are invisible to the naked eye and transported through the air. If the spores land on a wet surface indoors, mold can grow.

45.     In a dwelling, sinks, bathroom tile and grout, basement walls, and areas around windows are common sites for mold growth. Roof leaks, condensation due to high humidity or cold spots in a building, leaky plumbing fixtures, and flooding water are common sources of moisture that can promote mold growth.

46.     Mold growing near the intake to an HVAC system is indicative of possible problems with ventilation humidity. An HVAC system with a moisture problem is not only a source of mold growth, but can also distribute mold spores throughout a dwelling via the ductwork.

47.     Under certain conditions, some molds may produce potentially toxic by-products called mycotoxins. These molds can be found in dwellings with moisture or water damage.

48.     The adverse effects of mold on humans and animals can include: (1) infections; (2) allergic or hypersensitivity reactions; (3) irritant reactions; and (4) toxic reactions. Allergic responses such as sneezing, runny nose, red eyes, and skin rash are common. Mold can trigger episodes in asthmatic individuals.

49.     Some molds, known as microbial volatile organic compounds ("mVOCs"), produce compounds having a strong odor and are volatile. Exposure to mVOCs has been linked to symptoms such as headaches, nasal irritation, dizziness, fatigue, and nausea.

### D.      Problems with Mold on Fort Meade

50.      Defendants know or should have known that there is a pervasive problem with mold in the housing on Fort Meade.

51.      In the Fall of 2018, multiple news outlets started sharing photos and stories of mold infestations and their dangerous effects on servicemembers and their families.[4]

52.      In response to the growing body of evidence that mold issues were pervasive on military installations, the military departments conducted site visits to family housing and the Senate and House Armed Services Committees held hearings and meetings with contractors and military families.

53.      At a February 13, 2019 hearing before the Senate Armed Services Committee, John Picerne testified that, to address the problem, "[w]e hired a world-renowned specialist—at no cost to the government —to review our mold and mildew procedures, so that here, too, we are living up to the gold standard."

54.      In his written statement for that hearing, Picerne committed to the members of the Senate Armed Services Committee that Corvias would be "returning to the 'gold standard' level of resident care that defined our company, from the start." He further stated that "[o]ur homes are built 100 percent in compliance with Federal regulations, with third-party inspectors. No exceptions, no cutting corners."

---

[4] *See, e.g.*, Reuters, *Ambushed at Home*, https://www.reuters.com/investigates/section/usa-military/.

55.     Picerne committed that Corvias would respond promptly to requests for service, actively seek the feedback of families, and make changes to improve results. He announced that Corvias had launched a "service surge" to reduce the backlog of work orders and to improve the response time to service requests.

56.     Specifically regarding Fort Meade, Picerne testified that Corvias was hiring resident service specialists to "focus 100 percent on local resident needs" so that residents could speak to a "local Corvias team member, down the street, when they have a problem."

57.     At a January 11, 2019, resident meeting on Fort Meade hosted by garrison commander Colonel Erich Spragg, Corvias representatives committed to overhauling their system for repair requests and to complete repairs more swiftly.

58.     Corvias spokeswoman Kelly Douglas has stated: "Our core mission at Corvias is clear: put servicemembers and their families first. We can do better, and will do better, in addressing any resident issues."

59.     After receiving negative publicity in connection with the press articles and Congressional hearings, Corvias committed to ensuring that every home on Fort Meade would receive a visual inspection and Air Quality Test to identify suspected fungal growth ("SFG", *i.e.* potential mold) by July 1, 2019.

60.     Corvias further committed to professionally remediate any home that tested positive for a certain quantity of SFG.

61.     In taking these steps, Corvias stated that "the family's welfare is our number one priority."

62.     But, as demonstrated by what happened to Plaintiffs, Corvias's priority was not their welfare. Instead, Corvias, among other things, truncated mold inspections, conducted them improperly by failing to compare samples taken inside a house with those taken from a control of outside air, by running industrial-strength air scrubbers in houses prior to testing, in withholding information about the results of testing from the family members, in not following up on the recommendations of the testers to remediate, and in performing haphazard and incomplete remediation.

63.     In short, Defendants recognize the problem and that it is their responsibility to fix it. But Defendants have not fixed it. The mold problems have not been solved, maintenance backlogs continue to delay much-needed health and safety repairs, and "remediation" projects continue to be performed in a haphazard and improper manner.

64.     This is not the gold standard. This is no standard at all.

**E.     The "Mold Addendum"**

65.     Defendants knew that many, if not most, houses on Fort Meade had problems with mold.

66.     At all relevant times, Defendants included a "mold addendum" (attached as Exhibit A) with their leases, and required all residents to sign this Addendum before occupying any housing on Fort Meade.

67.     The mold addendum attempts to downplay the adverse health effects that mold can cause by saying that mold is all around us organically and that "[t]here is conflicting scientific evidence as to what constitutes a sufficient accumulation of mold which could lead to adverse health effects."

—13—

68.    The mold addendum requests that residents "promptly notify" Corvias of visible mold growth.

69.    In the mold addendum, Defendants covenanted to "respond in accordance with state law and the Lease contract to repair or remediate the situation, as necessary."

70.    Further, as discussed above, Corvias committed to arrange for air quality testing in every home and to remediate homes that needed it.

71.    A resident of Defendants' housing on Fort Meade would therefore reasonably rely on Defendants to address and remediate any mold issues reported to them.

## PLAINTIFFS

### A.    The Addis

72.    Plaintiff Joseph Addi is a Sergeant in the United States Army with nearly six years of active service. Sergeant Addi currently serves as a systems control watch officer for the Defense Information Systems Agency.

73.    Sergeant Addi is married to Plaintiff Juliea Addi.

74.    The Addis relocated from Germany to Fort Meade in early January 2018. The Addis moved in to 2925 Long Loop Unit C, an attached townhouse in the Potomac Place neighborhood on Fort Meade managed by Corvias.

75.    Having moved from Germany, where housing is assigned, the Addis accepted the unit after a brief walk-through, without being informed that they had a choice of any other property.

76.    Shortly after moving in, the Addis began to experience significant issues with the townhouse, which continued until they moved out in August, 2019.

77.    By April, the Addis noticed water accumulating in the cabinet of the guest bathroom on the second floor. The Corvias maintenance team merely wiped the water off the cabinets and left.[5]

78.    Also in April, the Addis discovered pests, including cockroaches and millipedes, throughout the kitchen, living room, and first floor bathroom. Corvias maintenance personnel placed some pest monitors in the townhouse and informed the Addis that someone would return to check the traps "in a couple of weeks." No one ever returned.

79.    In May, Juliea requested to have the ducts cleaned to alleviate her asthma symptoms. While Corvias sent personnel to the home, the Addis later discovered that the new air filters had been left in the HVAC closet in their original packaging.

80.    The entire time that the Addis occupied the townhouse, they had difficulty regulating the temperature. During the summer, the Addis noticed that the living room door to the backyard did not seal. Even when the door was closed and locked, a gap could be seen between the door and the doorframe, allowing air to enter

---

[5] This Section of the Complaint discussing Plaintiffs refers to "Corvias" maintenance teams and personnel because Defendants instructed Plaintiffs to refer any requests for maintenance to "Corvias." The responding personnel were either Corvias employees or persons hired by Corvias and acting as agents of Corvias for this purpose. And, as noted above, under the nesting doll structure of Defendants' businesses, Corvias was at all times acting as an agent for Meade Communities.

the living room from outside. In addition, the door had to be forced shut and fre-
quently would not lock properly. The Addis submitted a work order request for the
door to be repaired that went ignored until the Addis followed up. Maintenance work-
ers twice attempted to repair the door, but were unsuccessful.

81.    In August 2018, the Addi home was burglarized by someone entering
through the backyard door.

82.    After having to deal with a Corvias maintenance worker who was under
the influence of drugs, the Addis brought their complaints to the attention of senior
leadership on Fort Meade and to members of the Senate Armed Services Committee
on February 15, 2019. Only after taking this this extraordinary step did Corvias at-
tempt to take the Addis' concerns seriously.

83.    On February 19, 2019, Corvias finally sent an individual to conduct an
air quality test of the Addi home. However, that person never mentioned the HVAC
closet, where mold was clearly visible on the walls. Moreover, despite the presence of
mold permeating the townhouse as a result of the compromised HVAC unit, the in-
spector used the living room as the testing control sample. Even with these
deficiencies, the test results still showed elevated levels of mold in the living room,
air vents, and master bedroom.

84.    At the end of February and beginning of March 2019, Corvias finally
sent contractors to replace the weather stripping on the back door, to clean the air
ducts, to repair the floor, to fix the broken countertops, to repair peeling paint, to fix

protruding outlets, and to repair toilets that were breaking free of the floor. Corvias then pronounced the townhome remediated.

85.     However, Corvias's attempts to ignore and conceal the problem did not end. Following the remediation, on April 18, TRC Environmental Corporation ("TRC") a company hired by Defendants to do "independent" assessments of mold, conducted an additional air quality test. Despite the fact that the initial air quality test had detected elevated levels of mold in the master bedroom and air vents, TRC took samples only from the living room and the second floor hallway, at the top of the stairs.[6]

86.     TRC did not test the HVAC closet, claiming that it was unable to access the closet, despite the fact that TRC had previously entered the very same closet when testing the neighboring home.

87.     Even with these deficiencies in testing, the report still found mold growth. The report also recommended further inspection of the first floor bathroom to investigate the source of moisture. Despite Corvias having committed to follow up on the testing recommendations, no inspection ever took place.

---

[6] In touting that it was having TRC conduct these inspections, Corvias told Fort Meade residents: "Please do not be surprised if TRC asks you if you have a preferred location or recommendation for where they should take the air samples—this is part of their process to ensure that they are testing in the area most likely to identify mold if it is present." In practice, these tests were conducted in the areas least likely to identify mold.

88.     After the "remediation," beginning in July 2019, the Addis noticed water

dripping from the kitchen ceiling. To determine the cause, Corvias technicians cut a

4-foot-by-4-foot hole in the kitchen ceiling:



89.     Ultimately, they discovered a leak in the bathtub in the second floor

bathroom.

90.     But Corvias failed to repair the bathroom leak. First, Corvias techni-cians recaulked the bathroom and then told the Addis not to use the bathroom until they could perform further repairs.

91.     When the repair crew returned a few days later, they replaced a seal in the bathtub and proclaimed that the water was fixed. When the Addis informed Cor-vias that the water leakage continued, Corvias personnel told the Addis that the water leak had been fixed and that if the Addis had a problem, they could take it up with their military leadership.

92.     Corvias said (and did) nothing about the mold that was clearly visible on the second floor bathroom walls and under the sink.

93.     In the end, rather than fix the water leak and remediate the mold, Cor-vias just patched and painted over the mold-covered walls in the master bathroom and patched the hole in the kitchen ceiling.

94.     Corvias utterly failed to follow up with the recommendations of the TRC report. The importance of this follow-up became even clearer when the Addis learned of the results of the air quality test in their neighbors'—the Bowers—home.

95.     At the same time that Corvias was telling the Addis that their town-home had been fully remediated, TRC was testing the HVAC closet (shared by the Bowers and the Addis) and finding "10–100" square feet of mold in that HVAC closet, needing remediation.

96.     Previously healthy, Juliea suffered constant flu-like symptoms while living in the townhouse. Juliea frequently experienced headaches, nosebleeds, dizziness, fatigue, and shortness of breath. In addition, while dealing with the stress created by their living conditions, Juliea experienced gestational hypertension, which led to the early birth of their daughter.

97.     Sergeant Addi also suffered near-constant headaches while living in the home.

98.     The Addis experienced considerable emotional distress from the issues associated with the home.

99.     After enduring the constant frustrations from dealing with Corvias and continuing to be sickened by their own home, the Addis reached their breaking point and had to move out. After much haggling, Corvias grudgingly agreed to let the Addis end their lease early and vacate the house on August 31, 2019.

100.    To avoid bringing contaminated furniture that might affect the health of their newborn baby, the Addis were forced to leave behind many possessions, including a king bed, a queen bed, a couch, a futon, and a loveseat.

**B.    The Bowers**

101.    Plaintiff Kylie Bowers is a Petty Officer Second Class in the United States Navy. Petty Officer Bowers has served on active duty for over nine years. Her current station is at the United States Naval Academy as a Logistics Specialist.

102.    Plaintiff Antoine Bowers is Kylie's husband. The Bowers have a nineteen-month-old son, Plaintiff A.B.

103.    On August 26, 2018, the Bowers family moved to 2925 Long Loop Unit D, an attached townhouse in the Potomac Place neighborhood on Fort Meade managed by Corvias. This townhouse is adjacent to the Addi's townhouse; the townhomes share an HVAC area.

104.    The Bowers family lived in this townhouse for nearly a year before being forced to relocate to temporary housing on August 22, 2019, due to health and safety concerns arising from toxic mold contamination.

105.    The Bowers returned to the townhouse on September 16, 2019 after having been promised that the property had been fully remediated. It was not: Defendants failed to fully and properly remediate their home and mold issues remain to this day.

106.    When Petty Officer Bowers and her family first moved into 2925 Long Loop Unit D, they soon noticed a strong stench that permeated the townhouse. This smell has remained throughout the duration of their residence and persists even today.

107.    The Bowers also noticed that the water from the taps in their townhouse had a greyish brown hue to it. Concerned about the safety and health of her family, Petty Officer Bowers would typically use bottled water for cooking and drinking, resorting to boiling the water before using it for cooking when they ran out of bottled water.

108.    In addition to the stench and discolored water, there were water stains and black marks on the walls and bathrooms of the townhouse. Discoloration that

turned out to be mold was also visible in and around the bathtubs, in a bathroom, and around the front door.

109.    Bathtubs in the townhouse had drainage issues. The bathroom floors felt "soft" or "squishy" when stepped on. All of the floors felt wet and moist.

110.    The HVAC closet often had standing water in it, with paint flaking off the wall and a persistent leak outside the home near the door to the HVAC closet.

111.    Petty Officer Bowers first became aware that these issues might be related to a mold contamination when Corvias sent her an email stating that her residence had been selected for a mold test.

112.     On May 20, 2019, TRC completed a "limited mold assessment of accessible areas" at the Bowers' townhouse.

113.    The TRC inspector told Petty Officer Bowers that there was mold in the home, citing as an example the presence of mold behind the washer and dryer. He indicated that Corvias would follow-up with additional information and remediation actions.

114.    The mold in the HVAC room was visible on the floor and walls:



115.   The HVAC ceiling also had visible mold growth:



116.   The roof trusses and roof sheathing above the bathroom also had signif-icant mold issues.



117.   While waiting to hear from Corvias regarding the results of this initial inspection, Petty Officer Bowers learned from fellow service personnel that they too were experiencing mold issues in properties managed by Corvias. This included their neighbors, the Addis.

118.   On or about July 9, 2019, Corvias sent Petty Officer Bowers a prelimi-nary report based on the initial mold inspection. The report noted a number of areas

that had water staining and water damage, including the kitchen, two bathrooms, and the HVAC system. The report stated that remediation work was necessary for at least one of the bathrooms and the HVAC system.

119.   Despite the report indicating mold issues that required remediation, there was zero follow-up communication from Corvias.

120.   Separately, on August 20, 2019, Petty Officer Bowers called Corvias to report water leaking from the HVAC area onto the front porch. The Corvias work order indicated that there was "mold on the front entry door" and that a "review of test results from the last mold inspection and a re-inspect" was needed, given Petty Officer Bowers' concern about black mold found in the HVAC area.

121.   Tired of waiting for Corvias to do anything, and growing increasingly concerned and anxious about the health of her child, Petty Officer Bowers had a follow-up conversation with Corvias asking for the mold situation to be addressed immediately.

122.   In response, Corvias sent a team of inspectors to conduct another round of testing on August 22, 2019. The inspectors told Petty Officer Bowers that they would need to take the floors out of the bathroom to deal with the moisture/mold issues.

123.   Petty Officer Bowers requested information from Corvias about the mold infestation, to include copies of all mold reports and a referral to an industrial hygienist. Corvias ignored these requests and refused to provide the information.

124.    Deeply concerned about the safety and health of her family, including her toddler Plaintiff A.B. who had been sick ever since moving into this townhouse, Petty Officer Bowers demanded that Corvias move her family to temporary lodging in a hotel. Of particular concern to Petty Officer Bowers was Corvias' failure to take proactive steps to protect her family, since Corvias was on notice about mold issues affecting the Addi's HVAC area, which was adjacent to their own.

125.    On August 22, 2019, Corvias finally relocated the Bowers to a hotel while promising to perform remediation work on the townhome.

126.    Corvias refused to keep Petty Officer Bowers informed about what was being done to remediate the townhouse.

127.    The Bowers had been on leave visiting family after the death of a relative when they returned to the townhome on September 16 after Corvias had pronounced everything "fixed."

128.    Hoping for a smooth transition back into their home, Petty Officer Bowers and her family experienced anything but that. The townhouse was in total disarray. The living room was cluttered with remnants of cleaning products and plastic tarp with various cords and paper products littered all over the floor. And the stench remained.

129.    Thus, instead of coming back from a family funeral to a clean and peaceful home after having been displaced for over a month, the Bowers returned to a mess that Corvias left behind, and a townhome that was still contaminated with mold.

130.    Moreover, because Corvias had failed to reconnect the washer machine properly, the townhome had flooded:



131.    Making matters even worse, Corvias had failed to fully remediate the mold.

132.    There was still moisture in the upstairs bathrooms and the floors felt as wet and squishy as before.

133.    There was still an exterior water leak:



134.   In fact, things had gotten worse. On October 25, 2019, the hot water heater sprung a massive leak:



135.   To this day, Defendants have not fully repaired or remediated the townhouse.

136.   Before the Bowers moved into the townhouse, A.B. had not had any medical issues or complications. But soon after the Bowers moved into the townhome, A.B. began suffering from acute respiratory issues, including bronchitis, runny nose, rashes, and rotavirus infections. A.B. also had persistent breakouts and red patches emerge on his face and cheeks.

137.   A.B. needed breathing treatments on multiple occasions. He was so sick that Petty Officer Bowers had to remove him from daycare on multiple occasions for

extended periods of time. Both Petty Officer Bowers and Antoine had to take off multiple days from work to attend to A.B.

138.    A.B. requires an inhaler daily to address his breathing issues. His rashes have persisted.

139.    Petty Officer Bowers has experienced general depression and anxiety attributed to the concerns of her ailing son and from living in a contaminated home.

140.     Because Petty Officer Bowers suffers from rheumatoid arthritis, she is on medication that is an immunosuppressant. Fearing for her health, Petty Officer Bowers recently had a chest x-ray taken due to concerns about potential respiratory issues related to mold exposure.

141.    Petty Officer Bowers and her family suffered emotional distress from the sub-standard housing conditions. In addition, they incurred medical expenses and loss of personal property due to mold exposure, as well as expenses associated with temporarily moving to another location while the house was being remediated.

**C.    The Buitragos**

142.    Plaintiff Derek Buitrago is a Hospital Corpsman Third Class with nine years of service. Petty Officer Buitrago is now stationed at Camp Lejeune, North Carolina.

143.    Petty Officer Buitrago is married to Plaintiff Sandra Buitrago. They have two sons, Plaintiffs M.S. (10) and D.B. (3).

144.    On August 13, 2016, the Buitrago family moved to 2653 Gardner Lane, a home in the Heritage Park neighborhood of Fort Meade managed by Corvias.

145.    The Buitrago family lived in this house until February 2019.

146.   On March 31, 2017, Sandy Buitrago noticed water dripping from the top of the windowsill in the living room and a water bubble on the same windowsill:



147.   Sandy submitted a work order. When Corvias maintenance personnel came to the house to review the issue on April 3, 2017, they told Sandy that it was only moisture from recent rainstorms, wiped the mold off, and painted over it.

148.   On May 6, 2017, Sandy had to begin moving furniture to prevent it from being soaked due to the dripping window. After noticing more water on the window-sill, Sandy changed the curtains from the living room window and noticed mold behind the curtains around the window frame:



149.    Corvias maintenance personnel came to the house on May 12, 2017 to review the mold on the wall. The Corvias personnel said that it was only moisture from recent rainstorms, wiped the mold off, and painted over it.

150.    A few months later, the mold returned and a water bubble developed underneath the area that Corvias had painted over. Sandy asked the Corvias maintenance personnel about the mold again, and they reported to her that it was normal surface mold. The Corvias maintenance personnel scraped off the bubble and re-painted over the area on the window a second time.

151.    Due to these recurrences, the Buitragos had to purchase dehumidifiers and air purifiers for their living room and their kids' room.

152.    Over the next year and a half, leaks under the carpet and water bubbles would appear around the window every time it rained. When Sandy pulled the wet carpet up to look underneath, she found black mold along the baseboards:



153.    Despite repeated requests for assistance, Corvias failed to respond to the recurring leaks.

154.    The Buitragos purchased a Shopvac in an attempt to combat the problems themselves.

155.   Corvias never conducted an investigation to see where the leak under the carpet was coming from. Corvias maintenance personnel never replaced the carpet nor did they look underneath it in an attempt to identify the source of the leak.

156.   By January 2018, the Buitragos had grown tired of dealing with the constant leaks and puddles forming in their living room, so they purchased a heavy-duty carpet cleaner to clean the carpets after each leak.

157.   To finance the purchase of the carpet cleaner, Petty Officer Buitrago took a night job at Game Stop. The Buitragos experienced higher electricity bills while needing to run the carpet cleaner, air purifiers, and fans due to the constant leaks.[7]

158.   Due to these additional expenses, Petty Officer Buitrago spent time away from his family twice a week after work going to the plasma center to donate plasma for extra income. Petty Officer Buitrago went to multiple food pantries throughout the month to help with living expenses during this time.

159.   When the Buitragos requested that Defendants permit them to move to another house due to the repeated water issues, Corvias told them that this would require a $600 moving fee. The Buitragos did not have $600, so they were trapped in the leaky house.

---

[7] Under the terms of the lease with the servicemember, Defendants are responsible for the costs of utilities. But Corvias charged the Buitragos for using "excessive" electricity.

160.    In mid-2018, Sandy moved her sons' toy chest that was sitting below the window that continued to have leaks. The bottom of the chest, having soaked up the water from the leaks and rotted, fell off.

161.    On February 5, 2019, a pipe burst in the house and led to flooding. Corvias maintenance personnel changed the pipe and left, leaving behind wet padding, carpet, a wall exposed with mold, and standing water in the living room.



162.    The Buitragos then discovered a hole in the floor of their son's room, which was directly above the leaking living room window. When the carpet was removed, it was clear that the water damage had caused the floor and beams underneath to rot, causing a safety and health hazard.





163.   Corvias finally relocated the Buitragos to a hotel on post while searching for a new house for the Buitrago family.

164.    A February 18, 2019 mold inspection of the house found elevated levels of mold in the sons' room, the game room where the children played, the master bedroom, and the living and dining room.

165.    The Buitragos were advised to have their belongings remediated based on the results of the mold report. When Sandy asked J.C. Calder of Corvias to come to the house to look at their furniture. Calder declined and told her that the Environmental Protection Agency did not recommend remediation. He said instead that the Buitragos should shampoo their couch.

166.    The Buitragos discovered that their couch had mold on the inside, that their tables and chairs had soggy, split legs, and that their children's toy cubes also contained mold:





167.    Due to the continued issues with mold, leaks, flooding, and rodents, the Buitragos moved to 2519 Shea Loop in the Heritage Park neighborhood on Fort Meade, also managed by Corvias, in February 2019. The Buitragos incurred out-of-pocket expenses for this move.

168.    The house on Shea Loop also tested positive for elevated levels of mold. The Buitragos had to purchase an air purifier to try to deal with the issue while they lived their temporarily.

169.    The Buitragos lived in the Shea Loop house for a month before Petty Officer Buitrago received permanent change of station orders to Camp Lejeune.

170.    Before moving to the house at 2653 Gardner Lane, the Buitragos' son, M.S., had no health issues or symptoms apart from pneumonia when he was 1 year old.

171. Within the first year of living at the Gardner Lane house, M.S. started having asthma-like breathing problems that required an inhaler.

172. In addition, M.S.'s eyes were itchy and bloodshot constantly:



173. As a result of these issues, M.S. frequently missed class.

174. Doctors gave M.S. Claritin and eye drops, but they did not clear his symptoms.

175. Sandy took M.S. to see an allergist at Walter Reed to address his symptoms. The allergist diagnosed M.S. with swelling of the nostrils and prescribed nasal spray.

176. Since moving from Fort Meade to Camp Lejeune, M.S. has not had allergies or redness in the eyes, and his nostrils have cleared.

177. Since leaving Fort Meade, M.S. has not had any visits to the school nurse for eye problems.

178.    The Buitragos' other son, D.B., developed eczema while living in the home, which was resolved with a prescribed cream. D.B. also developed behavioral problems, including anger issues, which is possibly linked to the mold exposure.

179.    While living in the Gardner Lane house, Sandy underwent allergy testing that showed a sensitivity to mold. She also felt out of breath while in the home. Sandy's doctor prescribed her an inhaler to address the issue. Sandy felt tired, always had a headache, and would sometimes sleep all day.

180.    Since moving from the Gardner Lane house, Sandy no longer requires the use of an inhaler.

181.    Petty Officer Buitrago had migraines and continuous nosebleeds while living in the Gardner Lane house.

182.     Petty Officer Buitrago had corrective eye surgery during the time that the Buitragos were living in the Gardner Lane house. He recovered in the house and his vision was worse after the corrective surgery than it had been before.

183.    Petty Officer Buitrago's eyesight improved after he moved out of the Gardner Lane home.

184.    Once the Buitragos removed the mold-infested furniture from their home and set up an air purifier at the Shea Loop home, their symptoms began to improve.

185.    The Buitragos are concerned that the long-term health effects caused to M.S. and D.B. due to the mold may prevent them from ultimately joining the military due to issues, such as asthma, resulting from the mold exposure.

186.    The Buitragos continue to sleep on air mattresses at their new home in North Carolina because they had to give up so much of their furniture due to mold and do not yet have the means to purchase new furniture.

187.    Petty Officer Buitrago maxed out his credit cards while living at Fort Meade to purchase air filters, a carpet cleaner, fans, air mattresses, and to pay for movers. He had to get a loan in order to cover the costs of moving to North Carolina, including gas for the drive down, food, and hotel stays until they were able to move into their new house on base at Camp Lejeune.

188.    The Buitragos lost most of their family household furniture, children's toys and clothing, and handmade family items due to mold contamination and have been unable to replace most of those items due to debt incurred from remediating mold issues while living at Fort Meade. The family remains stressed about the future health impacts to their children.

**D.    The Chubbs**

189.    Plaintiff Daniel Chubb is a Senior Chief Petty Officer in the U.S. Navy with 23 years of military service.

190.    Senior Chief Chubb is married to Plaintiff Casey Chubb. They have four children, Plaintiffs C.C. (13), L.C. (11), E.C. (9), and K.C. (6).

191.    In June 2018, the Chubbs moved to 7718 Ray Street, a single-family home in the Midway Commons neighborhood on Fort Meade managed by Corvias.

192.    Before moving to Fort Meade, the Chubbs reviewed the housing options available to them and selected the only home that was appropriate for a family with four young children. Two weeks before moving into their home, and after the Chubbs

had already begun their move to Fort Meade from Hawaii, Corvias informed the Chubbs that the original home they had selected was no longer available. Instead, Corvias told the Chubbs that they would need to move into a different home, which the Chubbs had no opportunity to inspect.

193.   In March 2019, the Chubbs discovered bubbling on the ceiling of their home, which they reported to Corvias. The Chubbs were concerned about mold in their home and requested an inspection. On March 19, inspectors from TRC performed a visual inspection of the Chubbs' home. The TRC inspectors informed the Chubbs that the inspectors "found something" in the attic that required further investigation.

194.   After not hearing from Corvias, the Chubbs contacted their housing office on March 20, March 21, March 22, March 25, and March 26 regarding the status of the a follow-up inspection of their home and an initial mold report. On each occasion, Corvias assured the Chubbs that Corvias would take additional steps to identify the problem at the Chubbs' home; however, Corvias failed to take any steps to follow up to the initial findings by the TRC inspectors.

195.   Finally, on April 11, 2019, East Coast Mold Remediation, accompanied by representatives of Corvias, performed an additional inspection of the Chubbs' home. The East Coast Mold Remediation inspector identified both the bubbling and a crack on the ceiling as water damage. The inspector examined the attic, found mold, and informed the Chubbs that their home would need extensive remediation. The inspector informed the Chubbs that they should move out immediately.

196.    Corvias identified an attached townhouse for the Chubbs to live in as temporary housing while their home was subject to mold remediation. However, the townhouse was so filthy that the Chubbs had to delay their move. There was urine on the toilet seat, peanut butter smeared on the stairs, dirty dishes in the dishwasher, and dishes filled with mold underneath a bed.

197.    As part of the attempted remediation of the Chubbs' home, Corvias removed large portions of the main wall running through the entirety of the home, all of the insulation from the attic, and portions of the walls in every bedroom. However, incredibly, Corvias did not clean or replace the air vents, which were also covered in mold. Corvias assured the Chubbs that the mold in the vents would be removed, but never followed though to complete the work.

198.    In August 2019, the Chubbs decided to move off of Fort Meade, even though Senior Chief Chubb was still assigned to the same unit. They currently reside in East Berlin, Pennsylvania.

199.    Shortly after moving to Fort Meade, the Chubbs began experiencing medical issues caused by the mold in their home.

200.    Senior Chief Chubb, Casey, and their four young children all experienced respiratory issues, as well as chronic nasal congestion.

201.    The Chubbs' son started waking up with blood running from his nose—as often as four days a week. The Chubbs' son also suffered from severe appendicitis, which required an appendectomy.

202.    Casey Chubb suffered from a severe relapse of Graves' disease.

203.   Since receiving medical treatment and moving off of Fort Meade, the Chubb family has returned to good health.

204.   While living on Fort Meade, the Chubbs incurred substantial expenses associated with trying to deal with the mold and water damage, as well as in having to move off post.

### E.   The Gerbers

205.   Plaintiff Scott Gerber is a Colonel in the United States Army. He has honorably served on active duty for nearly three decades, following his graduation from West Point in 1991. This includes three deployments to Iraq and two deployments to the Balkans. Colonel Gerber has received numerous decorations, including a valor award for evacuating casualties during a massive rocket barrage in Iraq.

206.   Colonel Gerber is married to Plaintiff Sandy Gerber.

207.   Colonel Gerber was assigned to Fort Meade in 2018 while he was completing a Ph.D in political science from Johns Hopkins University, focusing on Russian security strategy. The Army sent Gerber there to complete this degree in advance of his next national-security related assignment.

208.   The Gerbers requested housing on Fort Meade. They were assigned to a house at 4542 English Avenue on Fort Meade, a property managed by Corvias.

209.   The Gerbers signed the lease for that property on June 28, 2018.

210.   When the Gerbers arrived at the property on July 2, 2018 to move in their belongings, they found the kitchen flooded, with water running from the kitchen into the garage.

211.   The garage tested positive for high levels of black mold and aspergillus/penicillium mold, while mold was visible in the kitchen when the flooring was removed.

212.   Unfortunately, this was the first of many instances of water damage and mold infestation at the house. During the half-year in which the Gerbers lived in the house, mold was visible and/or detected upon testing in: the upstairs HVAC system; the garage; the basement; the attic; the master bedroom; the master bathroom; and the guest bedroom. During the same half-year, the house had significant water damage or leaks in: the kitchen; the garage; the roof; the entryway; the master bedroom; the basement; the attic; and the dining room. The Gerbers were also exposed to lead paint in the house.

213.   For example, when the Gerbers removed the covering to a kitchen ventilation fan they observed black mold growing on and around that fan:



214.   The Gerbers would also discover mold growing inside their HVAC system:



215.    The mold was so bad that when Sandy went to visit her mother in Texas in October, her mother (who was battling lung cancer) had an acute respiratory attack after smelling the mold, which had infiltrated Sandy's clothes. Sandy had to call 9-1-1. While her mother was in the hospital, Sandy had to throw away all of her clothes, as well as the suitcases that she had brought, before her mother could safely return to her house. Her mother has since been diagnosed with a fungal infection, believed to be related to this second-hand mold exposure, that will require surgery.

216.    Eventually, even Corvias agreed that the Gerbers needed to be moved to a different house while the English Avenue property was undergoing remediation.

217.    Incredibly, the quarters to which Corvias relocated the Gerbers was itself infested with mold. Sandy suffered a severe allergy attack while living there, leading the Gerbers to discover significant mold growth in the bathroom of that house, too, which also required remediation:



218.   Although Corvias purported to resolve the water damage and mold issues at the property, the English Avenue house continued to experience leaks and mold continued to be visible throughout. When the Gerbers pointed out that leaks were still occurring and that mold was still visible, Corvias refused to conduct further testing for mold.

219.   Corvias never successfully remediated the mold at either the English Avenue property or the temporary quarters. Instead of tackling the problem head on, Corvias would do the least amount of work possible and declare the problem fixed, only for additional leaks and areas of mold to be discovered.

220.   For example, Corvias declared they could not find any mold in the English Avenue house, only to discover that there were toxic levels of mold in the HVAC system when Colonel Gerber forced them to examine the attic.

221.   Trying to deal with Corvias and oversee the remediation of the house became almost a full-time job for Colonel Gerber, detracting from his Army mission.

222.   The Gerbers had to make substantial out-of-pocket expenses to attempt to combat the mold growing in their house, and had to hire a private home inspection service to test for mold when Corvias refused to do so.

223.   The Gerbers learned that they were not the only ones dealing with mold issues in Fort Meade housing. The Gerbers helped multiple other servicemembers deal with mold issues in their housing.

224.   Because Corvias would often not believe a servicemember that there was a mold issue in his or her house, or would declare that there was no mold without

actually inspecting, the Gerbers paid out of their own pocket for multiple other families to have mold tests done on their houses.

225.   On multiple occasions, the Gerbers found that Corvias was placing industrial-strength air scrubbers inside a residence in advance of a purportedly "independent" inspection to assess whether the house still had mold issues:



226.   In other words, Defendants were taking active measures to try to have homes "pass" a mold inspection by deception rather than by actually fixing the mold problem.

227.   Eventually, the Gerbers had to move off of Fort Meade. They currently reside in Fairfax Station, Virginia. Colonel Gerber is now assigned to Fort Belvoir.

228.    When the Gerbers arrived at Fort Meade, Sandy was in excellent physical condition, being an avid runner and having recently completed a marathon and several half marathons.

229.    While living in the house on English Avenue, Sandy Gerber experienced repeated respiratory and other health issues, including frequent headaches. She has also experienced emotional distress from the decline in her physical health, as well as having repeatedly been assured by Corvias representatives that the mold had been taken care of, only for it to be discovered elsewhere in the house.

230.    While living in the mold-infested house, Colonel Gerber required treatment for allergies for the first time in his life.

231.    When they moved off of Fort Meade, the Gerbers lost personal property that had been exposed to mold and was no longer safe or went missing when under Corvias's control. The Gerbers also incurred substantial expenses associated with trying to deal with the mold and water damage, as well as in having to move off post.

**F.    The Gillilands**

232.    Plaintiff Andrew Gilliland is a Petty Officer Third Class in the United States Navy. He has served on active duty since March of 2017. His current assignment is as a CTN (Cryptologic Technician Networks) at Cryptologic Warfare Activity 66 on Fort Meade. Fort Meade is his first duty station.

233.    Petty Officer Gilliland is married to Plaintiff Shannon Gilliland.

234.    In April 2018, the Gillilands moved to 8112 Lawson Loop, Unit A duplex on Fort Meade managed by Corvias. The Gillilands reviewed the housing options

available to them for Petty Officer Gilliland's rank and selected the one that would provide them the most space.

235.    Upon moving into their home at Fort Meade, the Gillilands often noticed excessive moisture in and around the house, which they attributed initially to the air conditioning that was running during the warmer spring and summer months.

236.    The Gillilands also observed that the back door to the house had rotted to the point where they could see through to the outside with an opening large enough to let bugs through into the house.

237.    The Gillilands first became aware of the mold issues in the home when they removed their artificial Christmas tree and found mold in and surrounding an outlet across from the ventilation system in the house:



238.    Following this discovery, Shannon Gilliland saw Facebook posts from other families on Fort Meade suggesting that residents remove air vents to look for mold. The Gillilands removed the vents to find that the insides of the vents were covered in a black mold:



239.   Shannon called Corvias to report the mold and to request a service call to address the mold discovery. But Corvias failed to respond. It was only after the Gillilands' heat went out that a Corvias representative came to the house. That worker went into the HVAC closet, but did not report the presence of mold there, which the Gillilands later discovered.

240.   When asked to look at the mold in the living room vent, the worker told the Gillilands that he could not look at the mold but that he would try to have some-one sent to look at it the next Monday, eight days after the initial report.

241.   When someone finally came to look at the air vents, that person also went to look at the air filters in the utility closet. This maintenance worker told the Gillilands that he would put in a work order for air duct cleaning. But that worker didn't mention any mold in the HVAC closet. The worker also told the Gillilands that

it could take "a while" before someone could come and clean the air ducts due to the schedule being backed up with requests.

242.   At this point, the Gillilands put in a request to move out due to the uncertainty of when their mold issues were going to be addressed. Corvias later told the Gillilands that since they had decided to move out, they were waiting to fix it until after they moved.

243.   A week before the move-out was scheduled, the Gillilands went into the utility room where they discovered thick, black mold covering the inside of that room:





244.    While living in the 8112 Lawson Loop residence, Petty Officer Gilliland experienced chest tightness, shortness of breath, and allergies.

245.    Due to these symptoms, Petty Officer Gilliland went to see a physician at the Annapolis Naval Clinic, who informed him that mold exposure may be the cause of his medical issues. Petty Officer Gilliland was later prescribed Singulair and allergy medicine to address these issues that started when he moved into the Lawson Loop duplex.

246.    Shannon experienced persistent sinus infections for which she took medication while living at the Lawson Loop duplex. Shannon has an autoimmune disorder called Hashimoto's Thyroiditis, which was aggravated while living in the home. She was sick more often, had aching and inflamed joints, and was extremely fatigued where it affected her everyday activity.

247.    The Gilliland's dog, Oakley, began experiencing allergies soon after moving into the Lawson Loop duplex. These allergies caused him to itch and eat at

his skin, which was causing him to lose the hair around his eyes. Oakley was pre-scribed Zyrtec and a specific shampoo to treat the itching and allergies.

248.    Once the mold was discovered, the Gillilands went to the Kimbrough Clinic for medical appointments, which were advertised on base as being open to an-yone with a housing-related illness. The Gillilands were told to wait to see if their symptoms cleared after they moved out of the house and that their files would be annotated to document that they were seen for "mold exposure."

249.    The issues associated with the Lawson Loop duplex caused the Gilli-lands considerable emotional distress.

250.    The Gillilands decided that they did not want to risk their health and safety and informed Corvias they did not wish to live in the 8112 Lawson Loop, Unit A residence any longer.

251.    In response, and notwithstanding the presence of mold growing throughout the utility closet, Corvias said that it would only clean the air vents and ducts.

252.    The Gillilands did not wish to live off base but felt at this point that it was their only option to protect their health and safety. Petty Officer Gilliland is now paying rent and utilities costs that exceed his BAH at a townhome adjacent to the base in order to stay near work and the military community.

253.    The Gillilands incurred significant expenses replacing household items that had been contaminated with mold, paying for appointments and medical treat-ment for Oakley, paying for moving costs to move to their new home off base, and

purchasing cleaning supplies and a dehumidifier to try to minimize the mold expo-
sure while living in the 8112 Lawson Loop, Unit A residence.

### G.    The Nunezes

254.    Plaintiff Alexander Nunez is a Master Sergeant in the United States Air
Force. He has served for eighteen years, including deployments to Kuwait and in sup-
port of Operation Iraqi Freedom. Sergeant Nunez is the recipient of numerous awards
and decorations, including the Meritorious Service Medal, Iraq Campaign Medal, and
Global War on Terrorism Service Medal. Sergeant Nunez currently serves as the Ad-
ministration Superintendent at Air Combat Command, Langley Air Force Base.

255.    Sergeant Nunez is married to Plaintiff Liza Nunez. The couple has two
children, Plaintiffs M.N. (5) and E.N. (3).

256.    M.N. lives with Autism Spectrum Disorder, Sensory Processing Disor-
der, and Apraxia of Speech. Due to M.N.'s conditions, the Nunez family qualifies for
the Exceptional Family Member Program ("EFMP"), which provides special support
services to children of military servicemembers who have special needs. The program
helps to meet the children's unique educational and medical needs. Servicemembers
with a child enrolled in the EFMP get assigned to duty stations that will have the
specialized medical and/or educational needs required.

257.    Certain rules also apply to housing to ensure the safety of an EFMP
child. M.N.'s condition requires that the Nunez family be housed in a single level
dwelling, as M.N. is at high risk for window and second story falls.

258.    In April 2015, the Nunez family moved into 7721 Ray Street, a Corvias-
managed rental home located on Fort Meade. The Nunez family lived in this home

from April of 2015 until they were displaced to a hotel on March 18, 2019, where they stayed for over a month before moving on to Langley Air Force Base in Virginia.

259.    While living in the Ray Street house, the Nunezes were exposed to excessive moisture, mold, and standing sewage water. These substandard living conditions ultimately forced the Nunez family to evacuate their home.

260.    Upon moving into the Ray Street house, the Nunez family noticed a pronounced and pervasive odor throughout the home. Liza Nunez made repeated reports to Corvias, but Corvias failed to eradicate the smell.

261.    When Corvias failed to act, the Nunezes tried to remediate the smell themselves purchasing upgraded air filters and other supplies, but the odor persisted.

262.    Beginning in or around April 2018, the yard at the Ray Street house often flooded with standing sewage water:



263.    Liza Nunez repeatedly reported the sewage backup to Corvias, but Corvias failed to permanently remove the sewage water from the Nunez yard.

264.   The Nunez family first discovered that their home was infiltrated with toxic mold on or around March 18, 2019 when Corvias finally sent a team to the Nunez's house to inspect for mold as part of a mold inspection in response to the news reports of poor housing on the installation. When Liza Nunez heard about the inspections, she called to request that her home be among the first tested, given the repeated issues with the home.

265.   This inspection revealed that the Nunez's attic was covered in rotting and moldy insulation, with water-damaged roof beams. In addition, the HVAC vents in the attic were covered in spotty black mold.



266.   The inspector told the Nunez family that the attic was full of black mold and that it was no longer safe to live in the home. Based on this information, the Nunez family requested to move out of the home.

267.   The Nunezes also asked for immediate mold testing. Despite the mold covering the attic, Corvias refused to conduct any air quality/mold testing.

268.    The children's doctors required mold testing to know which strains of mold the children were exposed to. Corvias still refused to conduct any testing.

269.    The Nunez family hired a private mold inspector and the test results confirmed the presence of mold in the home along with specific types of mold present.

270.    At this point, Corvias finally offered to move the Nunez family out of the mold-infested house. But the options provided were essentially no options at all: A home on Shea Loop that had also been evacuated due to mold; a single hotel room for their family of four; or a two-story townhome that was a non-starter because of M.N.'s high risk for falling.

271.    Corvias, which did not want to pay for the hotel room, tried to pressure the Nunez family into accepting the two-level home, which would be dangerous to the health and welfare of M.N.

272.    In doing so, Corvias did exactly what John Picerne promised Congress it would never do again. Responding to testimony from a servicemember with a child in the EFMP program who required a one-level house but was placed by Corvias in a two-level home, Picerne testified: "But specifically to the family that moved to Fort Meade expecting to have their child brought into a single-family or single-story home, it is unacceptable. And my company will stand up and will help and support that family and every family going forward in trying to make these things better." And yet, just one month later, Corvias was trying to put another EFMP family into a non-suitable two-story home.

273.   During the hotel stay, the Nunez family had to repeatedly advocate to be able to stay in the hotel because Corvias refused to commit to paying for the lodging. Corvias also refused to pay for more than a single hotel room for this family of four. This caused the Nunezes considerable stress.

274.   When the Nunezes complained to Corvias about the stress that the uncertainty of their housing conditions was causing them, the Corvias "customer service" person asked what the issue was because the hotel had a couch and mattresses.

275.   The Nunez family's displacement from the Ray Street house was particularly difficult for M.N., whose conditions make him acutely sensitive to abrupt changes in his environment. Among other things, many of M.N.'s stuffed animals, which have a calming influence on M.N., were contaminated with mold and had to be thrown away at the direction of the children's pediatrician.

276.   M.N. continually askes his parents why they cannot go back to the "brick house" (on Ray Street) to get his animals and why the things at the house cannot be fixed. This has caused M.N. and his parents considerable emotional distress.

277.   M.N.'s conditions also require the use of a special sensory swing he was using all day at home. This sensory swing also had to be thrown away due to mold contamination. M.N. does not understand why the family had to move from the house to a hotel and why his comfort items were taken from him so abruptly. This continues to have a deep impact on M.N. to this day.

278.    While living in the Ray Street house, M.N. suffered from numerous health issues, including repeated upper respiratory infections, ear infections, tonsillitis, stridor, and eczema. He had to have surgery to put tubes in his ears. M.N.'s doctors initially recommended removing his tonsils, but since moving out of the Ray Street house, M.N. has not had a single respiratory infection or ear infection. M.N.'s tonsils have shrunk to a normal size, his eczema flare-ups have cleared, and he no longer suffers from ear infections or upper respiratory infections.

279.    E.N. was born while the Nunez family lived in the Ray Street house. E.N. was consistently sick from the time she was born until the time the Nunez family moved out of the Ray Street house.

280.    Like her older brother, E.N. suffered from a variety of illnesses, including acute respiratory distress, persistent upper respiratory infections, ear infections, eczema, fungal skin infections, and eye infections. E.N. also had to have surgery to put tubes in her ears. Because of so many infections at such a young age, E.N. was speech delayed and needed to see a speech therapist. As soon as her ears opened and her respiratory infections cleared up, she was able to speak. In addition, E.N. tested positive for allergies to each type of mold that was identified on the mold report found in the Ray Street house.

281.    Since she moved out of the Ray Street house, E.N. has remained healthy, without any infections or eczema flare-ups. However, as a result of her prolonged exposure to toxic mold at such a young age, E.N.'s doctor noted that her severe allergies will likely be a life-long condition.

282.    Before moving to Fort Meade, Liza Nunez was rarely sick. After moving into the Ray Street house, however, Liza began experiencing abdominal pain, vertigo, vision problems, chronic fatigue, and severe allergy symptoms (including lip, mouth, and throat swelling). Due to her many physical illnesses, Liza was in constant pain and was diagnosed with depression in the Fall of 2016. Liza was constantly going to the doctor with unexplainable symptoms, and the doctors were unable to give her answers. This was incredibly distressing to Liza and she began thinking something was horribly wrong. Liza worried that she was going to die and feared for the future of her family.

283.    In addition, in March 2018, Liza was diagnosed with recurrent upper respiratory infections and swollen lymph nodes. In January 2019, Liza found blood in her urine and began to experience acute pelvic pain. After consulting with a gastroenterologist, Liza was diagnosed with colon polyps and a condition known as "cobblestoning" of the colon.

284.    Since moving out of the Ray Street house, Liza has begun to feel healthier. She has started slowly weaning off a number of medications, including Singulair, Claritin, prednisone, and other steroid creams. To this day, Liza's pain has begun to subside, but she still has the cobblestoning condition, which will require her to get yearly colonoscopies and is likely to be a lifelong issue.

285.    Master Sergeant Nunez was diagnosed with sleep apnea while living in the Ray Street house. As a result, Sergeant Nunez was required to use a CPAP machine to assist with his breathing during sleep.

286.    Since moving out of the house at Fort Meade, Sergeant Nunez's sleep apnea symptoms have waned and he has been able to stop using the CPAP machine altogether.

287.    The Nunez family incurred significant expenses paying for air quality and mold testing and replacing porous items that had to be discarded due to mold contamination. Additionally, the family's emotional pain continues to this day, as M.N. continues to suffer from what is to him the inexplicable loss of his comfort items and sensory swing.

### H.    The Pascals

288.    Plaintiff Youn Pascal is a Sergeant First Class in the United States Army. Sergeant Pascal has served for nineteen years, including deployments to Iraq, Afghanistan, and Kuwait.

289.    Sergeant Pascal is married to Plaintiff Noreen Pascal. The Pascals have two children, Plaintiffs Y.P. (11) and K.P (17) who lived with them on Fort Meade, along with Sergeant Pascal's mother.

290.    On March 17, 2018, the Pascal family moved into 7733 Nelson Court, a single-family home on Fort Meade managed by Corvias. While living at this residence, the Pascal's were exposed to excessive moisture and mold, and experienced a range of adverse health effects.

291.    Immediately upon moving in, the Pascal's noticed a weird, mildew smell that permeated the house. Noreen cleaned the house several times to try to eradicate the smell, but the odor persisted. Noreen noticed that the house felt damp, especially

the carpets. Mold was also visible in the bedroom ceiling room fan, as well as under the carpet in the master bedroom.

292.   Over the next twelve months, Noreen made a number of calls to Corvias to try to address ongoing issues with this house.

293.   For example, Noreen raised the issue of dampness to Corvias, which eventually sent representatives to the house, but refused to acknowledge the dampness and denied the Pascals' request for a dehumidifier.

294.   Noreen called Corvias with an issue regarding the HVAC system, requesting an inspection of the vents and an air quality check. Corvias never responded.

295.   Noreen called Corvias about water intrusion into the dining room, resulting from poorly maintained window seals. While the window was eventually repaired, there was residual dampness from the initial leak.

296.   When Noreen heard through social media networks that mold might be causing health issues on Fort Meade, she called Corvias and requested an inspection. The Corvias representative told her not to worry.

297.   Eventually, the Pascals retained their own mold inspector who found "elevated levels" of several mold spores, including cladosporium, which is known to produce mycotoxins and that can trigger chronic allergy and asthma.

298.   Within one month of moving to the house, members of the Pascal family began to experience severe, adverse health effects.

299.   Sergeant Pascal's mother—who did not work and thus remained in the house most of the time—suffered extreme respiratory ailments, including difficulty

breathing, in addition to headaches and dizziness. Prior to moving to this house, she had not experienced these symptoms.

300.   To address these escalating medical issues, Sergeant Pascal had to take his mother to an off-base hospital since she was not under his medical coverage. These visits were both costly and time-consuming because they were farther away. At one point, her respiratory symptoms became so severe that 9-1-1 was called.

301.   The Pascal's youngest child, Y.P., also experienced severe health issues. In addition to having respiratory issues, he had regular nosebleeds, irregular coughing, and swollen eyes. He was also eventually diagnosed with asthma and is now dependent on regular inhaler use.

302.   Sergeant Pascal experienced consistent blood-shot, swollen eyes as well as a persistent cough and nosebleeds. This was the first time he had symptoms of this nature. Noreen Pascal also experienced severe headaches for the first time while living in that house.

303.   Given these extenuating medical issues and the lack of appropriate response from Corvias, the Pascals felt they had no choice but to leave Fort Meade housing. As such, within a month after their one-year lease ending and a few weeks after receiving the independent mold expert's report showing elevated mold levels, the Pascal's moved off base to a new home. Everyone's health improved dramatically within one month.

304.   Before leaving, Noreen called Corvias to inform them that the house had tested positive for elevated levels of mold. Corvias did not express any concern or

acknowledgement, nor did they indicate they would immediately remediate the house. Noreen later learned that a new family was moved into that house.

305.   Noreen and her family suffered emotional distress from living in a mold-infested home in addition to substantial and ongoing medical expenses.

## I.   The Scullarks

306.   Plaintiff Petty Officer Tyquan Scullark is a Coast Guard Operations Specialist with twelve years of military service.

307.   Petty Officer Scullark is married to Plaintiff Chauntay Scullark. They have four children, Plaintiffs I.S. (11), T.S. (8), L.S. (8), and N.S (1).

308.   The Scullark family lived at 8341 Hatler Lane, a townhouse in the Mews Forest neighborhood on Fort Meade managed by Corvias, from September 2017 until July 2019. This was the townhouse to which the Scullark family was assigned by the Fort Meade housing office.

309.   The Scullarks discovered the presence of toxic mold in their home on or around March 19, 2019. The Scullarks found mold under the carpet in their living room, by their back door, and throughout their HVAC system.

310.   On March 19, Corvias deployed maintenance teams to perform cursory inspections of each home on base. Chauntay was present when the Corvias team performed their initial inspection of her unit. Chauntay noticed visible water lines on the living room carpet and asked the Corvias inspectors to lift the carpet to look for mold. The Corvias team informed Chauntay that they were "not allowed" to do that. So Chauntay lifted the carpet herself to find the floor underneath covered in mold:



311.   In addition to the floor, Chauntay also discovered mold in her garage, her HVAC closet, and her HVAC vents:





312.    The Corvias personnel present told Chauntay that the mold was not bad and that what Chauntay saw was just "a little mildew."

313.    Chauntay insisted that Corvias look into the matter further. When a member of the Corvias mold remediation team came to the Scullark's house, the inspector agreed that the Scullarks' home needed remediation.

314.    At first, Corvias tried to tell the Scullark family that they could live in the home while the mold remediation was performed. The Scullarks were not willing to risk the health and safety of their children, so they insisted on staying in a hotel.

315.    Chauntay drove to her house from the hotel each day to check on the progress of the remediation. For the first two weeks, there was none.

316.    When remediation did finally begin, the work lasted for approximately two weeks. At that time, Corvias told the Scullarks that remediation was complete and the family could move back into their home. However, Chauntay wisely went to inspect the house for herself before moving her family out of the hotel. When she

arrived, Chauntay immediately saw that Corvias had not properly remediated the mold in her house. The HVAC ducts had not been cleaned, the floor had not been replaced, and the carpet had not been replaced. Mold was still visible throughout the house.

317.    Chauntay told Corvias that further remediation was needed and that her family would not move back into the house until the work was done properly. Corvias reluctantly agreed to conduct further remediation. While Corvias continued to remediate the home, the Scullarks spent another two weeks in their tiny hotel room, waiting for Corvias to make good on its commitments.

318.    The Scullarks returned to the Fort Meade house for a few months before being reassigned to Yorktown, Virginia.

319.    While living in their rental home at Fort Meade, I.S., L.S., and N.S. all suffered from persistent illnesses.

320.    I.S. had regular respiratory illnesses and seemed to be constantly sick. I.S. had to make many trips to his pediatrician to treat these illnesses.

321.    L.S. experienced regular outbreaks of hives and rashes.

322.    N.S., who was born while the Scullarks lived on Fort Meade, was a full-term but underweight baby. N.S. gained very little weight until she was about six-months old. She also had delayed developmental milestones: she did not crawl until she was one year old and did not walk until she was around sixteen months old.

323.    Since moving out of the Fort Meade house, I.S., L.S., and N.S. have all experienced a significant improvement in health and are no longer regularly sick.

324.   In addition to the physical impacts the Scullarks suffered, the Scullark family spent a significant amount of their own money in dealing with their mold infested home.

325.   Chauntay is self-employed and earns her living by making hairpieces and wigs, particularly to support women suffering hair loss from chemotherapy and other cancer-related treatments. After the discovery of the mold in the Scullarks' home, Chauntay suffered substantial financial losses. Since her clients are acutely vulnerable and sensitive to disease and infection, she was forced to throw away all her raw materials for the wigs due to mold exposure. In addition, she lost a significant amount of revenue due to delays during the mold remediation process.

326.   Adding insult to injury, when the Scullarks relocated to Yorktown, Defendants sent them a bill for thousands of dollars of "rent" related to the time during which the Scullarks had to live in a hotel while Corvias was trying to fix their mold-infested house. This "bill" almost prevented the Scullarks from closing on a home in the Yorktown area.

327.   Defendants have caused the Scullarks considerable emotional distress.

**J.   The Ziemanns**

328.   Plaintiff Andrew Ziemann is a Sergeant in the United States Army. Sergeant Ziemann deployed to Afghanistan three times in support of Operation Enduring Freedom and Operation Freedom Sentinel and once to Iraq under Iraqi Surge and Iraqi Sovereignty. In his twelve years of Army service he has earned has earned multiple commendation and achievement medals.  His current assignment is as a signal support systems specialist with U.S. Army Cyber Command.

—68—

329.    Sergeant Ziemann is married to Plaintiff Kelly Ziemann. The Ziemanns have three daughters, Plaintiffs M.S. (11), A.Z. (8), and S.Z. (5).

330.    The Ziemanns moved into 4937 Hayden Drive on Fort Meade, a property managed by Corvias, on October 31, 2015.

331.    The Ziemanns' issues with the house began soon after they moved into the Fort Meade house. When the Ziemanns attempted to run a bath upstairs, water overflowed onto the bathroom floor and cascaded through the kitchen ceiling due to a disconnected drain pipe in the bathtub. Although the Ziemanns reported this incident right away, Corvias took a week to fix the pipe and to remove the waterlogged section out of the kitchen ceiling, and then another week to patch the gaping hole.

332.    Unfortunately, extended delays and shoddy repairs became the norm when interacting with Corvias to request maintenance, even urgent requests. The Ziemanns submitted over one hundred work order requests to repair pervasive deficiencies in the home, including: broken toilets; a leaking water tank; a leaking refrigerator; leaking faucets; broken outlets; crumbled drywall; loose fixtures; insecure doors; a dysfunctional stove and oven; loose carpets; and multiple electrical failures.

333.    One example of Corvias' shoddy repairs is the house's laundry dryer. Roughly a year after moving in, the Ziemanns noticed that their dryer was not effectively drying clothes. When Corvias maintenance investigated the problem, they discovered that the dryer pipe was not properly sealed and was venting air and lint from the dryer throughout the walls of the home. Notwithstanding that its own "mold

addendum" identifies leaks from dryer discharge vents as a significant cause of mold growth, rather than fix the underlying issue, Corvias personnel would come by the house every six months to connect a leaf blower to the dryer vent to attempt to clear the debris that had collected.

334.   Corvias also failed to respond to the Ziemanns' requests in a timely manner. For certain maintenance requests, Corvias would often take up to two weeks to respond, and would rarely provide adequate notice. Even for the roughly one-third of work order requests that were elevated to emergency status because they impacted the habitability of the home—e.g., lost heat and power outages—Corvias remained slow to respond.

335.   For example, the Ziemanns' HVAC unit broke every winter from 2015 to 2019. During the time it would take for the unit to be repaired, the family had to live without heat. In the winter of 2018, an electrical surge led to the loss of power to four homes in the neighborhood, including the Ziemanns' home. Corvias spent two days pointing fingers at Baltimore Gas and Electric before offering to move some, but not all, families into temporary housing. Claiming there were no units available, Corvias literally left the Ziemanns out in the cold without providing them temporary housing or vouchers to cover housing expenses. Fending for themselves, the Ziemanns were forced to rely on the generosity of friends who took them into their home for the two weeks it took Corvias to restore power to their home.

336.   On February 27, 2019, following the announcement of the U.S. Army's plan to test all homes on Fort Meade for toxins, Philip Connolly, Head of Safety for

Corvias, conducted the first air quality test of the Ziemanns' home. This test found significantly elevated levels of mold in the air vents, living room, master bathroom, and kitchen. Corvias representatives stated that the HVAC closet and attic were normal.

337.    Corvias moved the Ziemanns into a hotel for a week while Corvias purported to remediate the home. Corvias claimed to have cleaned and disinfected the air ducts as well as the filters in the HVAC unit, although the Ziemanns did not feel a noticeable improvement in the air quality of the home. Further, the remediation team acted without care, damaging the kitchen countertops and cabinets as well as the Ziemanns' personal furniture and failing to cover their couches and chairs before commencing work. The Ziemanns returned to a home with paint and dust particles deposited all over their furniture.

338.    On March 11, 2019, Connolly conducted another air quality test to check the effectiveness of the remediation. In addition, TRC tested the air quality of the home on March 15, 2019. When Kelly followed up with Corvias for the results of these tests, she was told that TRC had lost the samples, so no report was provided.

339.    Frustrated, Kelly requested a meeting with garrison leadership and Sergeant Ziemann's chain of command. At this meeting, TRC, relying on the March 11 samples taken by Corvias *after* it had supposedly completed remediation efforts recommended further remediation to address the elevated levels of mold throughout the home and HVAC supply closet.

340.   On April 5, 2019, a second Corvias team came to address the mold found in the kitchen, bathroom, and HVAC closet. Mold was already regrowing in the kitchen despite it having been "remediated" a month earlier. This team also found mold in the attic, contrary to the statements made by Corvias' representative during the first inspection.

341.   Following this second remediation effort, TRC conducted an air test on June 6, 2019, and noted that the kitchen plumbing was still leaking. At a meeting with residents on August 21, 2019, when Kelly followed-up with a Corvias representative to inquire about the remediation recommendations, that representative confronted and reprimanded her, asserting that Kelly was incorrectly interpreting the air quality test and that no additional work was required.

342.   In addition to the loss of enjoyment of their home, the Ziemanns' health has suffered because of the persistent mold exposure.

343.   Kelly's asthma had been under control before moving to Fort Meade. However, after moving into the home, Kelly began experiencing nearly-continuous flu-like symptoms. Kelly developed bronchitis and repeatedly visited the clinic to receive in-office nebulizer treatments. After falling ill with pneumonia, the clinic finally prescribed a nebulizer for Kelly to use at home.

344.   Similarly, the youngest Ziemann child—S.Z.—has also experienced severe respiratory problems since moving to the Fort Meade house.

345.   S.Z. also experienced frequent respiratory issues after moving into the house. As these worsened, S.Z. was given a special pediatric mask to connect to Kelly's

nebulizer, so that S.Z. could receive similar treatments at home every four to six hours, as needed. Unfortunately, this was not enough, and S.Z.'s condition deteriorated so markedly that she was taken to urgent care where she was diagnosed with pneumonia and given her own nebulizer.

346.    Since then, S.Z. has continued to suffer regular bouts of bronchitis and pneumonia. In addition, on multiple occasions, S.Z. suffered from croup, an infection in the upper airway that causes a painful, barking cough. The Ziemanns found that the only way to alleviate S.Z.'s symptoms was to take her outside in the cold air with her nebulizer, which the Ziemanns did for nearly two weeks.

347.    S.Z. was ultimately prescribed Flovent—a corticosteroid—for daily use. S.Z. has been taking Flovent consistently since. In addition, S.Z. had to be referred to a specialist to properly diagnose and treat her condition.

348.    The Ziemanns' experience with Defendants' housing caused them significant emotional harm, which continues to this day.

\*\*\*     \*\*\*     \*\*\*

349.    The Addis, Bowers, Buitragos, Chubbs, Gerbers, Gillilands, Nunezes, Pascals, and Scullarks, and Ziemanns did not receive the "gold standard" of treatment from Defendants.

350.    Defendants did not put Plaintiffs first.

351.    Defendants did not "do better" with respect to the issues Plaintiffs experienced in their homes.

352.    Defendants' actions and inactions toward Plaintiffs demonstrated neither commitment to, nor care about, their wellbeing.

353.    None of what these families experienced should have or would have happened if Defendants honored their commitments, both contractual and under common law and statute, to provide safe and inhabitable housing on Fort Meade.

354.    Although Defendants did not provide appropriate housing to any of the Plaintiffs, Defendants happily collected Plaintiffs' BAH for the entirety, or virtual entirety of the time that they were living on Fort Meade.

355.    No family should have to pay for its own mold test to see whether the housing provided by Defendants is safe and habitable.

356.    While Defendants paid lip service to retaining "independent" companies to test for mold, on information and belief Defendants placed limitations on where those companies could test and on what kinds of tests they could run, sought to achieve false results by running industrial-strength air scrubbers in houses before the test, and failed to follow up on the recommendations that the tests revealed. In addition, Defendants pronounced houses mold-free that were found to still contain significant amounts of mold by independent testers.

357.    On information and belief, Defendants still have not fully remediated the mold at any of the residences described above. But Defendants have leased each residence to at least one more military family.

358.    This must be corrected. And it must not be allowed to continue.

# CLASS ALLEGATIONS

359. Plaintiffs repeat and allege all of the foregoing allegations.

360. Plaintiffs seek certification of a class under Federal Rule of Civil Procedure 23(b)(2) for the Counts identified below on behalf of a class consisting of all servicemembers and their families who live in housing on Fort Meade managed by Defendants from the present through the date of final judgment in this action.

361. **Ascertainability.** The proposed Class is readily ascertainable because they are defined using objective criteria so as to allow class members to determine if they are part of the Class. Further, the Class can be readily identified through records maintained by Defendants.

362. **Numerosity.** This class is numerous: There are over 800 houses on Fort Meade. Joinder of all members of the class would be impracticable.

363. **Commonality.** Common questions of fact and law exist for each cause of action identified below and predominate over questions affecting only individual Class Members, including the following:

a. Whether Defendants have breached a duty owed to servicemembers residing in housing on Fort Meade to provide safe, habitable housing free from mold contamination;

b. Whether Defendants are obligated to repair and remediate houses that have mold contamination; and

c. Whether Defendants have a pattern or practice of failing to remediate mold issues in housing at Fort Meade.

364. **Typicality.** Plaintiffs' claims are typical of the claims of the class. Among other things, Plaintiffs and members of the Class sustained (or would sustain in the absence of relief) similar injuries as a result of Defendants' wrongful conduct.

365. **Adequacy.** Plaintiffs are adequate representatives of the class. Plaintiffs are qualified to assume the role of class representatives. Plaintiffs are not aware of any conflicts of interest between themselves and the other members of the class.

366. **Final Declaratory or Injunctive Relief.** Plaintiffs satisfy the requirements for maintaining a class under Rule 23(b)(2). As described herein, Defendants have acted or refused to act on grounds that apply generally to the class in failing to meet their obligations to provide safe, habitable housing free from contamination by toxic mold.

## CAUSES OF ACTION

### COUNT I – Negligence
**(by all Plaintiffs against Defendants, and by the Class against Defendants)**

367. Plaintiffs incorporate herein by reference all previous and subsequent allegations.

368. Defendants, as landlords specializing in the business of privatized military housing, owe and owed Plaintiffs and other members of the Class a duty to provide them with habitable living conditions in the houses leased to them, and to properly maintain and repair the houses to a standard fit for human habitation.

369. Defendants also have and had a statutory duty to repair or eliminate serious conditions and defects of residential dwelling units. Serious conditions and

defects include any such condition that constitutes "a serious and substantial threat to the life, health, or safety of occupants." MD Code, Real Property § 8-211(e).

370.   Defendants' conduct is and has been below the applicable standard of care.

371.   Defendants' have breached their duty by failing to properly evaluate housing conditions to ensure leased properties were fit for human habitation, failing to properly repair and remedy those conditions affecting the health and safety of the residents even after being informed of and observing first-hand the degraded and unsafe conditions of the homes under their care, failing to send qualified repair persons to perform the necessary repairs and remediation, and falsely stating that repairs had been completed when the problems persisted.

372.   Defendants have been negligent in operating and maintaining the homes in which Plaintiffs and other members of the Class have lived on Fort Meade.

373.   Defendants' conduct in ignoring the mold problems, downplaying the severity of the mold problems, and in failing to fix the mold problems while representing that the problems had been fixed constitutes negligence.

374.   As a proximate cause of Defendants' conduct, Plaintiffs have been injured and have suffered damages.

375.   As a proximate cause of Defendants' conduct, Plaintiffs have experienced emotional distress.

376.   Members of the Class are threatened with additional severe injuries in the future for which there is no adequate remedy at law.

## COUNT II –Gross Negligence
### (by all Plaintiffs against Defendants)

377.   Plaintiffs incorporate herein by reference all previous and subsequent allegations.

378.   Defendants, as landlords specializing in the business of privatized military housing, owe and owed Plaintiffs a duty to provide them with habitable living conditions in the houses leased to them, and to properly maintain and repair the houses to a standard fit for human habitation.

379.   Defendants also have and had a statutory duty to repair or eliminate serious conditions and defects of residential dwelling units. Serious conditions and defects include any such condition that constitutes "a serious and substantial threat to the life, health, or safety of occupants." MD Code, Real Property § 8-211(e).

380.   Defendants' conduct is and has been grossly below the applicable standard of care.

381.   Defendants' have breached their duty by failing to properly evaluate housing conditions to ensure leased properties were fit for human habitation, failing to properly repair and remedy those conditions affecting the health and safety of the residents even after being informed of and observing first-hand the degraded and unsafe conditions of the homes under their care, failing to send qualified repair persons to perform the necessary repairs and remediation, and falsely stating that repairs had been completed when the problems persisted.

382.   Defendants have been grossly negligent in operating and maintaining the homes in which Plaintiffs have lived on Fort Meade.

383.   Defendants' conduct in ignoring the mold problems, downplaying the severity of the mold problems, and in failing to fix the mold problems while representing that the problems had been fixed constitutes gross negligence.

384.   By systematically concealing rampant issues of mold across Fort Meade, downplaying the adverse health effects of exposure to mold, and misrepresenting to Plaintiffs that mold issues had been remediated when they were not, Defendants have acted recklessly.

385.   As a proximate cause of Defendants' conduct, Plaintiffs have been injured and have suffered damages.

386.   As a proximate cause of Defendants' conduct, Plaintiffs have experienced emotional distress.

## COUNT III – Negligent Breach of Warranty to Repair
### (by all Plaintiffs against Defendants, and by the Class against Defendants)

387.   Plaintiffs incorporate herein by reference all previous and subsequent allegations.

388.   Defendants expressly agreed to repair Plaintiffs' and other members of the Class's housing to remediate the mold contamination.

389.   Plaintiffs' injuries and those of other members of the Class could not have been easily avoided by them.

390.   Defendants' actions (and inactions) with respect to the mold contamination described above have been negligent.

391.   Defendants negligently or intentionally failed to repair dangerous conditions that they knew existed in the homes.

392.    Plaintiffs notified Defendants (often repeatedly) of the above defects and dangerous conditions.

393.    Defendants made promises to eliminate these conditions, but negligently, if not intentionally, failed to do so.

394.    This failure subjected Plaintiffs to prolonged exposure to unsafe levels of toxic mold. This exposure has posed a dangerous and unreasonable risk to Plaintiffs' lives, health and safety and poses a dangerous and unreasonable risk to the lives, health and safety of other members of the Class.

395.    Plaintiffs have been injured and have suffered damages as a result.

396.     Members of the Class are threatened with additional severe injuries in the future for which there is no adequate remedy at law.

## COUNT IV – Breach of Contract
### (by all Plaintiffs against Defendants, and by the Class against Defendants)

397.    Plaintiffs incorporate herein by reference all previous and subsequent allegations.

398.    Defendants owed a contractual obligation to Plaintiffs and other members of the Class to provide inhabitable housing and to remedy water leaks, mold, and other issues.

399.    Defendants' contractual obligations arise by virtue of the ROAs with Plaintiffs and other members of the Class and because Plaintiffs and other members of the Class are intended third-party beneficiaries of the Ground Lease and property management agreements described above.

400.   Defendants have breached their obligations to Plaintiffs and other members of the Class.

401.   Plaintiffs have suffered damages as a result.

402.   Members of the Class are threatened with additional severe injuries in the future for which there is no adequate remedy at law.

## COUNT V – Tort Arising out of Breach of Contract
## (by all Plaintiffs against Defendants, and by the Class against Defendants)

403.   Plaintiffs incorporate herein by reference all previous and subsequent allegations.

404.   Plaintiffs and other members of the Class have and had a contractual relationship with Defendants by virtue of their residential lease agreements and because Plaintiffs and other members of the Class are intended third-party beneficiaries of the Ground Lease and property management agreements described above.

405.   Defendants' actions and inactions regarding the failure to maintain the properties and the failure to remediate the mold issues are and were tortious.

406.   There is a direct nexus between Defendants' tortious conduct and the breach of Defendants' obligations under the residential lease agreements such that the two are intertwined and cannot be viewed in isolation from one another.

407.   Plaintiffs have been injured and have suffered damages as a result.

408.   Members of the Class are threatened with additional severe injuries in the future for which there is no adequate remedy at law.

Case 1:19-cv-03253-ELH   Document 1   Filed 11/12/19   Page 82 of 92


## COUNT VI – Constructive Eviction
### (by all Plaintiffs against Defendants)

409.   Plaintiffs incorporate herein by reference all previous and subsequent allegations.

410.   Defendants' failures to identify, respond to, or repair/remediate the mold and other issues described above resulted in serious or substantial interference with Plaintiffs' enjoyment of their property.

411.   Defendants intentionally failed to repair dangerous conditions that they knew existed on Fort Meade and of which Defendants had a duty to repair pursuant to the Ground Lease and other agreements described above.

412.   Defendants' failures permanently deprived Plaintiffs of their beneficial use and enjoyment of the properties described above.

413.   Defendants' failures subjected Plaintiffs to prolonged exposure to unsafe levels of toxic mold and an unreasonable risk to Plaintiffs' personal health in both the near and future terms

414.   Plaintiffs repeatedly notified Defendants of the above defects and dangerous conditions present in the Subject Properties. Defendants made promises to eliminate these conditions, but failed to do so.

415.   Defendants' failure to repair or eliminate these dangerous conditions required Plaintiffs to vacate the properties. Plaintiffs would not have vacated the properties but for Defendants' serious and substantial failures to maintain the properties in safe, inhabitable condition.

416.   Defendants' conduct has caused Plaintiffs to suffer damages.

**COUNT VII – Violation of § 3951(a) of the Servicemembers Civil Relief Act
(by all Plaintiffs against Defendants and by the Class against Defendants)**

417.   Plaintiffs incorporate herein by reference all previous and subsequent allegations.

418.   A primary purpose of the Servicemembers Civil Relief Act ("SCRA") is "to provide for, strengthen, and expedite the national defense through protection extended by this chapter to servicemembers of the United States to enable such persons to devote their entire energy to the defense needs of the Nation." 50 U.S.C. § 3902(1).

419.   To that end, Section 301 of the SCRA (50 U.S.C. § 3951) prohibits a landlord from evicting an active duty servicemember or their dependents from a residence.

420.   Defendants intentionally failed to repair or eliminate the dangerous conditions in the properties described above.

421.   As a direct result, Plaintiffs and other members of the Class have vacated the properties.

422.   Defendants' actions and inactions constitute constructive eviction by the Defendants, in violation of 50 U.S.C. § 3951(a).

423.   Plaintiffs sustained damages as a result.

424.   Plaintiffs and the Class are entitled to their reasonable costs and attorney's fees.

425.   Members of the Class are threatened with additional severe injuries in the future for which there is no adequate remedy at law.

## COUNT VIII – Violation of Maryland Code, Real Property § 8-211
### (by the Class against Defendants)

426.    Plaintiffs incorporate herein by reference all previous and subsequent allegations.

427.    In the Ground Lease, Property Management Agreement, and ROA, Defendants agreed to abide by Maryland law.

428.    Under Maryland law, Defendants have a duty to the Class as landlord and property manager to provide safe and habitable housing for its residential tenants.

429.    Maryland Code, Real Property § 8-211 imposes upon landlords a duty to repair or eliminate serious conditions and defects of residential dwelling units. Serious conditions and defects include any such condition that constitutes "a serious and substantial threat to the life, health, or safety of occupants." § 8-211(e).

430.    Defendants intentionally failed to repair dangerous conditions that they knew existed on the properties and that Defendants had a duty to repair.

431.    Defendants' failures subject or threaten to subject members of the Class to prolonged exposure to unsafe levels of toxic mold. This exposure posed a dangerous and unreasonable risk to the Class members' lives, health, and safety.

432.    Defendants are aware of the problems with mold on Fort Meade and have committed to fix it, but Defendants have not fixed it.

433.    Defendants have therefore breached their duty to eliminate or repair serious conditions and defects pursuant to Maryland Code, Real Property § 8-211.

434.    Members of the Class are threatened with additional severe injuries in the future for which there is no adequate remedy at law. The Class is entitled to an injunction requiring Defendants to repair the properties, and to have the Class Members' "rent" (BAH) placed in escrow for return.

**COUNT IX – Breach of the Implied Covenant of Quiet Enjoyment (Maryland Code, Real Property § 2-115)**
**(by all Plaintiffs against Defendants and by the Class against Defendants)**

435.    Plaintiffs incorporate herein by reference all previous and subsequent allegations.

436.    In the Ground Lease, Property Management Agreement, and ROA, Defendants agreed to abide by Maryland law.

437.    Maryland Code, Real Property § 2-115 provides that "in a lease, unless the lease provides otherwise, there is an implied covenant by the lessor that the lessee shall quietly enjoy the land."

438.    Defendants' failure to provide Plaintiffs and other members of the Class with housing that did not subject them to exposure to toxic mold went to the essence of what Defendants were supposed to provide—safe and habitable housing.

439.    Defendants intentionally failed to repair dangerous conditions that they knew existed and that Defendants had a duty to repair.

440.    Defendants' actions and inactions breached the covenant of quiet enjoyment.

441.    Plaintiffs have suffered damages as a result.

442.    Members of the Class are threatened with additional severe injuries in the future for which there is no adequate remedy at law.

## COUNT X – Unjust Enrichment
## (by all Plaintiffs against Defendants and by the Class against Defendants)

443. Plaintiffs incorporate herein by reference all previous and subsequent allegations.

444. Plaintiffs and other members of the Class have conferred a benefit on Defendants by assigning their full BAH to Defendants.

445. Defendants acknowledged this benefit by collecting the BAH.

446. The housing conditions to which Plaintiffs and other members of the Class have been subjected makes it inequitable for Defendants to have retained the BAH.

447. Defendants' actions and inactions demonstrate fraud and bad faith and a breach of their contractual, statutory, and common-law obligations to Plaintiffs and other members of the Class.

448. Plaintiffs should be reimbursed their BAH.

449. Members of the Class are threatened with additional severe injuries in the future for which there is no adequate remedy at law. To protect the Class against future unjust enrichment, the Court should enter an injunction prohibiting Defendants from directly receiving any Class member's BAH for any house that has not been affirmatively certified as habitable by an independent, qualified home inspection service.

## COUNT XI – Unfair or Deceptive Trade Practice,
## (Maryland Consumer Protection Act, § 13-301)
## (by all Plaintiffs against Defendants and by the Class against Defendants)

450.   Plaintiffs incorporate herein by reference all previous and subsequent allegations.

451.   Plaintiffs and other members of the Class are consumers of Defendants' services.

452.   Defendants' statements about their commitment to providing the "gold standard" for housing and service, about their commitment to quality property management, about their commitment to fixing promptly issues that are reported to them, and about having fixed or remediated problems that were not fixed or remediated were (and are) false and misleading.

453.   Plaintiffs and other members of the Class have been misled by Defendants' statements.

454.   Defendants failed to disclose material facts regarding the condition and habitability of the homes, thus deceiving Plaintiffs and other members of the Class and constituting an unfair or deceptive trade practice.

455.   Plaintiffs are entitled to compensatory damages pursuant to MD Code, Real Property § 13-408.

456.    Members of the Class are threatened with additional severe injuries in the future for which there is no adequate remedy at law.

457.   Plaintiffs and the Class are entitled to their costs and attorney's fees.

## COUNT XII - Negligent Misrepresentation
### (by all Plaintiffs against Defendants and by the Class against Defendants)

458.   Plaintiffs incorporate herein by reference all previous and subsequent allegations.

459.   Defendants, as landlords specializing in the business of privatized military housing, owed Plaintiffs and other members of the Class a duty to provide them with habitable living conditions in the houses leased to them, and to properly maintain and repair the houses to a standard fit for human habitation.

460.   Defendants, with specialized knowledge regarding the business of tenancies on military installations and the properties leased to the Plaintiffs and other members of the Class, and a pecuniary interest in leasing houses to military families, falsely represented to Plaintiffs and other members of the Class that their houses were safe and fit for human habitation and were and would continue to be properly maintained.

461.   Defendants utterly failed to exercise reasonable diligence in ascertaining whether the houses were habitable or that Defendants' procedures were sufficient to ensure the houses would remain habitable. Defendants knew or should have known that Plaintiffs and other members of the Class—who were often not given a choice concerning the properties or an opportunity to inspect the houses leased to them prior to signing the lease—would and did justifiably rely on the Defendants' misrepresentations.

462.   As a proximate cause of Defendants' conduct, Plaintiffs have been injured and suffered damages.

463.    Members of the Class are threatened with additional severe injuries in the future for which there is no adequate remedy at law.

## COUNT XIII – Fraud
### (by all Plaintiffs against Defendants)

464.    Plaintiffs incorporate herein by reference all previous and subsequent allegations.

465.    Defendants made false statements and material omissions about the condition of the housing on Fort Meade, as described above.

466.    Defendants maintained a practice of moving Plaintiffs into homes which Defendants knew were infested with toxic mold.

467.    Defendants also made false statements about the status and success of their repair and remediation work, as described above. For example, Defendants assured the Bowers family that mold remediation had been fully completed on their townhome. The Bowers family relied on this assertion and moved back into the home. In fact, the mold had not been eradicated and the Bowers family continues to live in mold infested housing today.

468.    Defendants were aware that the false statements and omissions would be material to Plaintiffs because these false statements and omissions concerned the suitability of housing for basic human habitation.

469.    Defendants also knew these statements were false at the time Defendants made them. Defendants had actual knowledge of the ongoing mold infestation in the housing on Fort Meade due to the repeated reports made by Plaintiffs of mold

in the homes. Notwithstanding such reports, Defendants continued to move new families into the affected homes. Defendants also continued to represent to Plaintiffs that mold remediation would be complete and thorough and that once remediation was completed, a home would be, at the very least, free of mold and suitable for human habitation.

470.    Plaintiffs reasonably relied on Defendants' statements.

471.    But for Defendants' false statements and omissions, Plaintiffs would not have agreed to move in or remain in their respective homes.

472.    Plaintiffs have been injured and have suffered damages as a result.

## COUNT XIV - Civil Conspiracy
### (by all Plaintiffs against Defendants and by the Class against Defendants)

473.    Plaintiffs incorporate herein by reference all previous and subsequent allegations.

474.    At all times described herein, Defendants acted by agreement and understanding to maintain rental homes on Fort Meade in substandard condition, in violation of state law, federal law, and in breach of contract with both the United States Military and with Plaintiffs and other members of the Class.

475.    Each Defendant performed overt acts in furtherance of this objective, as set forth above.

476.    These acts have injured Plaintiffs and caused them damages, as described above and as alleged in Counts I–VIII and X–XIII herein.

477.    Members of the Class are threatened with additional severe injuries in the future for which there is no adequate remedy at law.

# PRAYER FOR RELIEF

Yesterday was Veterans Day. What Plaintiffs and the other members of the class have experienced cannot be allowed to continue over another Veterans Day.

WHEREFORE, all Plaintiffs respectfully request that this Court set this matter for expedited proceedings and upon completion of the proceedings enter an order and judgement providing the following relief:

1.    Damages, in an amount to be proven at trial;

2.    Certifying the Rule 23(b)(2) class described above, appointing Plaintiffs' counsel as class counsel, and entering an injunction on behalf of the Class:

    a.    requiring Defendants to retain an independent, accredited third-party inspection service to test each property on Fort Meade for mold contamination and to certify the property as habitable;

    b.    requiring Defendants to fully and wholly remediate any property with mold contamination (to be established by an independent, accredited third-party inspection service);

    c.    prohibiting Defendants from leasing any property on Fort Meade that has not been certified as safe from mold contamination;

    d.    appointing a Special Master to oversee the inspection and remediation process and to receive regular reports from the third-party testing service and Defendants as to the status of inspections and repairs; and

    e.    enjoining Defendants from collecting any servicemembers' BAH pending completion of (a)–(b) above.

3.    Prejudgment and postjudgment interest;

4.    Plaintiffs' costs and attorney's fees; and

5.    Such other and further relief as this Court deems just or proper to cure the violations specified in this Complaint, or that justice may require.

## JURY DEMAND

Plaintiffs demand a trial by jury on all counts so triable.

Respectfully submitted,

|                                      | /s/Kevin B. Collins                        |
|--------------------------------------|--------------------------------------------|
| Sonya D. Winner**                    | Kevin B. Collins (D. Md. No. 13131)        |
| COVINGTON & BURLING LLP              | Benjamin C. Block (D. Md. No. 15811)       |
| Salesforce Tower                     | Paul J. Wilson*                            |
| 415 Mission Street                   | Samantha L. Clark**                        |
| Suite 5400                           | Paige M. Jennings**                        |
| San Francisco, CA 94105-2533         | Jonathan Y. Mincer**                       |
| (415) 591-6000                       | Lala R. Qadir*                             |
| (415) 591-6291 (fax)                 | Bradley J. Altvater**                      |
| swinner@cov.com                      | Joseph B. Caplan**                         |
|                                      | COVINGTON & BURLING LLP                    |
|                                      | One CityCenter                             |
|                                      | 850 Tenth Street, NW                       |
|                                      | Washington, DC 20001-4956                  |
|                                      | (202) 662-6000                             |
|                                      | (202) 662-6291 (fax)                       |
|                                      | kcollins@cov.com                           |
|                                      | bblock@cov.com                             |
|                                      | pwilson@cov.com                            |
|                                      | sclark@cov.com                             |
|                                      | pjennings@cov.com                          |
|                                      | jmincer@cov.com                            |
|                                      | lqadir@cov.com                             |
|                                      | baltvater@cov.com                          |
|                                      | bcaplan@cov.com                            |

*Counsel for Plaintiffs*

* admission application forthcoming
** *pro hac* application forthcoming

November 12, 2019