IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOSEPH ADDI, *et al.*,
    *Plaintiffs*,

v.

CORVIAS MANAGEMENT-ARMY,
LLC, *et al.*,
    *Defendants*.

Civil Action No. ELH-19-3253

**MEMORANDUM OPINION**

In a First Amended Complaint (ECF 40), plaintiffs, all active-duty service members and their families who have resided or currently reside in Maryland at U.S. Army Installation Fort George G. Meade ("Fort Meade"), have filed a class action suit against defendants Corvias Management-Army, LLC ("Corvias") and Meade Communities, LLC ("Meade"). Defendants are responsible for the operation, construction, and maintenance of housing at Fort Meade (*id.* ¶ 7) and plaintiffs complain about mold and other housing conditions.[1]

Plaintiffs, 22 adults and 21 children, seek monetary damages as well as injunctive relief. ECF 40 at 102. In addition, they seek appointment of "a Special Master to oversee the inspection and remediation process . . . ." *Id.* Further, they seek to enjoin defendants from collecting any basic allowance for housing ("BAH") from the service members, pending completion of remediation. And, they seek to bar defendants from leasing any property that has not been certified as safe from mold contamination. *Id.*

The suit also seeks certification of two classes. The first, under Fed. R. Civ. P. 23(b)(2), consists of "all service members and their families who live in housing on Fort Meade managed

---

[1] Jurisdiction is predicated on 28 U.S.C. § 1331 because Fort Meade is a federal enclave. ECF 40, ¶ 8. It is also founded on diversity of citizenship, under 28 U.S.C. § 1332. *Id.* ¶ 9.

by Defendants from the present through the date of final judgment in this action (the '(b)(2) Class'). . . ." *Id.* ¶ 397. The second, under Fed. R. Civ. P. 23(b)(3), consists of "all tenants who, within the limitations period through the date of final judgment in this action, had [resident occupancy agreements] with Defendants for housing on Fort Meade and from whom the Defendants collected rent (the '(b)(3) Class')." *Id.*

The First Amended Complaint ("FAC" or "Amended Complaint") is over 100 pages in length and includes one exhibit. ECF 40-1. In the proverbial "kitchen sink" approach, the FAC lodges fifteen claims:[2] negligence (Count I); gross negligence (Count II); negligent breach of warranty to repair (Count III); breach of contract (Count IV); tort arising out of breach of contract (Count V); constructive eviction (Count VI); violation of § 3951(a) of the Servicemembers Civil Relief Act (Count VII); violation of the Maryland Code, Real Property Article ("R.P."), § 8-211 (Count VIII); breach of the implied covenant of quiet enjoyment, R.P. § 2-115 (Count IX); unjust enrichment (Count X); unfair and deceptive trade practices, under Md. Code, Commercial Law Article ("C.L.") § 13-301 (Count XI); negligent misrepresentation (Count XII); fraud (Count XIII); nuisance (Count XIV); and civil conspiracy (Count XV). ECF 40, ¶¶ 406-527. Counts I, III, V, VII, IX, XII, XIV, and XV are brought by the named plaintiffs and the (b)(2) Class plaintiffs. Counts II, VI, and VIII are brought by the named plaintiffs. Counts IV, X, and XI are brought by the named plaintiffs and all Class plaintiffs. And, Count VIII is brought by the (b)(2) Class plaintiffs.

---

[2] The Amended Complaint is a quintessential example of shotgun pleading. Indeed, it seems as if counsel rifled through a hornbook and selected every conceivable claim. Such pleadings impose undue burdens on litigants and the judiciary. *See, e.g.*, *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 979-80 & n.54 (11th Cir. 2008) (cataloging the negative consequences of shotgun pleading), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

Defendants have moved to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  ECF 43.  The motion is supported by a memorandum of law.  ECF 43-1 (collectively, the "Motion").  It is also supported by three exhibits.  ECF 43-2 to ECF 43-4.  Plaintiffs oppose the Motion.  ECF 44 (the "Opposition").  Defendants have replied.  ECF 45 (the "Reply").

The parties do not agree on much.  But, they agree that Maryland law generally governs the claims in the FAC.  *See* 28 U.S.C. § 5001(b)( ("In a civil action bought to recover on account of an injury sustained in a place [subject to the exclusive jurisdiction of the United States within a State], the rights of the parties shall be governed by the law of the State in which the place is located.").  *See also* ECF 43-1 at 8; 21, 23, 26; ECF 43-2, ¶ 6(a); ECF 43-3, ¶¶ 11, 21, 33(a); ECF 43-4, ¶ 14; ECF 44 at 9 n.1.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I.  Factual Background[3]

### A.  Meade and Corvias

In 1996, Congress passed the National Defense Authorization Act, which authorized the development of the military Housing Privatization Initiative ("MHPI").  ECF 40, ¶ 11.  The goal was to improve housing for military families by "outsourcing construction and maintenance of military housing to private contractors."  *Id.*  Developers receive federal loans as well as guaranteed rental income through payment of the service member's basic allowance for housing ("BAH").  *Id.* ¶ 12.  Fort Meade, "home to a major Army installation, the National Security Agency, and multiple other commands," participates in the MHPI.  *Id.* ¶ 13.

---

[3] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit.  *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

On April 20, 2002, the Secretary of the Army "signed a 50-year ground lease for land only with Defendant [Meade] to operate the military base housing 'in good order and in a clean, safe condition' at its expense." ECF 40, ¶ 14.  John Picerne is the president and CEO of Meade. *Id.* ¶ 15.

A few weeks later, on May 1, 2002, Meade "signed a property management agreement with Picerne Management/FM, LLC ('Picerne Management') to manage the housing on Fort Meade." *Id.* ¶ 20.  Picerne was the president and Chief Executive Officer ("CEO") of Picerne Management.  *Id.* ¶ 24.  Plaintiffs allege that in 2013 Picerne Management "merged into" Corvias.  *Id.* ¶ 22.  And, Picerne is Corvias's president and/or CEO.  *Id.* ¶ 23.  According to plaintiffs, "the contract between [Meade] and Picerne Management (now Corvias) for property management was signed by Picerne on behalf of both entities."  *Id.* ¶ 24.  Plaintiffs assert that defendants "use 'Corvias' as the outward-facing, brand name for their property management services." *Id.* ¶ 29.

Plaintiffs allege that defendants "operate all on-base housing at Fort Meade."  *Id.* ¶ 31. They add that defendants' housing is the only on-base housing option for service members and their families.  *Id.* ¶ 37.  Plaintiffs assert that, in "undertaking to take over operations and management of housing on Fort Meade from the Army," defendants "stated that their purpose was to 'guide Fort Meade families . . . from today's stoic acceptance of obsolescent housing and catch-as-catch-can maintenance to a nirvana of planned Neighborhoods and no-hassle living.'" *Id.* ¶ 28.

Defendants have attached to the Motion a copy of the Ground Lease. ECF 43-2 (the "Ground Lease").[4] It establishes a 50-year lease of the land and "reflects the concurrent conveyance of the then-existing housing improvements on Ft. Meade from the United States to Meade." ECF 43-1 at 4. Further, it states that Meade "shall at all times during the term of this Ground Lease faithfully observe and comply with, at its sole cost and expense, the provisions of all applicable Federal, State, and local laws, rules, regulations, orders, ordinances, and other government standards and requirements." *Id.* at 8, ¶ 6(a). The Ground Lease also requires Meade to "exercise due care in the protection of all property located on the Site against fire or damage from any and all other causes." *Id.* at 14, ¶ 10(c).

In addition, the Ground Lease provides, *id.* at 9, ¶ 8:

> The Lessee [Meade] shall be permitted to assign, sublease, or otherwise transfer all or any portion of its rights and/or obligations hereunder with the prior consent of the Secretary, except that no consent shall be required for leases to persons entitled to rent dwelling units in accordance with Condition 12 hereof ("Permitted Tenants"). Any assignment or sublease granted by the Lessee shall be subject to and consistent with all of the terms and conditions of this Ground Lease and shall terminate immediately upon the expiration or any earlier termination of this Ground Lease. Under any assignment made, the assignee shall be deemed to have assumed all of the obligations of the Lessee under this Ground Lease and all other documents and agreements incorporated into this Ground Lease from and after the date of the assignment. No sublease shall relieve the Lessee of any of its obligations hereunder. . . .

Paragraph 10a of the Ground Lease states, *id.* at 13: "The Lessee shall keep the Project in good order and in a clean, safe condition by and at the expense of the Lessee and in accordance with the requirements of the Ground Lease and Exhibit E, incorporated herein by reference."

---

[4] The Ground Lease was amended on several occasions. *See*, *e.g.*, ECF 43-2 at 38-44. As discussed, *infra*, in resolving a motion to dismiss, the court may consider exhibits submitted by the defense that are integral to the suit.

And, the Ground Lease states, *id.* at 16, ¶ 12(a):

> The Project shall be operated as a first class residential rental development for Permitted Tenants.  Specifically, the Project shall be managed in accordance with the management procedures and protocols set forth in Condition 10a and in Exhibit E, and the failure of the Lessee so to manage the Project in accordance with the level of service designated therein, shall be a Default, subject to all applicable cure rights set forth therein.

Exhibit E to the Ground Lease is titled "Project Management Procedures and Protocols."

ECF 43-2 at 37.  It states, *id.*:

> Lessee will operate five neighborhoods of 500-700 homes, and, when conveyed, one smaller neighborhood of 112 historic homes.  Lessee will ensure professional management and maintenance of these neighborhoods consistent with the standards of market rate residential rental development in the Baltimore/Washington metropolitan area.  The Community Development Management Plan (CDMP) is an overall plan to guide initial development activity.  The Management and Property Operations Plan, CDMP Chapter 3, establishes additional performance standards.

> Neighborhood Management Offices will be operated by Lessee in five of the neighborhoods.  The Neighborhood Management Offices will be open and staffed for business seven days a week, for at least 56 hours per week.  The staffs of these offices will consist of persons capable of performing management and operations duties as well as maintenance functions necessary to satisfy residents' housing needs.  When the Neighborhood Management Offices are not open, Lessee will provide on-call staff, to include emergency maintenance personnel, to meet residents' immediate needs.

> Lessee will also maintain a Property Management Program Office on Fort Meade to oversee the overall maintenance and repair of housing stock, pest control, and the maintenance of the lawns and landscaping in the six neighborhoods.

> Lessee will establish a quality control program.  The quality control program will include regular inspections of vendor work projects (including an annual, scheduled inspection), resident surveys (including an annual survey), and the establishment of other mechanisms for residents to provide timely feedback regarding their housing experience.

Defendants have also submitted with their Motion a copy of the Property Management Agreement (the "PMA") between Meade and Picerne Management (now Corvias).  ECF 43-3. In paragraph 2, it sets forth "Operational Standards," as follows:

> Operational Standards. Management Agent shall operate the Project in a manner consistent with the standards of practice followed by first class professional property managers of properties of similar type and quality and in accordance with the requirements and standards set forth in the Community Development and Management Plan ('CDMP') and Exhibit E of the ground lease between Owner and the Department of the Army with respect to the land on which the Project is located. . . .

Paragraph 11 of the PMA provides, in part, *id.* at 5:

> Maintenance and Repair.  Management Agent will cause the Project to be maintained and repaired in accordance with military, federal, state and local codes, as applicable, and with the requirements of the Ground Lease. . . and in a condition at all times reasonably acceptable to Owner, including, but not limited to cleaning, painting, decorating, plumbing, electrical, HVAC, appliances, carpentry, grounds-care, and such other maintenance and repair work as may be necessary, subject to any limitations imposed by Owner in addition to those contained therein. . . .

And, the PMA requires Picerne/Corvias to "systematically and promptly receive and investigate all service requests from tenants, take such reasonable action thereon as may be justified, and . . . keep records of the same." *Id.* at 6, ¶ 11(b).

"Defendants lease properties on Fort Meade to service members via Resident Occupancy Agreements ('ROA').  The ROA is a contract between the service member and [Meade] (which owns the property), with Corvias signing the agreement as [Meade's] agent and being designated as the property manager."  ECF 40, ¶ 32.  Defendants submitted a copy of the ROA with the Motion.  ECF 43-4.

In the ROA, Meade is defined as the "Owner."  *Id.* at 2.  In paragraph 1, the ROA defines "Home" as the rental property.  *Id.*  The ROA states in paragraph 1: "The Home and all matters

relating to this Agreement will be managed by **Corvias Management-Army, LLC** (the **'Community Manager'**)." *Id.* (emphasis in ROA).   The ROA also states: "Resident has inspected the Home and is satisfied that it is in a condition that is reasonably safe and habitable for occupancy." *Id.*

In paragraph 11 of the ROA, residents are barred from making "repairs or any interior or exterior alterations of the Home without Owner's prior written consent." *Id.* at 4.  Paragraph 23 of the ROA is titled "Mold." *Id.* at 6.  It states, in part:

> **MOLD**: The Resident acknowledges that to avoid mold growth it is important to prevent excessive moisture buildup and agrees to remove visible moisture accumulation as soon as it occurs and immediately report to Owner any evidence of excess moisture or mold or mildew inside the Home. Resident acknowledges receipt of the "Mold Information and Prevention Addendum," which is fully executed and incorporated herein by reference, and agrees to comply with all of its terms. . . .

Plaintiffs included a copy of the ROA's "Mold Information and Prevention Addendum" ("Mold Addendum") as an exhibit to the suit.  ECF 40-1.  The Mold Addendum was included with plaintiffs' leases.  ECF 40, ¶ 74.  It states, in paragraph 2, ECF 40-1 at 2: "Mold is found virtually everywhere in our environment – both indoors and outdoors and in both new and old structures."  It also said, *id.*: "There is conflicting scientific evidence as to what constitutes a sufficient accumulation of mold which could lead to adverse health effects."

The Mold Addendum provides tips to residents on steps to prevent mold growth.  *Id.* at 2-3.  And, the Mold Addendum states in paragraph 3, *id.* at 2: "Promptly notify us in writing about any signs of water leaks, water infiltration or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation, as necessary."  Further, it provides: "If you fail to comply with this Addendum, you can be held responsible for property damage to the

dwelling and any health problems that may result.  We can't fix the problems in your dwelling unless we know about them." *Id.* at 3, ¶ 7.

According to plaintiffs, when a service member moves to a new facility, "there is often little time to no time to meaningfully review housing options at the new duty station before arriving on base," because "the main priority" is to begin the new assignment "as expeditiously as possible." *Id.* ¶ 38.  This is particularly true for "service members who serve as part of high operations-tempo units vital to national security or those who need to quickly integrate into pre-deployment training" or those arriving from overseas.  *Id.*  Moreover, housing is provided "based on rank. . . ." *Id.* ¶ 39.  As a result, families are "assigned" to "whatever inventory is available." *Id.*  And, for families with children, "the high cost of living in the area adjacent to Fort Meade makes finding a house of adequate size off-base unaffordable." *Id.* ¶ 40.

As noted, defendants receive the service member's basic allowance for housing as the rent payment. ECF 40, ¶¶ 12, 34.[5]  The "rent" is the full BAH, *id.* ¶ 35, which is paid via direct-deposit.  *Id.* ¶¶ 12, 35.  Thus, plaintiffs describe the BAH as a "guaranteed revenue stream" for defendants.  *Id.* ¶ 36.

Indeed, plaintiffs allege that defendants "have profited substantially" from the operation of on-base housing.  *Id.* ¶ 44.  They claim that defendants have collected "well over $500,000 in rent (that is, the service members' BAH)" from the named plaintiffs alone.  *Id.*  Yet, they contend that defendants "repeatedly failed to address the problem at all, let alone correct it properly."  *Id.*  According to plaintiffs, "the only way that Defendants would not reap

---

[5] The BAH is "an in-kind, tax-free benefit to service members in recognition of the fact that the average military assignment of three years makes purchasing a home or settling down in a community untenable."  ECF 40, ¶ 36.

tremendous profits would be if they had to expend significant funds on maintenance and repair." *Id.* ¶ 45.

Plaintiffs assert that defendants advertised "to service members and their families. . . the purported high quality of their housing and quick attention to any needed repairs[.]"  *Id.* ¶ 46. But, defendants spent "far less on maintenance and repair than what they budgeted and knew was necessary, thereby further increasing their profit margins."  *Id.*

In connection with the bid for the Ground Lease, "Corvias conducted inspections of over 300 homes on Fort Meade."  *Id.* ¶ 47.  From these inspections, assert plaintiffs, Corvias "knew" that "many of the homes on Fort Meade had not been maintained properly" and that "it would have to expend considerable resources on maintenance, and to proactively engage in preventative maintenance going forward."  *Id.*  And, "Corvias committed to ensuring that every home was properly inspected" and that "any issues would be addressed[.]"  *Id.* ¶ 48.  Nevertheless, plaintiffs claim that defendants knowingly provided "housing that was plagued with mold. . . ." *Id.* ¶ 44.

According to plaintiffs, defendants knew or should have known that "there is a pervasive problem with mold in the housing on Fort Meade."  *Id.* ¶ 57.  In the Fall of 2018, "multiple news outlets started sharing photos and stories of mold infestation and their dangerous effects on service members and their families."  *Id.* ¶ 58.  These news reports resulted in home inspections and hearings in front of the House and Senate Armed Services Committees.  *Id.* ¶ 59.

Plaintiffs acknowledge that mold is "part of the natural environment, and can be found both indoors and outdoors."  *Id.* ¶ 50.  And, "sinks, bathroom tile and grout, basement walls, and areas around windows are common sites for mold growth."  *Id.* ¶ 52.  In addition, "[r]oof leaks, condensation due to high humidity or cold spots in a building, leaky plumbing fixtures, and

flooding water" can lead to "moisture that can promote mold growth."  *Id.*   Moreover, an "HVAC system with a moisture problem" leads to mold growth, and it can also cause the mold to be distributed throughout a home "via the ductwork."  *Id.*   ¶ 53.

Plaintiffs describe the adverse effects of mold on human and animal health, including, *id.* ¶ 55:

> (1)    infections; (2) allergic or hypersensitivity reactions; (3) irritant reactions; and (4) toxic reactions. Allergic responses such as sneezing, runny nose, red eyes, and skin rash are common. Mold can trigger episodes in asthmatic individuals.

And, plaintiffs explain that molds known as "microbial volatile organic compounds ('mVOCs') produce compounds having a strong odor and are volatile.  Exposure to mVocs has been linked to symptoms such as headaches, nasal irritation, dizziness, fatigue, and nausea."  *Id.* ¶ 56.  Moreover, some molds "produce potentially toxic by-products called mycotoxins."  *Id.* ¶ 54.

In January 2019, at a resident meeting at Fort Meade, "Corvias representatives committed to overhauling their system for repair requests and to complete repairs more swiftly."  *Id.* ¶ 64. A spokesperson for Corvias reiterated the company's commitment to putting "'service members and their families first,'" acknowledging that the company could "'do better.'"  *Id.* ¶ 65.

Picerne testified before the Senate Armed Services Committee on February 13, 2019, and stated: "'We hired a world-renowned specialist—at no cost to the government—to review our mold and mildew procedures. . . .'"  *Id.* ¶ 60.    In his written statement to the Committee, Picerne indicated that "Corvias would be 'returning to the 'gold standard' level of resident care that defined our company, from the start.'"  *Id.*   He "committed that Corvias would respond promptly to requests for service, actively seek the feedback of families, and make changes to improve results."  *Id.* ¶ 62.  As to Fort Meade, Picerne stated that "Corvias was hiring resident

service specialists . . . ." *Id.* ¶ 63.   In addition, Picerne told Congress that "'the family's welfare is our number one priority,'" *id.* ¶ 68, and Corvias "would cover the costs of medical care" for any service member who becomes ill due to mold.  *Id.*

After the hearings, "Corvias committed to ensuring that [by July 11, 2019,] every home on Fort Meade would receive a visual inspection and Air Quality Test to identify suspected fungal growth . . . ." *Id.* ¶ 66.  Corvias also stated it would "professionally remediate any home with a certain quantity of fungal growth." *Id.* ¶ 67.

However, plaintiffs contend that Corvias failed to fulfill its commitments because it provided "truncated mold inspections, conducted them improperly by failing to compare samples taken inside a house with those taken from a control of outside air, by running industrial-strength air scrubbers in houses prior to testing, in withholding information about the results of testing from family members, in not following up on the recommendations of the testers to remediate, and in performing haphazard and incomplete remediation." *Id.* ¶ 69.

According to plaintiffs, defendants "placed limitations" on the testing conducted by independent mold inspectors, "sought to achieve false results by running industrial strength air scrubbers in houses" before tests were conducted, and "failed to follow up on the recommendations that the tests revealed." *Id.* ¶ 393.  They told families their homes were "mold-free" even when they still contained significant amounts of mold.  *Id.*  Plaintiffs state, on information and belief, that defendants "still have not fully remediated the mold at any of the residences" of the plaintiffs, and in some cases leased the homes to other military families. *Id.* ¶ 394.

## B.  The Plaintiffs

The plaintiffs are Joseph and Juliea Addi; Kylie and Antoine Bowers, individually and as next friend of their minor child, A.B.; Derek and Sandra Buitrago, individually and as next friend of their minor children, M.S. and D.B.; Daniel and Casey Chubb, individually and as next friend for their minor children, C.C., L.C., E.C., and K.C.; Scott and Sandra Gerber; Andrew and Shannon Gilliland; Alexander and Liza Nunez, individually and as next friend of their minor children, M.N. and E.N.; Youn and Noreen Pascal, individually and as next friend of their minor children, Y.P. and K.P; Josh and Lucy Saindon, individually and as next friend of their minor children, D.S., A.S., and A.S.; Tyquan and Chauntay Scullark, individually and as next friend of their minor children, L.S., T.S., L.S., and N.S.; and Andrew and Kelly Ziemann, individually and as next friend of their minor children, M.S., A.Z., and S.Z.

### 1.  The Addis

Joseph Addi, an Army sergeant, and his wife, Juliea Addi, relocated from Germany to Fort Meade in early 2018.  *Id.* ¶¶ 80-82.  The Addis corresponded with Corvias representatives, who characterized the on-base homes as in "'high demand'" and represented that Corvias had "'[a]ward-winning, dedicated and professional management and maintenance teams.'"  *Id.* ¶ 83. After the Addis reviewed pictures of homes on Corvias's website, they decided to live in a Corvias townhouse.  *Id.*  They had "a brief walk-through, without being informed that they had a choice of any other property."  *Id.* ¶ 84.

Problems with the home began "[s]hortly after moving in[.]" *Id.* ¶ 85.  In April 2018, the "Addis noticed water accumulating in the cabinet of the guest bathroom on the second floor. The Corvias maintenance team merely wiped the water off the cabinet and left.[1]"  *Id.* ¶ 86.  The Addis discovered pests throughout the home.  *Id.* ¶ 87.  In May 2018, Ms. Addi "requested to

have the ducts cleaned to alleviate her asthma symptoms." *Id.* ¶ 88.  Corvias personnel left the "new air filters. . . in the HVAC closet in their original packaging." *Id.*

There were chronic issues with the Addis' home.  They had difficulty regulating the temperature.  *Id.* ¶ 89.  The door to the backyard did not seal, which let air into the home from the outside.  *Id.*  The door would not lock properly, and in August 2018, the Addis' home was burglarized through this door. *Id.* ¶¶ 89-90.

Plaintiffs contend that one Corvias maintenance worker was "under the influence of drugs." *Id.* ¶ 91.  The Addis raised their complaints with "senior leadership on Fort Meade" and on February 15, 2019, they complained to members of the Senate Armed Services Committee. *Id.*  Four days later, Corvias conducted an air quality test of the Addis' home.  *Id.* ¶ 92. However, the inspector ignored the visible mold on the walls of the HVAC closet, and "used the living room as the testing control sample."  *Id.*  Despite the inappropriate choice of control sample, the testing "still showed elevated levels of mold in the living room, air vents, and master bedroom." *Id.*

In February and March of 2019, Corvias repaired a host of items and "then pronounced the townhome remediated." *Id.* ¶ 93.  A subsequent air quality test, conducted by an independent company, only tested the living room and second floor hallway, not the areas of the home that had previously had elevated mold levels or the HVAC closet.  *Id.* ¶¶ 94, 95.  There was still mold growth.  *Id.* ¶ 96.  The company recommended "further inspection of the first floor bathroom to investigate the source of moisture." *Id.*  However, no such inspection took place. *Id.*

In July 2019, the Addis "noticed water dripping from the kitchen ceiling." *Id.* ¶ 97.  The source of the moisture was a "leak in the bathtub in the second floor bathroom."  *Id.* ¶ 98. Corvias caulked the bathtub and replaced a seal a few days later. *Id.* ¶¶ 99, 100.  Although, the

water leak continued, Corvias insisted that the leak had been fixed.  *Id.* ¶ 100.  Corvias did not remediate the visible mold in the second floor bathroom, on the walls, and under the sink.  *Id.* ¶ 101.  Instead, Corvias just painted over it.  *Id.* ¶ 102.

As a result of the mold, plaintiffs allege that Ms. Addi, who was previously healthy, "suffered constant flu-like symptoms" as well as "headaches, nosebleeds, dizziness, fatigue, and shortness of breath" and "gestational hypertension, which led to the early birth of their daughter."  *Id.* ¶ 105.  Sergeant Addi "suffered near-constant headaches" and both experienced "considerable emotional distress."  *Id.* ¶¶ 106, 107.  Eventually, on August 31, 2019, the Addis terminated their lease early and moved out.  *Id.* ¶ 108.  They left behind mold-contaminated furniture to avoid exposing their newborn child to mold.  *Id.* ¶ 109.

### 2. The Bowers

Kylie Bowers, a Navy Petty Officer Second Class, and her husband, Antoine Bowers, are the parents of A.B., who was 19 months old when the Amended Complaint was filed.  *Id.* ¶¶ 110, 111.  In August 2018, the Bowers moved to the townhouse adjoining the Addis, and the two homes "share an HVAC area."  *Id.* ¶ 112.  The Bowers allegedly "relied on Corvias's representations that it was providing quality housing and that it would address any needed maintenance issues."  *Id.* ¶ 113.

Soon after moving in, the Bowers "noticed a strong stench that permeated the townhouse." *Id.* ¶ 116.  Water from their faucets was discolored, and they cooked with bottled water.  *Id.* ¶ 117.  There was visible mold in the bathroom and "around the front door," *id.* ¶ 118, as well as moisture throughout the home, including standing water in the HVAC closet.  *Id.* ¶¶ 119, 120, 124, 125.  The independent testing company found mold throughout the residence.  *Id.* ¶¶ 121-123.

In early July 2019, "Corvias sent Petty Officer Bowers a preliminary report based on the initial mold inspection," which noted that remediation would be necessary for "at least one of the bathrooms and the HVAC system." *Id.* ¶ 128. But, there was no "follow-up communication" from Corvias. *Id.* ¶ 129. On August 20, 2019, Petty Officer Bowers contacted Corvias concerning a leak from the HVAC closet. The "work order indicated that there was 'mold on the front entry door' and that a 'review of test results from the last mold inspection and a re-inspect' was needed. . . ." *Id.* More testing was conducted two days later. *Id.* ¶ 132. Petty Officer Bowers requested that all of the information concerning mold in the home be sent to an industrial hygienist, but Corvias "ignored" the request. *Id.* ¶ 133.

On August 22, 2019, "Corvias finally relocated the Bowers to a hotel while promising to perform remediation work on the townhome." *Id.* ¶ 135. The family returned to the home on September 16, 2019, "after Corvias had pronounced everything 'fixed.'" *Id.* ¶ 137. However, the home was "in total disarray" and the "stench remained." *Id.* ¶ 138. Due to Corvias's failure to "reconnect the washing machine properly, the townhome had flooded." *Id.* ¶ 140. The mold remained, as did the moisture throughout the home. *Id.* ¶¶ 141-143. On October 25, 2019, the Bowers's hot water heater "sprung a massive leak." *Id.* ¶ 144. They contend that defendants have never fully repaired the defects. *Id.* ¶¶ 145.

A.B. "began suffering from acute respiratory issues, including bronchitis, runny nose, rashes, and rotavirus infections." *Id.* ¶ 146. He "needed breathing treatments on multiple occasions," had to be removed from daycare "for extended periods of time," and he now requires an inhaler. *Id.* ¶¶ 147, 148. Petty Officer Bowers takes immunosuppressant medication and is concerned about her mold exposure. *Id.* ¶ 150. She has also experienced "general depression and anxiety attributed to concerns of her ailing son and from living in a contaminated home." *Id.*

¶ 149.  The entire family "suffered emotional distress" from the situation and "incurred medical expenses and loss of personal property due to mold exposure, as well as expenses associated with temporarily moving to another location while the house was being remediated."  *Id.* ¶ 151.

### 3. The Buitragos

Derek Buitrago, a Hospital Corpsman Third Class, is married to Sandra Buitrago, and they have two young sons, M.S. and D.B.  *Id.* ¶ 152.  In August 2016, the Buitragos moved into a Corvias home at Fort Meade.  *Id.* ¶ 154.  They decided to rent the home based on the Corvias website, "which touted the quality of the housing and emphasized that the units in the . . . neighborhood were newly constructed."  *Id.* ¶ 155.  They lived in the house until February 2019.  *Id.* ¶ 156.  Petty Officer Buitrago is now stationed at Camp Lejeune in North Carolina.  *Id.* ¶ 152.

On March 31, 2017, Ms. Buitrago noticed water around a window in the living room and submitted a work order.  *Id.* ¶¶ 157, 158.  Corvias personnel came to the home on April 3, 2017, and claimed the water resulted from a rainstorm; they merely wiped the mold and painted over it.  *Id.* ¶ 158.  However, the window continued to leak, which caused mold.  *Id.* ¶ 159.  Corvias came to the house on May 12, 2017, again claimed the mold was due to moisture from recent rain, and again painted over the mold.  *Id.* ¶ 160.

Several months later, the mold returned, but Corvias claimed "it was normal surface mold."  *Id.* ¶ 161.  Corvias again repainted the window.  *Id.*  The Buitragos purchased dehumidifiers and air purifiers.  *Id.* ¶ 162.  Nevertheless, the window continued to leak, and mold developed along the baseboards.  *Id.* ¶ 163.  Corvias did not respond to further requests for assistance, conducted no investigation, and failed to replace the carpet.  *Id.* ¶¶ 164, 166.  The Buitragos purchased a Shopvac "in an attempt to combat the problem themselves."  *Id.* ¶ 165.

Derek Buitrago took a night job to cover the expenses, donated plasma for extra income, and went to food pantries for assistance. *Id.* ¶¶ 168, 169. The Buitragos requested a transfer to a different unit, but Corvias told them they would need to pay a $600 moving fee, which the family could not afford. *Id.* ¶ 170.

In February 2019, a pipe burst in the Buitragos' home; Corvias personnel changed the pipe but left wet carpet and standing water in their living room. *Id.* ¶ 172. The family subsequently discovered a hole in the floor of their son's room, "which was directly above the leaking living room window." *Id.* ¶ 173. The moisture had caused the floor and beams to rot. *Id.*

Eventually, the Buitragos were relocated to a hotel. *Id.* ¶ 174. An inspection on February 18, 2019, revealed "elevated levels of mold in the sons' room, the game room where the children played, the master bedroom, and the living and dining room." *Id.* ¶ 175. Much of the Buitragos' furniture, including their couch, tables and chairs, and children's toy cubes, contained mold. *Id.* ¶ 177. The family moved to another Corvias townhome in the same neighborhood, incurring out-of-pocket expenses. *Id.* ¶ 178. However, this home "also tested positive for elevated levels of mold." *Id.* ¶ 179.[6]

After the family moved into the first townhome, their son, M.S., developed "asthma-like breathing problems that required an inhaler" and his eyes were "itchy and bloodshot constantly." *Id.* ¶¶ 182, 183. He frequently missed school. *Id.* ¶ 184. His symptoms have disappeared since the relocation to Camp Lejeune. *Id.* ¶ 187. D.B. developed eczema while living in the first home. *Id.* ¶ 189. He also developed "behavioral problems, including anger issues, which is possibly linked to the mold exposure." *Id.* Ms. Buitrago is sensitive to mold and, while living in

---

[6] One month after the Buitragos moved into the new home, Petty Officer Buitrago "received permanent change of station orders to Camp Lejeune." ECF 40, ¶ 180.

the house, she "felt tired, always had a headache, and would sometimes sleep all day." *Id.* ¶ 190. She used an inhaler, but since moving no longer needs it. *Id.* ¶¶ 190, 191. Petty Officer Buitrago "had migraines and continuous nosebleeds" while living in the first home. *Id.* ¶ 192. He had corrective eye surgery and recovered in the home, and "his vision was worse after the corrective surgery than it had been before." *Id.* ¶ 193. Yet, his vision improved after the family vacated the home. *Id.* ¶ 194.

The Buitragos gave up their mold-infested furniture and "continue to sleep on air mattresses at their new home in North Carolina. . . ." *Id.* ¶ 197. The family suffered financial consequences from purchasing "air filters, a carpet cleaner, fans, air mattresses" and paying for movers. *Id.* ¶ 198. Petty Officer Buitrago took out a loan to cover the moving expenses to North Carolina. *Id.*

### 4.  The Chubbs

Daniel Chubb is a Senior Chief Petty Officer in the U.S. Navy. *Id.* ¶ 200. He is married to Casey Chubb, and they have four minor children: C.C., L.C., E.C., and K.C. *Id.* ¶¶ 200, 201.

The family moved into a Corvias home in June of 2018, after reviewing photos on the Corvias website, viewing some housing options in person, and being assured by Corvias representatives that "Corvias houses were well-maintained, cleaned, and inspected prior to move-in" and that "any needed maintenance would be performed promptly." *Id.* ¶¶ 202, 203. But, two weeks before the Chubbs moved into the home they had selected, Corvias assigned them to a different home that they did not have the opportunity to inspect. *Id.* ¶ 204.

In March 2019, the Chubbs reported to Corvias that there was "bubbling on the ceiling of their home," and they requested a mold inspection. *Id.* ¶ 205. The independent inspectors performed a visual inspection and informed the Chubbs that the attic "required further

19

investigation." *Id.* Corvias failed to follow up, despite being repeatedly contacted by the family. *Id.* ¶ 206. The following month, Corvias representatives inspected the home with a mold remediation company. *Id.* ¶ 207. The mold remediators found water damage and mold, and told the family that the home "would need extensive remediation" and that they "should move out immediately." *Id.* The temporary housing Corvias identified for the Chubbs was "so filthy" that the move was delayed. *Id.* ¶ 208.

During the remediation, Corvias "did not clean or replace the air vents, which were covered in mold." *Id.* ¶ 209. The family moved off base in August 2019, even though Senior Chief Chubb was still assigned there. *Id.* ¶ 210. While living in the home, the entire family experienced "respiratory issues, as well as chronic nasal congestion." *Id.* ¶ 212. The Chubbs' son experienced chronic nosebleeds. *Id.* ¶ 213. Ms. Chubb suffered "a severe relapse of Graves' disease." *Id.* ¶ 214. However, since moving off-base, they have recovered. *Id.* ¶ 215. The family also "incurred substantial expenses associated with trying to deal with the mold and water damage, as well as in having to move off post." *Id.* ¶ 216.

### 5. The Gerbers

Scott Gerber, a Colonel in the United States Army, is married to Sandy Gerber. *Id.* ¶¶ 217, 218. He was stationed at Fort Meade while completing a Ph.D. at Johns Hopkins University in 2018. *Id.* ¶ 219. The Gerbers were assigned to a property managed by Corvias. *Id.* ¶ 220. Before moving in, they spoke with Corvias representatives and were assured that the on-base properties were well-maintained, clean, and inspected. *Id.* ¶ 221.

The Gerbers signed the lease on June 28, 2018. *Id.* ¶ 222. When they moved into their residence on July 2, 2018, they discovered that the kitchen was flooded and the water was running into the garage, both of which contained mold. *Id.* ¶¶ 223, 224. Over the course of a

year and a half, the Gerbers discovered mold in their kitchen ventilation system and their HVAC system, and in various rooms in the home, as well as the basement and the attic. *Id.* ¶¶ 225-27.

Ms. Gerber visited her mother in Texas, who was "battling lung cancer." *Id.* ¶ 228. Ms. Gerber's mother suffered an acute respiratory attack due to mold that was present on Ms. Gerber's clothes. *Id.* Ms. Gerber threw away all of her clothes, as well as the suitcase she brought to Texas. *Id.* Nevertheless, her mother requires surgery from a fungal infection "believed to be related to the second-hand mold exposure." *Id.*

Corvias moved the Gerbers into a different home while the original underwent remediation, but that home contained mold as well. *Id.* ¶¶ 229, 230. The problems with water leaks and visible mold growth continued in the first home, but Corvias "refused to conduct further testing for mold." *Id.* ¶ 231. The mold problem was never fully remediated, and the Gerbers "had to hire a private home inspection service to test for mold when Corvias refused to do so." *Id.* ¶¶ 232-35. The Gerbers also "paid out of their own pocket for multiple other families to have mold tests done on their houses." *Id.* ¶ 238. The Gerbers found that "Corvias was placing industrial-strength air scrubbers inside a residence in advance of a purportedly 'independent' inspection. . . to try to have homes 'pass' a mold inspection by deception rather than by actually fixing the mold problem." *Id.* ¶¶ 239, 240.

Colonel Gerber is now assigned to Fort Belvoir in Virginia. *Id.* ¶ 241. While living at Fort Meade, Ms. Gerber, previously "an avid runner," experienced "repeated respiratory and other health issues, including frequent headaches." *Id.* ¶¶ 242, 243. Colonel Gerber "required treatment for allergies for the first time in his life." *Id.* ¶ 244. They also lost personal property that was exposed to mold, and incurred personal expenses in trying to deal with the mold. *Id.* ¶ 245.

### 6.   The Gillilands

Andrew Gilliland, a Petty Officer Third Class in the Navy, is married to Shannon Gilliland.  *Id.* ¶¶ 246, 247.  They moved into a Corvias home in April 2018, after reviewing information on the Corvias website and selecting "the one that appeared to be the most recently updated and that would provide the most space."  *Id.* ¶ 248.  Upon moving in, the Gillilands noticed "excessive moisture in and around the house," as well as a rotted back door.  *Id.* ¶¶ 249, 250.

When the Gillilands removed their artificial Christmas tree, they discovered mold surrounding an outlet "across form the ventilation system in the house."  *Id.* ¶ 251.  Ms. Gilliland "saw Facebook posts from other families on Fort Meade suggesting that residents remove air vents to look for mold."  *Id.* ¶ 252.  They removed the vents and discovered black mold in their air vents.  *Id.*  Ms. Gilliland alerted Corvias, but Corvias did not respond.  *Id.* ¶ 253.  When the heat went out in the home, a Corvias representative stated that he would send someone to look at the mold.  *Id.*  The Corvias worker who inspected the air vents also inspected the HVAC closet, but did not mention the mold there.  *Id.* ¶ 255.  Because it was uncertain when the mold could be remediated, the Gillilands opted to move out of the home.  *Id.* ¶ 256.  As a result, Corvias decided to wait until they had moved out to fix the issue.  *Id.*  The Gillilands subsequently discovered "thick, black mold" in the utility room.  *Id.* ¶ 257.  However, Corvias stated that "it would only clean the air vents and ducts."  *Id.* ¶ 265.

While living in the defendants' unit, Petty Officer Gilliland "experienced chest tightness, shortness of breath, and allergies," for which he was prescribed medication.  *Id.* ¶¶ 258, 259.  He was informed by a physician at the Annapolis Naval Clinic that the medical issues could be the result of mold exposure. *Id.* ¶ 259.  Ms. Gilliland, who has Hashimoto's Thyroiditis, experienced

persistent sinus infections in the Corvias home, and experienced other symptoms. *Id.* ¶ 260. The Gillilands moved off base, where they are paying "rent and utilities costs that exceed his BAH at a townhome adjacent to the base in order to stay near work and the military community." *Id.* ¶ 266. And, they "incurred significant expenses replacing household items that had been contaminated with mold," paid for medical treatments for themselves and their dog, paid moving expenses, and bought cleaning supplies and a dehumidifier to minimize their mold exposure. *Id.* ¶ 267.

### 7.  The Nunezes

Alexander Nunez, an Air Force Master Sergeant, is married to Liza Nunez, and they have two young children, M.N. and E.N. *Id.* ¶¶ 268, 269. Due to medical conditions, M.N. is enrolled in the Exceptional Family Member Program ("EFMP"), "which provides special support to children of military service members who have special needs." *Id.* ¶ 270. M.N.'s condition requires housing in a single-level residence. *Id.* ¶ 271.

The family moved into a Corvias rental home in April 2015 (*id.* ¶ 272), after being informed by Corvias that there was "only one option." *Id.* ¶ 273. They remained in the residence until March 18, 2019. *Id.* ¶ 272.

When the Nunezes moved into the rental home, they "noticed a pronounced and pervasive odor throughout the home." *Id.* ¶ 275. They reported the condition repeatedly to Corvias. *Id.* However, Corvias "failed to eradicate" the odor. *Id.* So, the Nunezes purchased upgraded air filters, to no avail. *Id.* ¶ 276.

In April 2018, the Nunezes' yard "flooded with standing sewage water." *Id.* ¶ 277. Ms. Nunez repeatedly reported the issue to Corvias, which "failed to permanently remove the sewage water from the Nunez yard." *Id.* ¶ 278. The home was inspected for mold on March 18, 2019.

*Id.* ¶ 279.  The inspection revealed that the "attic was covered in rotting and moldy insulation, with water-damaged roof beams.  In addition, the HVAC vents in the attic were covered in spotty black mold." *Id.* ¶ 280.  The investigator told the family that "it was no longer safe to live in the home" so the family "requested to move out of the home." *Id.* ¶ 281.

The Nunezes "also asked for immediate mold testing[,]" which Corvias refused, even when the childrens' doctor required testing. *Id.* ¶¶ 282, 283.  The family "hired a private mold inspector and the test results confirmed the presence of mold in the home along with specific types of mold . . . ." *Id.* ¶ 284.  Corvias offered to move the family out, but the available options were another mold-infested home, a single hotel room, or a two-story townhome that was inappropriate for M.N. *Id.* ¶ 285.  Because Corvias "did not want to pay for the hotel room," it tried to "pressure" the family into living in the two-level home. *Id.* ¶ 286.[7]  The Nunezes stayed in the hotel, although Corvias did not "commit to paying for the lodging." *Id.* ¶ 288.  The family's dislocation caused considerable stress to M.N. *Id.* ¶¶ 290-92.

During the family's stay in the home, M.N. suffered from "repeated upper respiratory infections, ear infections, tonsillitis, stridor, and eczema." *Id.* ¶ 293.  After the family moved out of the home, those medical issues resolved. *Id.*  E.N., who was born while the family resided in the Corvias home, was "constantly sick from the time she was born until the time the Nunez family moved out" of the home. *Id.* ¶ 294.  According to plaintiffs, the child's repeated infections caused a speech delay. *Id.* ¶ 295.  The child "tested positive for allergies to each type of mold that was identified on the mold report . . . ." *Id.*  After the family moved out, the child's symptoms abated, but her allergies "will likely be a life-long condition." *Id.* ¶ 296.

---

[7] According to plaintiffs, Picerne had testified in Congress a month prior, in response to another EFMP family being pressured to take a two-level home, and said that such pressure was "unacceptable."  ECF 40, ¶ 287.

Ms. Nunez, too, was affected.  She experienced abdominal pain, vertigo, vision problems, chronic fatigue, and severe allergies.  *Id.* ¶ 297.  She was diagnosed with depression in the fall of 2016.  *Id.*  In March 2018, Ms. Nunez was diagnosed with "recurrent" upper respiratory infections and swollen lymph nodes, as well as colon polyps.  *Id.* ¶ 298.  Since moving out of the home, her respiratory symptoms have begun to subside.  *Id.* ¶ 299.  Master Sergeant Nunez was diagnosed with sleep apnea while living in the home.  *Id.* ¶ 300.  Since moving out, his symptoms have also subsided.  *Id.* ¶ 301.  The family incurred expenses for air quality and mold testing and to replace items contaminated with mold.  *Id.* ¶ 302.

### 8.   The Pascals

Youn Pascal, an Army Sergeant First Class, is married to Noreen Pascal, and the couple has two minor children, Y.P. and K.P.  *Id.* ¶¶ 303, 304.  The family moved into a single-family home at Fort Meade on March 17, 2018, managed by Corvias.  *Id.* ¶ 305.  The Pascals decided to lease from Corvias after viewing the website and communicating with Corvias representatives.  *Id.* ¶ 306.  Sergeant Pascal's mother lived with them.  *Id.* ¶ 304.

When the Pascals moved into the home, they noticed a "mildew" smell immediately.  *Id.* ¶ 307.  Ms. Pascal cleaned the house, but to no avail.  *Id.*  She noticed dampness in the home, and there was visible mold "in the bedroom ceiling room fan, as well as under the carpet in the master bedroom."  *Id.*  She repeatedly contacted Corvias, but Corvias was not responsive.  *Id.* ¶¶ 308, 309.  Corvias "refused to acknowledge the dampness and denied the Pacals' request for a dehumidifier."  *Id.* ¶ 309.  Corvias also never responded to an issue with the HVAC system.  *Id.* ¶ 310.  Although Corvias responded to water intrusion in the Pascals' dining room from "poorly maintained window seals," and repaired the window, there was "residual dampness from the initial leak."  *Id.* ¶ 311.

Ms. Pascal learned through social media that there was a mold problem at Fort Meade. *Id.* ¶ 312.  She contacted Corvias and requested an inspection, but the Corvias representative "told her not to worry."  *Id.*   The Pascals "retained their own mold inspector who found 'elevated levels' of several mold spores, including Cladosporium, which is known to produce mycotoxins and can trigger chronic allergy and asthma."  *Id.* ¶ 313.

Family members began to experience medical issues within one month of moving into the Corvias home.  *Id.* ¶ 314.  Sergeant Pascal's mother, who spent most of her time in the home, developed respiratory ailments, headaches, and dizziness.  *Id.* ¶ 315.  She required "costly and time consuming" treatment at an off-base hospital.  *Id.* ¶ 316.  On one occasion, her respiratory symptoms were serious enough to warrant a 9-1-1- call.  *Id.*

Y.P. experienced respiratory issues resulting in an asthma diagnosis, nosebleeds, coughing, and swollen eyes.  *Id.* ¶ 317.  Sergeant Pascal also experienced eye problems, coughing, and nosebleeds.  *Id.* ¶ 318.  Ms. Pascal experienced headaches.  *Id.* ¶ 318.  The family also suffered considerable emotional distress from the experience.  *Id.* ¶ 321.

The family moved out soon after the expiration of their one-year lease.  *Id.* ¶ 319. Notably, "[e]veryone's health improved dramatically within one month."  *Id.*

Ms. Pascal informed Corvias about the positive test for elevated levels of mold.  *Id.* ¶ 320.  But, Corvias did not "indicate that they would immediately remediate the house," and a new family moved in.  *Id.*

### 9.  The Saindons

Josh Saindon, an Air Force Staff Sergeant, is married to Lacy Saindon, and they are the parents of three young children: D.S., A.S., and A.S.  *Id.* ¶¶ 322, 323.  On December 29, 2016, the family moved into a home at Fort Meade, managed by Corvias.  *Id.* ¶ 324.

26

When the Saindons moved into the home, they discovered "it was full of rotting cabinets and perforated walls." *Id.* ¶ 326. In addition, there were multiple leaks, including "condensation leaks from the HVAC vent, leaks from the dishwasher, and a leak in the roof near the exhaust pipe for the oven range." *Id.* They reported the issues to Corvias, but Corvias "did not actually fix things." *Id.* ¶ 327. Instead, Corvias made repairs, like "cut[ting] out selected areas of the rotting wood and patch[ing] those areas up." *Id.*

Notably, the family observed "pervasive mold" throughout the home. *Id.* ¶ 328. The Saindons reported the mold to Corvias beginning in November 2018. *Id.* ¶ 329. Corvias "tried to downplay the issue, telling the Saindons on multiple occasions that the house had dust, dirt, or grease, but not mold." *Id.* After "nearly two months of repeated follow-up," Corvias inspected the home for mold. *Id.* ¶ 330. The Corvias worker found mold in the childrens' bathroom, but "did nothing further." *Id.*

Corvias did not remediate the mold until Sergeant Saindon's commanding officer personally attended a home inspection and "stayed until Corvias personnel started cleaning and eradicating the mold" in the living room. *Id.* ¶ 331. Corvias began remediating the home in February 2019. *Id.* ¶ 332. Eventually, Corvias put the family up in a "hospitality suite," which also had visible mold. *Id.* ¶¶ 332, 333.

When Corvias conducted testing of the Saindons' home after remediation, it "first ran industrial-strength air scrubbers throughout the house and then conducted the testing only seconds after turning off the air scrubbers." *Id.* ¶ 334. Thus, plaintiffs contend that Corvias "rigged the test to generate a false impression of having remediated the mold." *Id.* ¶ 335. Since the Saindons moved back in, mold has returned to the kitchen and water is leaking into a child's

bedroom, which has elevated moisture levels.  *Id.*  Most of the Saindons' furniture was ruined by mold contamination.  *Id.* ¶ 336.

A.S. has been diagnosed with reactive airway disease and tested positive for exposure to aspergillus mold.  *Id.* ¶ 337.  The Saindons have developed respiratory issues, and Ms. Saindon has suffered frequent migraines.  *Id.* ¶ 338.  In addition, the family has experienced significant emotional distress.  *Id.* ¶ 339.

### 10. The Scullarks

Petty Officer Tyquan Scullark, a Coast Guard Operations Specialist, is married to Chauntay Scullark.  *Id.* ¶¶ 340, 341.  They are the parents of four children: I.S., T.S., L.S., and N.S.  *Id.* ¶ 341.  From September 2017 until July 2019, the Scullarks lived in a townhome managed by Corvias.  *Id.* ¶ 342.

Before deciding to lease from Corvias, the Scullarks spoke to a Corvias leasing representative, who directed them to "virtual tours" on the Corvias website.  *Id.* ¶ 343.  They also toured the homes in person.  *Id.*  The Scullarks were "assigned" to a townhouse, *id.* ¶ 342, but a Corvias representative "assured them that their chosen home" was "ideal . . . ."  *Id.* ¶ 343.

On or around March 19, 2019, the Schullarks discovered mold "in their living room, by their back door, and throughout the HVAC system."  *Id.* ¶ 344.  That day, Corvias "deployed maintenance teams to perform cursory inspections of each home on base."  *Id.* ¶ 345.  Ms. Scullark asked the inspectors to lift the living room carpet to check for mold, because of "visible water lines," but they responded that they were "not allowed to do so."  *Id.*  When she lifted the carpet, she found the floor "covered in mold."  *Id.*  She also discovered mold "in her garage, her HVAC closet, and her HVAC vents."  *Id.* ¶ 346.  Corvias personnel told her "that the mold was not bad" and that what she had found was "just 'a little mildew.'"  *Id.* ¶ 347.

Nevertheless, a member of Corvias's mold remediation team agreed that the home needed remediation. *Id.* ¶ 348. Corvias initially told the Scullarks that "they could live in the home while the mold remediation was performed" but the family "insisted on staying in a hotel." *Id.* ¶ 349. Ms. Scullark "drove to her house from the hotel each day to check on the progress of the remediation. For the first two weeks, there was none." *Id.* ¶ 351.

Once the remediation was complete, Ms. Scullark inspected the home before moving her family back into it. *Id.* ¶ 351. However, the "HVAC ducts had not been cleaned, the floor had not been replaced, and the carpet had not been replaced. Mold was still visible throughout the house." *Id.* Corvias "reluctantly agreed to conduct further remediation" so the Scullarks remained in their hotel room for another two weeks. *Id.* ¶ 352. They returned to the Fort Meade home "for a few months before being reassigned to Yorktown, Virginia." *Id.* ¶ 353.

While living at the rental home, I.S., L.S., and N.S. "all suffered from persistent illnesses." *Id.* ¶ 354. I.S. had "regular respiratory illnesses," which required many trips to the pediatrician. *Id.* ¶ 355. L.S. "experienced regular outbreaks of hives and rashes." *Id.* ¶ 356. And, N.S., who was born while the family lived in the Corvias home, was a "full-term but underweight baby." *Id.* ¶ 357. She had delayed developmental milestones and gained little weight for her first six months. *Id.* All three have experienced "significant improvement" since moving out of the home. *Id.* ¶ 358.

The family spent significant money dealing with the mold. *Id.* ¶ 359. Ms. Scullark, a self-employed businesswoman who makes wigs for women with hair loss from chemotherapy, was forced to throw away mold-exposed raw materials, costing her money and "revenues due to delays during the mold remediation process." *Id.* ¶ 360. And, Corvias sent the family a bill for rent while they were at the hotel, which "almost prevented the Scullarks from closing on a home

in the Yorktown area." *Id.* ¶ 361. This experience has caused the family "considerable emotional distress." *Id.* ¶ 362.

### 11. The Ziemanns

Andrew Ziemann is an Army Sergeant. *Id.* ¶ 363. He and his wife, Kelly Ziemann, have three minor daughters, M.S., A.Z., and S.Z. *Id.* ¶ 364. On October 31, 2015, the family moved into a home at Fort Meade, managed by Corvias. *Id.* ¶ 365. When they spoke to Corvias about rental units, "Corvias told them that they had a choice of two units: an older one and a newer one. Corvias refused to provide additional information about the houses." *Id.* ¶ 366. The Ziemanns chose the newer home. *Id.*

Shortly after the family moved into the home, they discovered a "disconnected drain pipe in the bathtub" that caused the bathtub to overflow and water to flow through the kitchen ceiling. *Id.* ¶ 367. It took Corvias a week "to fix the pipe and to remove the waterlogged section out of the kitchen ceiling, and then another week to patch the gaping hole." *Id.* ¶ 367.

Over the course of their stay in the Corvias home, the Ziemanns "submitted over one hundred work order requests to repair pervasive deficiencies in the home, including: broken toilets; a leaking water tank; a leaking refrigerator; leaking faucets; broken outlets; crumbled drywall; loose fixtures; insecure doors; a dysfunctional stove and oven; loose carpets; and multiple electrical failures." *Id.* ¶ 369. Corvias "would often take up to two weeks to respond" to the requests, and was often slow to respond even to urgent requests. *Id.* ¶ 370.

On one occasion, the Ziemanns reported to Corvias that their dryer was not working properly; the "dryer pipe was not properly sealed and was venting air and lint from the dryer throughout the walls of the home." *Id.* ¶ 369. The Mold Addendum "identifies leaks from dryer

discharge vents as a significant cause of mold growth" but Corvias did not fix the underlying issue. *Id.*

The Ziemanns' HVAC unit broke "every winter from 2015 to 2019." *Id.* ¶ 371. Each time, the family lived without heat until the unit was fixed. *Id.* In the winter of 2018, an electrical surge led to the loss of power to four homes, including the Ziemanns' home. "Corvias spent two days pointing fingers at Baltimore Gas and Electric before offering to move some, but not all, families into temporary housing." *Id.* The Ziemanns "were forced to rely on the generosity of friends who took them into their home for the two weeks it took Corvias to restore power to their home." *Id.*

On February 27, 2019, significantly elevated levels of mold were found in the Ziemanns' air vents, living room, master bathroom, and kitchen. *Id.* ¶ 372. Corvias placed the Ziemanns in a hotel while the home was remediated. *Id.* ¶ 373. Although Corvias "claimed to have cleaned and disinfected the air ducts as well as the filters in the HVAC unit, . . . the Ziemanns did not feel a noticeable improvement in the air quality of their home." *Id.* The remediation team had also damaged the family's furniture. *Id.*

The air quality of the home was tested again on March 11, 2019, and March 15, 2019. *Id.* ¶ 374. When Ms. Ziemann asked for the results, she was told the samples had been lost. *Id.* But, further remediation was recommended based on the samples of March 11, 2019. *Id.* ¶ 375.

On April 5, 2019, a Corvias team addressed the mold in the kitchen, bathroom, HVAC closet, and attic. *Id.* ¶ 376. Another air quality test was conducted on June 6, 2019. When Ms. Ziemann asked about remediation recommendations, she was reprimanded by a Corvias representative for "incorrectly interpreting the air quality test." *Id.* ¶ 377.

While living in the home, Ms. Ziemann's asthma worsened and she developed bronchitis. *Id.* ¶ 379.  S.Z. also developed respiratory problems, resulting in pneumonia.  *Id.* ¶ 380.  She has suffered from "regular bouts of bronchitis and pneumonia" as well as croup.  *Id.* ¶ 381.  The family also experienced emotional distress.  *Id.* ¶ 383.

## II.  Legal Standards

### A.  Rule 12(b)(6)

As noted, defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6).  A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for

'all civil actions' . . . ." (citation omitted)); *see also Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief.  *Iqbal*, 556 U.S. at 678.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).  However, "a court

is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605

(citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d

140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating

the legal conclusions from the factual allegations, assuming the truth of only the factual

allegations, and then determining whether those allegations allow the court to reasonably infer"

that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*,

655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or

the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting

*Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to

rule on an affirmative defense are alleged in the complaint, the defense may be reached by a

motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th

Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334,

336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the

complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir.

1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly

appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*)

(quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts

are limited to considering the sufficiency of allegations set forth in the complaint and the

'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l,

Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at

448). Ordinarily, the court "may not consider any documents that are outside of the complaint,

or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, ___ U.S. ___, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint

and there is no dispute about the document's authenticity." *Id.* at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) ) (emphasis in original) (citation omitted). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

As noted, plaintiffs attached to their Amended Complaint a copy of the Mold Addendum. ECF 40-1 at 2-3. Defendants submitted with the Motion the Ground Lease between the Army and Meade.   ECF 43-2. They also provided the PMA between Meade and Picerne. ECF 43-3. And, they included the ROA used by Meade and Corvias. ECF 43-4. These documents are all

integral to the Amended Complaint, and referenced repeatedly therein.   Therefore, I may consider them in resolving the Motion.

## B.  Rule 9(b)

Plaintiffs lodge several fraud-based claims.  Claims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened pleading standard of Fed. R. Civ. P. 9(b).  *See, e.g.*, *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that a claim under the Maryland Consumer Protection Act that sounds in fraud is subject to the heightened pleading standard of Rule 9(b)).  Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Under Rule 9(b), a claim that sounds in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"   *United States ex rel. Nathan v. Takeda Pharms. N.A., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (citation omitted); *see United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.,* 612 F.3d 724, 731 (4th Cir. 2010).   In other words, Rule 9(b) requires the plaintiff to plead "the who, what, when, where, and how of the alleged fraud" before the parties can proceed to discovery.  *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotation marks and citation omitted)

Rule 9(b) serves several salutary purposes:

First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of. . . . Second, Rule

> 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is
> to eliminate fraud actions in which all the facts are learned after discovery.
> Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).

However, by its plain text, Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)).

## III.   Discussion

Defendants assert numerous grounds to support their request for dismissal.  In addressing the issues, they group the plaintiffs' fifteen counts into several categories: "(i) landlord negligence (Counts I, II, III); (ii) contract-based claims ([Counts] IV, V, X); (iii) statutory violations (Counts VII, VIII, IX, XI); and (iv) other tort claims (Counts VI, XII, XIII, XIV, XV)." ECF 43-1 at 13.

As to all claims, defendants contend that plaintiffs lack standing to sue Corvias, because Corvias "is not the landlord, is not in a contractual relationship with the plaintiffs, and does not

shoulder the statutory obligations of a landlord." *Id.* at 15.  Defendants also argue that plaintiffs

lack standing to sue as third-party beneficiaries of "either the Ground Lease between the United

States and Meade, or the Property Management Agreement between Meade and Corvias. . . ."

*Id.* Further, defendants contend that plaintiffs' negligence claims are deficient because they are

merely "formulaic recitals of elements of a claim and do not flow from properly alleged facts

that detail the source of a claimed duty under the common law or the cited statutes." *Id.*  And,

defendants argue that plaintiffs are not entitled to relief under any of the statutory provisions, and

cannot "establish a plausible basis for treating this case as a class action under Federal Rule of

Civil Procedure 23(b)(2) or (3)." *Id.*

I address these contentions, in turn.

### A.  Corvias as Landlord

Defendants urge the Court to dismiss all of the claims "seeking to hold Corvias. . . liable

for breach of lease or for violations of common-law or statutory provisions applicable to

landlords in Maryland . . . ."  ECF 43-1 at 15.  As to the breach of contract claims (Counts IV, V,

and X) and the claims for violations of statutory duties (Counts VI, VII, VIII, IX), defendants

assert that Corvias is not the landlord and has no contractual privity with any of the plaintiffs. *Id.*

As to the remaining claims (Counts III, XI, XIII, XIV, and XV), defendants urge dismissal based

on legal insufficiency.

According to defendants, it is "indisputably incorrect to characterize Corvias as the

landlord." *Id.* at 17.  They dispute plaintiffs' assertion in a footnote that Meade and Corvias exist

in a "nesting doll structure," so as to make it "appropriate to lump [them] together.[]" *Id.* at 16.

Defendants maintain that the exhibits show that "Meade is a public-private venture with the

Army; Corvias Management is not." *Id.* at 16.   Further, defendants posit that "the plain language" of the PMA refutes the allegations in the Amended Complaint. *Id.*

Plaintiffs argue that they have alleged facts sufficient to show that Corvias is the *de facto* landlord.   ECF 44 at 9.   They assert in the Complaint that plaintiffs were required to refer maintenance requests to Corvias.   ECF 40 at 17 n.5.   And, they contend that Corvias "at all times" acted as Meade's agent.   *Id.*   To that end, they reference remarks of J.C. Calder, Corvias's Fort Meade Operations Director, who said at a meeting held on January 20, 2020:   "'It's very important to us that the people out there representing Corvias are doing things the right way because we're not going to pass the buck and say that's the contractor . . . . [W]e have a responsibility to make sure they're operating the way we want them to.'"   *Id.*

In reply, defendants maintain that plaintiffs are attempting to amend the FAC by way of their Opposition.   In this regard, they point out that plaintiffs characterize Corvias as the *de facto* landlord "for the first time" in their Opposition.   ECF 45 at 2.

Whether Corvias is a *de facto* landlord is as much a factual question as a legal one; the label is neither necessary nor dispositive.   Therefore, plaintiffs' failure in the suit to characterize Corvias as a de facto landlord is not fatal here.   *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (noting that federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted").

To support their argument, plaintiffs rely on *Jones v. Mid-Atl. Funding Co.*, 362 Md. 661, 766 A.2d 617 (2001).   *See* ECF 44 at 9.   There, a tenant, individually and on behalf of her two minor children, brought a lead paint poisoning negligence action against both the management company and the property owners.   *Id.* at 664, 778 A.2d at 618.   The tenant signed a lease with Consumer Management Corporation ("CMC"), which was managing the property for the

owners.  *Id.* at 667, 778 A.2d at 620.  The plaintiff inspected the property before moving in, and confirmed that it was in "fair condition." *Id.*  However, problems with peeling paint developed after the family moved in, and the residence had numerous other problems.  *Id.* at 668, 778 A.2d at 620.  Eventually, the children's blood reflected elevated lead levels.  *Id.* at 669, 778 A.2d at 621.

The Maryland Court of Appeals described Consumer Management as the "property management company that. . . manages properties for landlords, providing services such as arranging for repairs, rent collection, evictions, and renting vacant properties."  *Id.* at 667 n.7, 722 A.2d at 620 n.7.  And, the court said in a footnote: "Because of the services Consumer Management provided to the landlords, it acted as the *de facto* landlord to the tenants."  *Id.* at 669 n.14, 766 A.2d at 621 n.14.  Further, the court said, *id.* at 686, 766 A.2d 630: "Consumer Management, with its knowledge of the dangers of lead-based paint, would have been on notice that if there was a problem . . .Consumer Management's notice is attributable to the landlords, as Consumer Management was apparently authorized to act for the landlords when it came to making repairs.[]"

Defendants contend that *Jones* is factually inapposite to the case sub judice because in *Jones* the plaintiff signed a written lease with the property management company, and thus Consumer Management "was the lessor under the contract."  ECF 45 at 2.  And, they contend that the focus of the Maryland Court of Appeals was on whether the landlord had notice of lead paint hazards, so it is a "stretch" for plaintiffs to cite to it as a basis for *de facto* landlord status in this case.  *Id.* at 3.  Moreover, defendants argue that the Amended Complaint "does not allege facts from which the Court can plausibly determine that Corvias is the 'de facto' landlord, much less that the two entities are one and the same."  *Id.*

41

To be sure, in *Jones* the Court was not asked to decide the viability of contract, tort, or statutory claims against a management company with duties akin to those of Corvias. Nevertheless, the court suggested that, under certain circumstances, a management company may be deemed to function as the landlord.

The PMA states that Corvias is "an independent contractor, and nothing in this Agreement or in the relationship of Owner and Management Agent shall constitute a partnership, joint venture, agency or any other similar relationship." ECF 43-3 at 3.  Yet, the Mold Addendum expressly states that Corvias is the "agent of Meade Communities, LLC." ECF 40-1 at 3.  Thus, the Court is presented with two competing characterizations of Corvias in contract documents— one as an independent contractor, the other as an agent.

In my view, the question of whether Corvias functioned as a landlord cannot be decided at this juncture.  But, plaintiffs have adequately alleged facts to support the claim that Corvias functioned as the landlord.

Plaintiffs have alleged that Corvias was required "to conduct preventative maintenance on the properties and to promptly act to resolve service requests from tenants." ECF 40, ¶ 27. The Mold Addendum was executed by the tenant and Corvias, not Meade.  ECF 40-1 at 3. Although plaintiffs assert that Corvias was the leasing agent, ECF 40, ¶¶ 83, 221, they also allege that Corvias signed the ROAs as the property manager.  *Id.* ¶ 32.  Pursuant to the ROA, tenants are required to "report any issues requiring maintenance to Corvias, and only to Corvias." *Id.* ¶ 33.  Further, the ROA states: "The Home and all matters relating to this Agreement will be managed by [Corvias]."  ECF 43-4 at 2.  In addition, the ROA requires the tenant to deliver written notice of early lease termination to Corvias, not Meade.  *Id.* at 3. Further, the ROA authorizes Corvias to enter the homes.  *Id.* at 5.  And, the ROA has signature lines for the tenant

and "Greta Bibbs *(Owner/Agent)*." *Id.* at 6.   But, the ROA does not specify whether Bibbs worked for Meade or Corvias.

Accordingly, to the extent that defendants seek dismissal of Corvias on the ground that Corvias is not the landlord, I shall deny the Motion as premature.

## B.  Negligence Claims (Counts I, II, III, V)

Plaintiffs have lodged claims of negligence (Count I); gross negligence (Count II); negligent breach of warranty to repair (Count III); and "Tort Arising out of Breach of Contract" (Count V).  Plaintiffs advance varying arguments to support their negligence claims.  According to plaintiffs, defendants "'voluntarily undert[ook] to rectify a dangerous or defective condition within the leased premises,'" and did so negligently.   ECF 44 at 12 (quoting *Matthews v. Amberwood Assocs. Ltd. P'Ship, Inc.*, 351 Md. 544, 556, 719 A.2d 119, 124 (1998) (alterations in brief)).  And, plaintiffs argue that defendants had an independent statutory duty to remediate the mold and other housing defects.  ECF 44 at 13.  Moreover, plaintiffs assert that Corvias is a proper defendant because it is an "agent" of Meade and is therefore "subject to liability for torts arising out of the ROAs."  ECF 44 at 10.

In general, defendants argue that Corvias had no duty to plaintiffs because Corvias is not the landlord, and so the negligence-based claims against Corvias must be dismissed.   And, defendants maintain that plaintiffs' agency claims amount to a "novel reverse *respondeat superior* theory that an agent is liable for the acts of the principal" and thus such claims should be rejected.  ECF 45 at 3.  But, they advance no specific arguments as to the claim of gross negligence.  Nor do they substantively address Count V, in which plaintiffs assert an unspecified tort arising from a breach of contract.

**1.**

In Maryland, "to assert a claim in negligence, the plaintiff must prove: '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.'" *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 212-13, 60 A.3d 1, 10 (2013) (quoting *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108, 131-32, 916 A.2d 257, 270-71 (2007)) (emphasis omitted); *accord Armacost v. Davis*, 462 Md. 504, 526, 200 A.3d 859, 872 (2019); *see also Schultz v. Bank of Am., N.A.*, 413 Md. 15, 27, 990 A.2d 1078, 1086 (2010) ("In a negligence case, there are four elements that the plaintiff must prove to prevail: 'a duty owed to him [or her] (or to a class of which he [or she] is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages.'") (quoting *Jacques v. First Nat'l Bank of Maryland*, 307 Md. 527 531, 515 A.2d 756, 758 (1986) (alterations in *Schultz*)).

As to the negligence claim (Count I), defendants argue that plaintiffs have not sufficiently pleaded negligence "beyond the mere breach of contract." ECF 43-1 at 27 (emphasis removed).

According to plaintiffs, defendants "breached their duty to redress pre-existing conditions in the leased premises." ECF 44 at 11 (quotation omitted). For example, they point to the Gerbers, who initially arrived in their home to find that the kitchen was flooded. *See* ECF 40, ¶ 223. Plaintiffs also argue that defendants failed to remediate the mold in plaintiffs' homes, over which defendants "maintained exclusive control . . . ." ECF 44 at 12. And, they argue that defendants negligently undertook to remedy dangerous conditions in the homes, but did not do so adequately. *Id.* They also assert that the mold constitutes "a serious and substantial threat to the life, health or safety of occupants." *Id.* at 13.

Further, plaintiffs contend that defendants had a statutory duty embodied in R.P. § 8-211(e) to remediate the mold because it constituted a substantial threat to the health of the occupants.  This gives rise to their negligence claim.

R.P. § 8-211 is titled "Repair of dangerous defects; rent escrow."  R.P. § 8-211(e) is titled "Serious and Substantial defects and conditions."[8]  It states (emphasis added):

> (e) This section provides a remedy and imposes an obligation *upon landlords* to repair and eliminate conditions and defects which constitute, or if not promptly corrected will constitute, a fire hazard or a serious and substantial threat to the life, health or safety of occupants, including, but not limited to:
>
>> (1) Lack of heat, light, electricity, or hot or cold running water, except where the tenant is responsible for the payment of the utilities and the lack thereof is the direct result of the tenant's failure to pay the charges;
>>
>> (2) Lack of adequate sewage disposal facilities;
>>
>> (3) Infestation of rodents in two or more dwelling units;
>>
>> (4) The existence of any structural defect which presents a serious and substantial threat to the physical safety of the occupants; or
>>
>> (5) The existence of any condition which presents a health or fire hazard to the dwelling unit.

In *Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 645 A.2d 1147 (1994), overruled on other grounds by *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 835 A.2d 616 (2003), the Maryland Court of Appeals concluded that, "even if a landlord is not liable for negligence under the common law, absent a covenant to repair, its duty to protect the plaintiffs from injury may nonetheless emanate from specific provisions of the Baltimore City Code."  *Id.* at 670, 645 A.2d at 1151.  Although defendants attempt to distinguish this case because the Baltimore City Code "is not relevant here" (ECF 45 at 4), the case stands for the proposition that, even in the absence of a contractual duty, a landlord may be subject to an applicable statutory obligation.

---

[8] R.P. § 8-211 is also discussed, *infra*.

The Maryland Court of Appeals reiterated in *Brooks*, 378 Md. at 78, 835 A.2d at 620:

> Moreover, where there is an applicable statutory scheme designed to protect a class of persons which includes the plaintiff, another well-settled Maryland common law rule has long been applied by this Court in negligence actions. That rule states that the defendant's duty ordinarily "is prescribed by the statute" or ordinance and that the violation of the statute or ordinance is itself evidence of negligence.

In sum, plaintiffs allege that defendants breached their duty to provide habitable homes; defendants allegedly failed to maintain and repair the residences. The Amended Complaint is replete with allegations of the problematic defects in the homes and the inadequate repairs. For example, the Addis "noticed water accumulating in the cabinet of the guest bathroom on the second floor." ECF 40, ¶ 86. Plaintiffs claim that the Corvias maintenance team "merely wiped the water off the cabinets and left," without determining the cause of the leak and fixing it. *Id.* The Bowers vacated their home for mold remediation, but they allegedly discovered mold upon their return to the home. *Id.* ¶ 141. On several occasions, the Buitragos reported to Corvias that they had mold around their leaking window. In response, Corvias personnel allegedly painted over the area, without correcting the source of the problem. *Id.* ¶¶ 160, 161.

These claims are sufficient to state a claim of negligence. Therefore, I shall deny the Motion as to Count I.

## 2.

Under Maryland law, gross negligence is "'something *more* than simple negligence, and likely more akin to reckless conduct.'" *Barbre v. Pope*, 402 Md. 157, 187, 935 A.2d 699, 717 (2007) (emphasis in *Barbe*) (quoting *Taylor v. Harford Cty. Dep't of Soc. Servs.*, 384 Md. 213, 229, 862 A.2d 1026, 1035 (2004)). It "has been equated with 'wilful and wanton misconduct,' a 'wanton or reckless disregard for human life or the rights of others.'" *Foor v. Juvenile Servs. Admin.*, 78 Md. App. 151, 175, 552 A.2d 947, 956 (1989)); *see Romanesk v. Rose*, 248 Md. 420,

423, 237 A.2d 12, 14 (1968) (stating that "'a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist'") (citation omitted); *Wells v. State*, 100 Md. App. 693, 702-03, 642 A.2d 879, 883-84 (1994) (stating that gross negligence "implies malice and evil intention") (citations and quotations omitted); *see also McCoy v. Hatmaker*, 135 Md. App. 693, 699, 763 A.2d 1233, 1236 (2000), *cert. denied*, 364 Md. 141, 771 A.2d 1070 (2001).

"'As a general proposition, if the tortious act is intentional, it may be willful, wanton, or fraudulent, but not negligent.'" *MacDonald v. Costco Wholesale Corp*., JKB-17-1747, 2018 WL 1583470, at *9 (D. Md. Apr. 2, 2018) (quoting *Wasler v. Resthaven Mem'l Gardens, Inc*., 98 Md. App. 371, 393, 633 A.2d 466, 476 (1993)).  In some cases, however, an intentional act can form the basis of a negligence claim.  *Ghassemieh v. Schafer*, 52 Md. App. 31, 42, 447 A.2d 84, 89-90 (1982).  But, that occurs where the intentional act "produces unintended consequences[.]" *Id.*; 447 A.2d at 89 (finding that the intentional act of pulling away a chair could support a negligence claim).

Curiously, defendants make no specific arguments as to the claim of gross negligence in Count II.  Because no arguments have been advanced as to Count II, I shall deny the Motion as to that claim.

### 3.

As to Count III, the claim of negligent breach of a warranty to repair, defendants contend that the Amended Complaint fails to plead "the existence of [a warranty to repair] to which Corvias Management is a party."  ECF 43 at 17.  They argue that the Amended Complaint "does not allege facts which could support a plausible claim that the manner in which the conditions

were repaired (or not) by Corvias Management. . . itself caused injury to the plaintiffs separate and apart from whatever liability a landlord night have regarding the presence of mold." *Id.* at 17-18.

The Amended Complaint does not identify the warranty defendants allegedly made, beyond that defendants "expressly agreed to repair Plaintiffs' and other members of the Class's housing to remediate the mold contamination." ECF 40, ¶ 427. There is no basis to conclude that the Mold Addendum constitutes a warranty. In any event, this claim appears to be duplicative of the breach of contract and negligence claims. *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 11 (D.D.C. 2010) ("As a matter of judicial economy, courts should dismiss claims that are duplicative of other claims."). Accordingly, I shall dismiss Count III as to both defendants.

## 4.

I turn to Count V. Although defendants address Count V in the context of the contract claims (*see* ECF 43-1 at 21), it is a tort claim.

It is well established in Maryland that "'[t]he mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort.'" *Blondell v. Littlepage*, 413 Md. 96, 120-21, 991 A.2d 80, 94 (2010) (quoting *Jacques*, 307 Md. at 534, 515 A.2d at 759). In *Mesmer v. Md. Auto. Ins. Fund*, 353 Md. 241, 252, 725 A.2d 1053, 1058 (1999), the Maryland Court of Appeals said: "A contractual obligation, by itself, does not create a tort duty. Instead, the duty giving rise to a tort action must have some independent basis." In other words, "when the dispute is over the existence of any valid contractual obligation covering a particular matter, or where the defendant has failed to recognize or undertake any contractual obligation whatsoever, the plaintiff is

48

ordinarily limited to a breach of contract remedy." *Id.* at 254, 725 A.2d at 1059.

However, "[w]hen the defendant has proceeded on the basis that a contractual obligation exists, has undertaken that obligation, and has undertaken it in violation of the *appropriate standard of care*, . . . the plaintiff may, in some circumstances, maintain a tort action." *Mesmer*, 553 Md. at 254 (emphasis added). Of relevance here, in Maryland, "'when a landlord has agreed to make repairs there is a *duty* resting on him to do so, and upon his failure the tenant may either sue on his contract or bring an action on the case founded in tort for neglect of that duty.'" *Bocchini v. Gorn Management Co.*, 69 Md. App. 1, 17, 515 A.2d 1179, 1187 (1986)) (citation omitted) (emphasis in original).

Under Maryland law, "[w]here the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability" arising from a contract. *Jacques*, 307 Md. at 534, 515 A.2d at 759. This doctrine is sometimes called the "economic loss rule." *See, e.g.*, *Farmers Bank of Md. v. Chicago Title Ins. Co.*, 163 Md. App. 158, 172, 877 A.3d 1145, 1153 (2005). The "intimate nexus" is "satisfied by contractual privity or its equivalent." *Jacques*, 307 Md. at 534-35, 515 A.2d at 759-60.

Courts have found "privity and an 'intimate nexus' as a result of the expectation and knowledge of reliance by the plaintiff." *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 197, 219, 60 A.3d 1, 14 (2013). In *Jacques*, perhaps the touchstone Maryland case on the economic loss rule, the Maryland Court of Appeals found an "intimate nexus" between loan applicants and a bank where "the relationship between these parties … left the [applicants] particularly vulnerable and dependent on the Bank's exercise of due care" and "[t]he Bank was well aware of the nature of its obligation." *Jacques*, 307 Md. at 540-41, 515 A.2d at 762.

The Maryland Court of Appeals also recognized an "intimate nexus" between a bank and a non-customer in the case of *Chicago Title Ins. Co. v. Allfirst Bank*, 394 Md. 270, 905 A.2d 366 (2006).  There, the court found that an intimate nexus existed where a bank received a check from a title company that was not its customer, for the purpose of retiring a mortgage debt on real property owned by a customer of the bank, but the bank allowed the customer to deposit the check into the customer's own account, rather than apply the check to the mortgage loan.  *Id*. at 278, 905 A.2d at 370.  The court said, *id.* at 288 n.11, 905 A.2d at 376 n.11: "We disagree with [the] contention that [*Messing*] stands for the proposition that a depositary bank has no duty to … a 'non-customer and a stranger to the Bank.'" (quoting *Messing v. Bank of Am., N.A.*, 373 Md. 672, 691, 821 A.2d 22, 33 (2003)).

Similarly, in *Columbia Town Ctr. Title Co.*, 430 Md. at 224, 60 A.3d at 17, the court held that such a relationship existed between a title company and a real estate purchaser that was not its client, where "the Title Companies knew that the [purchaser] would rely on the title commitment [and] the [purchaser's] reliance on the information in the commitment … was an aim of the title insurance transaction."  An "intimate nexus" was also found between two parties with no contractual relationship where a defendant accounting firm "knew that the [plaintiffs] had relied on information supplied by [the firm] in deciding to lend monies to, or securing loans" for the accounting firm's client.  *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 693, 762 A.2d 582, 608 (2000).

The case of *Iglesias v. Pentagon Title & Escrow, LLC*, 206 Md. App. 624, 51 A.3d 51 (2012), *cert. denied*, 430 Md. 346, 61 A.3d 19 (2013), is also illuminating.  In that case, the plaintiff, Iglesias, had been the victim of an identity fraud scheme, whereby another person had purchased two parcels of real property in Iglesias's name, using a forged power of attorney.  The

Maryland Court of Special Appeals concluded that Pentagon, the company that conducted the settlements of the real estate transactions (and an individual member of Pentagon who acted as the settlement agent), did not owe a duty in tort to Iglesias to detect the fraud.

The *Iglesias* Court explained the standard under Maryland law for recognition of a tort duty in cases involving economic loss.  It said, *Iglesias*, 206 Md. App. at 638, 51 A.3d at 59 (quoting *Jacques*, 307 Md. at 534-35, 515 A.2d at 759-60) (footnote and citations omitted in *Iglesias*):

> "Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability.  This intimate nexus is satisfied by contractual privity or its equivalent.  By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability."

*See also Farmers Bank of Md. v. Chicago Title Ins. Co.*, 163 Md. App. 158, 172, 877 A.3d 1145, 1153 (2005).

Both sides discuss the case of *New Summit Associates, Ltd. P'Ship v. Nistle*, 73 Md. App. 351, 533 A.2d 1350 (1987).  In that case, the tenant brought claims against her former landlord and its corporate agent, which managed the apartment complex.  *Id.* at 356, 533 A.2d at 1352. The tenant alleged that the defendants "breached express and implied covenants of quiet enjoyment contained in her lease by permitting an invasion of her privacy. . . ."  *Id.* at 355, 533 A.2d at 1532.  She also asserted claims of negligence and intentional infliction of emotional distress against both the landlord and the agent.  *Id.*

Of relevance here, with respect to a tort claim arising out of a contract, the *New Summit* Court said, *id.* at 366, 533 A.2d at 1357:

> In order for a tort to arise out of a contract, both parties to the tort action need not be parties to the contract. *R.E. Linder Steel Erection Co., Inc. v. Wedemeyer, Cernik, Corrubia, Inc.*, 585 F.Supp. 1530, 1533 (D.Md.1984) *citing*

51

*Knickerbocker Ice Co. v. Gardiner Dairy Co.*, 107 Md. 556, 69 A. 405 (1908). As the agent of the landlord, New Summit, Dreyfuss was liable to the [plaintiff] for its failure to warn her of the latent defect in her leasehold only because it failed to perform a duty which was created by the contractual relationship established by the lease. This duty would not have existed "but for" the lease. Her negligence claim against Dreyfuss therefore arose out of a contract.

As I see it, plaintiffs allege tortious conduct arising from an alleged breach of contract. Defendants do not advance any grounds that support dismissal of Count V.

### C. Breach of Contract Claims (Counts IV and X)

### 1.

Plaintiffs assert breach of contract (Count IV) and unjust enrichment (Count X). They allege that defendants' "contractual obligations arise by virtue of the ROAs with Plaintiffs and other members of the Classes and because Plaintiffs and other members of the Classes are intended third-party beneficiaries of the Ground Lease and property management agreements. . . ." ECF 40, ¶ 438.

Defendants do not appear to challenge Meade's contractual obligations under the ROAs. *See* ECF 43 at 23. However, they argue that plaintiffs "do not have standing to sue as third-party beneficiaries of either the Ground Lease between Meade and the United States or the Property Management Agreement between Meade and Corvias Management." *Id.* at 24. They contend that in order to qualify as third-party beneficiaries, plaintiffs have to demonstrate that "the contact was expressly made for [their] benefit" and that they were intended as primary beneficiaries. *Id.* Defendants point out that neither the Ground Lease nor the PMA explicitly identifies plaintiffs as third-party beneficiaries. *Id.*

According to defendants, it would be "illogical and unworkable" for every tenant at Fort Meade to be "privy to the promises and an enforcer of the contractual obligations" between Meade and the United States, and Meade and Corvias. *Id.* Moreover, they note that the text of

the Ground Lease and the PMA expressly identifies the mortgagees, rather than the tenants, as third-party beneficiaries.  ECF 45 at 7.

Plaintiffs contend that third-party beneficiary status does not require express identification of the beneficiary in the contract. ECF 44 at 14.  They posit that the "touchstone is the parties' intent. . . ." *Id.*  Plaintiffs point to the "stated goal and entire purpose" of the Military Housing Privatization Initiative, which was "to improve housing for military families living on base." *Id.* at 15; ECF 40, ¶ 11.  And, they point to specific language in the Ground Lease and the PMA, to the effect that the housing on Fort Meade should be "first class."  ECF 44 at 15; ECF 43-2, ¶ 12.

### 2.

Because the Ground Lease and the PMA are contracts, I pause to review the principles of contract construction.  In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1 (4th ed. 1990); *accord* RESTATEMENT (SECOND) CONTRACTS § 1 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006).  "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's Cty. v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)).  Thus, mutual assent is an integral component of every contract.  *See, e.g.*, *Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, 759 F. App'x 170, 173 (4th Cir. 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a

contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

In determining whether there is an enforceable contract, courts begin the analysis "by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cty. Comm'rs of Caroline Cty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)). Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Servs.*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). An agreement is not enforceable if it omits an important term or is otherwise too vague or indefinite with respect to an essential term. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L&L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123,

131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted).  To determine the parties' intention, courts look first to the written language of the contract.  *Walton v. Mariner Health of Md., Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997).

Maryland adheres to the law of objective interpretation of contracts, so that "'the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract.'" *Sy-Lene of Wash., Inc. v. Starwood Urban Retail ll, LLC*, 376 Md. 157, 166, 829 A.2d 540, 545 (2003) (citation omitted); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014); *accord Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 306 (4th Cir. 2020).  The court's task is thus not to imagine what the parties' intended at the time of the agreement but to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'"  *Dumbarton*, 434 Md. at 52, 73 A.3d at 232 (quoting *Gen. Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)); *see*

*Parkway 1046, LLC*, 961 F.3d at 307. Notably, under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014). Ordinarily, a court should enforce an unambiguous contract "'without regard to the consequences of that enforcement'" and without rewriting the terms. *Parkway 1046, LLC*, 961 F.3d at 307 (citation omitted).

"Generally, a breach of contract is defined as a 'failure, without legal excuse, to perform any promise that forms the whole or part of a contract.'" *Weaver v. ZeniMax Media, Inc.*, 175 Md. App. 16, 51, 923 A.2d 1032 (2007) (citing WILLISTON ON CONTRACTS § 63:1). Under Maryland law, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan Servicing, LLC*, 83 F.Supp.3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda*, 198 Md. App. 337, 17 A.3d 744, 749 (2011)). To "prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *accord Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 437 (D. Md. 2015); *see also RRC Ne., LLC v. BAA Md., Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010). In other words, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005).

In *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012), the Maryland Court of Appeals said: "Maryland law requires that a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'"

(citation omitted) (emphasis *in Polek*); *see also Robinson v. GEO Licensing Co., LLC*, 173 F. Supp. 2d 419, 423 (D. Md. 2001).

**3.**

As noted, plaintiffs allege that they are third-party beneficiaries of the Ground Lease and property management agreements. "The original rule of the common law was that privity between the plaintiff and the defendant is requisite to maintain an action on a contract, even though the contract is for the benefit of a third person." *Mackubin v. Curtiss-Wright Corp.*, 190 Md. 52, 56, 57 A.2d 318, 320 (1948). "Ever since 1866, however, Maryland, like most other jurisdictions, has recognized the doctrine of third party beneficiary." *Parlette v. Parlette*, 88 Md. App. 628, 637, 596 A.2d 665, 669 (1991) (Motz, Diana, J.). "That doctrine permits a person for whose benefit a contract is made to maintain an action on it without any privity of contract." *Id.*, 596 A.2d at 669-70.

For example, under Maryland law, "[t]here can be no doubt that … the original named beneficiary" to an insurance policy "has standing as a third party beneficiary to sue for breach of contract." *Milbourne v. Conseco Servs., LLC*, 181 F. Supp. 2d 466, 468 (D. Md. 2002) (Davis, J.) (citing *Parlette*, 88 Md. App. at 637-38, 596 A.2d at 670); *see also Colden v. W. Coast Life Ins. Co.*, RDB-12-1691, 2013 WL 1164922, at *4 (D. Md. Mar. 19, 2013) ("[B]ecause Maryland law recognizes the doctrine of third-party beneficiary, *Parlette,* 596 A.2d at 669–70, these Plaintiffs — the named beneficiaries of Mr. Weedon's insurance policy — may maintain this contract action.").

"In order for a person to recover as a third party beneficiary, he or she must show that the parties to the contract clearly intended that the third party benefit from it." *Id.*, 596 A.2d at 670 (citing *Shillman v. Hobstetter*, 249 Md. 678, 687, 241 A.2d 570, 575 (1968)). Moreover, it

57

"'must clearly appear that the parties [to the contract] intend to recognize him as the *primary party* in interest and as privy to the promise.'"  *Shillman*, 249 Md. at 688, 241 A.2d at 575 (quoting *Marlboro Shirt Co. v. American District Telegraph Co.*, 196 Md. 565, 569, 77 A.2d 776, 777 (1951)) (emphasis added).   "An incidental beneficiary," in contrast, is "one who benefits from the contract although the benefit was not specifically intended or planned by the contracting parties."  *Parlette*, 88 Md. App. at 637, 596 A.2d at 670.   Notably, an incidental beneficiary "has no rights against the promisee or promisor."  *Id.*

*Parlette*, *supra*, is instructive.   The parties were the parents of the insured decedent.   The plaintiff alleged and produced evidence at trial that she was the intended beneficiary of the son's insurance policy, and that the defendant, who sold his son the policy, ignored his son's request to name the plaintiff as the beneficiary.   Instead, the defendant completed the beneficiary form, naming himself, without telling the parties' son.   88 Md. App. at 631-34, 596 A.2d at 667-68. Judge Diana Motz, then serving on the Maryland Court of Special Appeals, wrote for that court that the trial judge erred in granting the defendant's motion for judgment at the close of the plaintiff's case on the ground that he alone was the named beneficiary of the son's life insurance policy.  *Id.* at 631, 596 A.2d at 667.   The *Parlette* Court concluded that an "intended" beneficiary who was not a named beneficiary had standing to sue for breach of contract under the third party beneficiary doctrine, where the evidence showed the insured had intended to name the plaintiff, rather than the defendant, as beneficiary to the policy.  *Id.* at 637-68, 596 A.2d at 670.

*Milbourne*, *supra*, 181 F. Supp. 2d 466.   ECF 18-1 at 7-8, also provides guidance.   There, the evidence showed that the insured had attempted to change the named beneficiary to someone other than plaintiff, but there was some question as to whether the insured had effectively completed the change.  *Id.* at 468.   Judge Andre Davis, then a member of this court, held that "as

the original named beneficiary," there was "no doubt" that plaintiff had "standing as a third party beneficiary to sue for breach of contract." *Id*. He cited *Parlette* for that assertion. *Id*. And, he granted summary judgment to the insurer in *Milbourne*, based on a change of beneficiary form executed by the insured before he died. *Id*. at 469-70.

More recently, Judge Bredar explained in *CX Reinsurance Co. Ltd. v. Levitas*, 207 F. Supp. 566, 570 (D. Md. 2016):

> Section 302 of the Restatement (Second) of Contracts, cited with approval in Maryland case law, provides:
>
>> (1) [U]nless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>>
>>> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>>>
>>> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>>
>> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.
>
> The Maryland courts have noted a decisive distinction between intended beneficiaries and incidental beneficiaries. *Id.* To determine on which side of that distinguishing line an individual or entity falls, courts "look to the intention of the parties to recognize a person or class as a primary party in interest as expressed in the language of the instrument and consideration of the surrounding circumstances as reflecting upon the parties' intention." *Id.* at 213 (internal quotation marks omitted).

At this stage, whether plaintiffs are third-party beneficiaries of the Ground Lease and the PMA turns, at least in part, on the intent of the parties in the formation of those contracts. That is a factual dispute, and is not appropriate for adjudication at this stage. In any event, plaintiffs' claims may proceed on the basis of the ROAs. I shall deny the Motion as to Count IV.

**4.**

With respect to Count X, defendants contend that plaintiffs' unjust enrichment claim must fail because "it cannot coexist with an express contract. . . ." ECF 43-1 at 26. Plaintiffs observe that they are "not limited to a single theory of liability at the outset." ECF 44 at 23. They maintain that they are permitted to plead unjust enrichment as an alternative to the breach of contract claim. *Id.* at 24.

The claim of unjust enrichment is "'notoriously difficult to define.'" *AAC HP Realty, LLC v. Bubba Gump Shrimp Co. Restaurants, Inc.*, 243 Md. App. 62, 69, 219 A.3d 99, 103 (2019) (citation omitted). The claim implicates the distinctions in Maryland between an "express contract," a "contract implied-in-fact," and a "contract implied-in-law." *Dolan v. McQuaide*, 215 Md. App. 24, 37, 79 A.3d 394, 402 (2013).

"An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing." *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cty. Comm'rs of Caroline Cty v. J. Roland Dashiell & Sons, Inc.* ("*Dashiell*"), 358 Md. 83, 94, 747 A.2d 600, 606 (2000)) (emphasis omitted).

A contract implied-in-fact, or an "implied contract," is "an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men." *Maryland Cas. Co.*, 442 Md. at 706, 114 A.3d at 688; *see also Dashiell*, 358 Md. at 94, 747 A.2d at 606 ("An implied contract is an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men.") (internal quotation and citations omitted). An implied-in-fact contract "is 'inferred from conduct

of parties and arises where plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefore, and defendant, knowing such circumstances, avails himself of [the] benefit of those services.'" *Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6 (citation omitted); *see Mogavero v. Silverstein*, 142 Md. App. 259, 275, 790 A.2d 43, 52 (2002) ("An implied-in-fact contract is a 'true contract' and 'means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'"); *Slick v. Reinecker*, 154 Md. App. 312, 318, 839 A.2d 784, 787 (2003) ("'The term [implied in fact contract] only means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'") (quoting *Mass Transit Admin. v. Granite Constr. Co.*, 57 Md. App. 766, 774, 471 A.2d 1121 (1984)) (emphasis omitted) (bracketed comments added in *Slick*).

Thus, an implied-in-fact contract "'*refers to that class of obligations which arises from mutual agreement and intent to promise*, when the agreement and promise have *simply not been expressed in words.* Despite the fact that no words of promise or agreement have been used, *such transactions are nevertheless true contracts*, and may properly be called inferred contracts or contracts implied in fact.'" *Mohiuddin v. Doctors Billing & Management Solutions, Inc.* 196 Md. App. 439, 448, 9 A.3d 859, 865 (2010) (quoting 1 Richard A. Lord, *Williston on Contracts*, § 1.5, pp. 20-21 (1990)) (emphasis in *Mohiuddin*). "Recovery on a contract implied in fact . . . is based on the amount that the parties intended as the contract price or, if that amount is unexpressed, the fair market value of the plaintiff's services." *Mogavero*, 142 Md. App. at 276, 790 A.2d at 53.

A contract implied-in-law, also known as a "quasi-contract," or unjust enrichment, is a "[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a

recovery as though there had been a promise." *Maryland Cas. Co.*, 442 Md. at 707, 114 A.2d at 689 (emphasis and citations omitted); *see Bubba Gump Shrimp Co.*, 243 Md. App. at 70, 219 A.3d at 104; *Mohiuddin*, 196 Md. App. at 449, 9 A.3d at 865 (quoting Restatement (Second) of Contracts, § 4 (1981)); *accord Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6 ("A contract implied by law is now what commonly is called quasi-contract . . . ."). However, "'unlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. *They are obligations created by law for reasons of justice*.'" *Mohiuddin*, 196 Md. App. at 449, 9 A.3d at 865 (citation omitted) (emphasis in *Mohiuddin*).

And, of relevance here, under Maryland law, "a claim of unjust enrichment, which is a quasi-contract claim, may not be brought where the subject matter of the claim is covered by an express contract between the parties." *Janusz v. Gilliam*, 404 Md. 524, 537, 947 A.2d 560, 567 (2008) (internal quotation marks omitted); *see Dashiell*, 358 Md. at 101, 747 A.2d at 610 ("We hold that, generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists."); *FLF, Inc. v. World Publications, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties."); *Bubba Gump Shrimp Co.*, 243 Md. App. at 70-71, 219 A.3d at 104 (recognizing that "'no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests'") (citation omitted).[9]

---

[9] There are "four potential exceptions to the prevailing rule barring unjust enrichment when an enforceable contract exists." *Bubba Gump Shrimp Co.*, 243 Md. App. at 72, 219 A.3d at 105. These include "'when there is evidence of fraud or bad faith . . . .'" *Id.*

In Maryland, "[a] claim of unjust enrichment is established when: (1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return." *Benson v. State*, 389 Md. 615, 651–52, 887 A.2d 525, 546 (2005) (citation omitted); *see Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295, 936 A.2d 343, 351 (2007); *Dashiell*, 358 Md. at 95 n.7, 747 A.2d at 607 n.7; *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 574, 952 A.2d 304, 327, *cert. denied*, 406 Md. 444, 959 A.2d 793 (2008); *Swedish Civil Aviation Admin. v. Project Mgmt. Enter., Inc.*, 190 F.Supp.2d 785, 792-93 (D. Md. 2002).

"A successful unjust enrichment claim serves to 'deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses.'" *Hill*, 402 Md. at 295–96, 936 A.2d at 352 (citation omitted); *see also Berry & Gould, P.A. v. Berry*, 360 Md. 142, 151, 757 A.2d 108, 113 (2000). "Generally, courts are hesitant to deviate from the principle of the rule and allow unjust enrichment claims only when there is evidence of fraud or bad faith,[ ] there has been a breach of contract or a mutual rescission of the contract[ ], when rescission is warranted,[ ] or when the express contract does not fully address a subject matter.[ ]" *Dashiell*, 358 Md. at 100, 747 A.2d at 608–09.

Here, plaintiffs assert contract claims against both defendants. However, "a plaintiff may plead in the alternative by asserting claims for unjust enrichment and breach of contract, [but] when doing so the 'plaintiff's claim for unjust enrichment *must* include an allegation of fraud or bad faith in the formation of the contract.'" *J.E. Dunn Const. Co. v. S.R.P. Development Ltd.*

*Partnership*, 115 F. Supp. 3d 593, 608 (D. Md. 2015) (quoting *Jones v. Pohanka Auto North, Inc.*, 43 F. Supp. 3d 554, 573 (D. Md. 2014) (emphasis in original)).

Plaintiffs' claim of bad faith may ultimately fail.  But, they have adequately pleaded bad faith in the formation of the ROAs.  ECF 40, ¶ 487.  They allege that defendants "conducted inspections of over 300 homes on Fort Meade" and became aware that many of them "had not been maintained properly."  *Id.* ¶ 47.  Nevertheless, according to plaintiffs, defendants knowingly leased "defective housing to service members and their families."  *Id.* ¶ 49. And, plaintiffs allege that while advertising the housing, defendants spent "far less on maintenance and repair than what they budgeted and knew was necessary. . . ."  *Id.* ¶ 46.

Defendants have not provided any basis as to why any particular element of plaintiffs' unjust enrichment claim fails, aside from the contention that there is a written contract.  *See* ECF 43 at 26.  Accordingly, I decline to dismiss the unjust enrichment claim in Count X.

### D.  Fraud/Misrepresentation Claims (Counts XI, XII, XIII)

Plaintiffs lodge several claims rooted in defendants' alleged misrepresentations, including unfair or deceptive trade practices (Count XI), negligent misrepresentation (Count XII), and fraud (Count XIII).

### 1.  Unfair Trade Practices

In Count XI, plaintiffs bring a claim for unfair or deceptive trade practices under C.L. § 13-301.  They allege that defendants promised to provide the "gold standard" of housing, including fixing defects and inspecting the homes, and the representations were "false and misleading" because defendants knew that the homes "needed more maintenance and preventative maintenance than Defendants were providing[.]"  ECF 40, ¶ 492.

Defendants contend that Picerne's statements before Congress in February 2019 cannot support a plausible deceptive trade practices claim because "there is no allegation that the statements were directed at plaintiffs or any other potential consumer for rental housing at Fort Meade at the time of the alleged statements in February 2019."   ECF 43-1 at 19.   These statements, according to defendants, were not representations to customers.  *Id.*  And, plaintiffs did not rely on the statements, because they had already moved into the residences.   *Id.* Moreover, defendants contend that there are no allegations that the statements caused injury to the plaintiffs.  *Id.* at 20.

Further, defendants argue that the allegations about the statements of Corvias representatives to plaintiffs, and images on the Corvias website, are not specific enough to sustain a misrepresentation claim.  *Id.*  In addition, defendants point to the portion of the ROA that indicates that plaintiffs inspected the homes before leasing, and claim that this acknowledgement is "inconsistent with an allegation that they relied upon representations on a website or in a conversation that occurred before they signed a statement that they inspected and were satisfied with the condition of the specific housing unit they leased before they moved in." *Id.*  at 21.

Plaintiffs counter that the Amended Complaint alleges more than plaintiffs merely viewing images on the Corvias website.  Rather, the Amended Complaint alleges that plaintiffs viewed "the pictures of purportedly clean, affordable, and well-maintained houses available on Corvias's website."   ECF 44 at 16; ECF 40, ¶ 83.   In their view, these advertisements misrepresented the condition of the homes.  ECF 44 at 16.  By advertising the homes, defendants "implicitly represented that they were providing habitable homes and would repair any dangerous housing conditions."  *Id.*

Moreover, plaintiffs assert that "'the landlord who leases premises for human habitation is presumed to have knowledge of any defective condition that a reasonable inspection would have disclosed' and thus may be liable" under C.L. § 13-301(9).  *Id.* at 17 (quoting *Benik v. Hatcher*, 358 Md. 507, 536, 750 A.2d 19, 26 (2000)). And, plaintiffs argue that the fact that the ROA contains a clause that states that the plaintiffs had inspected the homes before entering into the lease is of no moment, because claims under C.L. § 13-301 "can proceed even when the tenant 'inspected the premises before renting it.'"  ECF 44 at 17 n.6.

In their Reply, defendants maintain that the mere presence of mold did not render the homes uninhabitable or create liability under C.L. § 13-301.  ECF 45 at 9.  They argue that to state a claim under the Commercial Law Article, plaintiffs must sufficiently allege that there was a mold problem at the time the leases were signed.  *Id.*  And, they maintain that plaintiffs have failed to plead any misrepresentations with particularity.  *Id.*

In relevant part, C.L. § 13-301, the Maryland Consumer Protection Act ("CPA"), provides:

> Unfair, abusive, or deceptive trade practices include any:
>
> (1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;
>
> * * * *
>
> (3) Failure to state a material fact if the failure deceives or tends to deceive;
>
> ****
>
> (5) Advertisement or offer of consumer goods, consumer realty, or consumer services:
>> (i)     Without intent to sell, lease, or rent them as advertised or offered . . . .
>
> ****

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

(i) The promotion or sale of any consumer goods, consumer realty, or consumer service;

(ii) A contract or other agreement for the evaluation, perfection, marketing, brokering or promotion of an invention; or

(iii) The subsequent performance of a merchant with respect to an agreement of sale, lease, or rental[.]

The CPA defines "consumer" as "an actual or prospective purchaser, *lessee*, or recipient of consumer goods, consumer services, consumer realty, or consumer credit." C.L. § 13-101(c)(1) (emphasis added). And, Maryland courts consider two components in analyzing whether a statement violates C.L. § 13-301(1). A misrepresentation "falls within the scope of C.L. § 13-301(1) if it is 'false' or 'misleading' *and* it has 'the capacity, tendency, or effect of deceiving or misleading' consumers." *McGraw v. Loyola Ford, Inc.*, 124 Md. App. 560, 577, 723 A.2d 502, 510 (emphasis in original), *cert. denied*, 353 Md. 473, 727 A.2d 382 (1999).

Whether a statement is "misleading" is judged in Maryland from the point of view of a reasonable but unsophisticated consumer. *See Luskin's, Inc. v. Consumer Protection Div.*, 353 Md. 335, 356-57, 726 A.2d 702, 712 (1999). In assessing the "capacity, tendency, or effect" of a statement to deceive or mislead, courts consider whether "a significant number of unsophisticated consumers would find [the] information [at issue] important in determining a course of action." *Green v. H & R Block, Inc.*, 355 Md. 488, 524, 735 A.2d 1039, 1059 (1999). Put another way, a court should ask whether the information is "'important to consumers and, hence, likely to affect their choice.'" *Luskin's*, 353 Md. at 359, 726 A.2d at 713 (citation omitted). In this respect, a statement "cannot be viewed in a vacuum"; rather, it must be viewed

in the context in which it was made, along with other representations to the consumer. *McGraw*, 124 Md. App. at 580, 723 A.2d at 511.

As noted, plaintiffs allege that defendants learned during the process of bidding for the Ground Lease that many of the homes at Fort Meade "had not been maintained properly." ECF 40, ¶ 47. They also allege that Corvias knew "it would have to expend considerable resources on maintenance, and to proactively engage in preventative maintenance going forward." *Id.*

The allegations are sufficient to state a claim under C.L. § 13-301. To illustrate, the Amended Complaint alleges that the Gerbers were "assigned" to a house. *Id.* ¶ 220. And, before leasing their residence, the Gerbers "visited the Corvias website," which "touted the quality of on-post housing." *Id.* ¶ 221. They also spoke with Corvias representatives who "assured" them that "the houses were well-maintained, cleaned, and inspected prior to move-in and emphasized that any needed maintenance would be performed promptly." *Id*. But, "[w]hen the Gerbers arrived at the property on July 2, 2018 to move in their belongings, they found the kitchen flooded, with water running from the kitchen into the garage." *Id.* ¶ 223. *See also id.* ¶ 275 ("Upon moving in. . . the Nunez family noticed a pronounced and pervasive odor throughout the home. Liza Nunez made repeated reports to Corvias, but Corvias failed to eradicate the smell.").

### 2.        Negligent Misrepresentation

Plaintiffs lodge a claim of negligent misrepresentation in Count XII. The Maryland Court of Appeals sets forth the elements of a claim for negligent misrepresentation in *Lloyd v. General Motors Corp.*, 397 Md.108, 136, 916 A.2d 257, 273 (2007) (quotation marks omitted):

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

Numerous Maryland cases are to the same effect.  *See*, *e.g.*, *Griesi v. Atlantic Gen'l Hosp. Corp.*, 360 Md. 1, 11, 765 A.2d 548, 553 (2000); *Blondell*, 413 Md. at 119, 991 A.2d at 94; *Valentine v. On Target*, 353 Md. 544, 549, 727 A.2d 947, 949 (1999); *BG & E v. Lane*, 338 Md. 34, 43, 656 A.2d 307, 311 (1995); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 336-37, 439 A.2d 534, 539 (1982); *Virginia Dare Stores v. Schuman*, 175 Md. 287, 291-92, 1 A.2d 897, 899 (1938); *see also Heritage Oldsmobile-Imports v. Volkswagen of Am., Inc.*, 264 F. Supp. 2d 282, 290-91 (D. Md. 2003); *All Med. Personnel, Inc. v. Ameritox, LLC*, 18-CCB-1527, 2018 WL 5810866, at *2 (D. Md. Nov. 6, 2018).

A "negligent misrepresentation claim based on statements promissory or predictive in nature" is not viable "[u]nless the plaintiff puts forward evidence tending to show that the 'promisor' or 'predictor' made the statements with the present intention not to perform…." *Miller v. Fairchild Indus., Inc.*, 97 Md. App. 324, 346, 629 A.2d 1293, 1304 (1993).  But, a promise made with the present intention not to perform is "perforce, an intentional misrepresentation, not a negligent one, and thus cannot sustain an action for negligent misrepresentation." *Id*.

Put another way, "[i]n order for a negligent misrepresentation claim based upon a promise of future conduct to be actionable, the party making the representation regarding its future conduct must know, at the time it makes the representation, that it does not intend to carry out the promise." *Heritage Oldsmobile,* 264 F. Supp. 2d at 291.  But, if "the party knows the representation to be false at the time it is made, then the claim is one for *fraudulent* misrepresentation" and the "negligent misrepresentation claim [is converted] into a claim for fraudulent misrepresentation." *Id.* (emphasis in original); *see also Orteck Intern. Inc. v. TransPacific Tire & Wheel, Inc.,* DKC-2005-2882, 2006 WL 2572474 at *20 (D. Md. Sept. 5,

2006) ("To the extent that a party making the representation about its future conduct knows at the time the statement is made that it is false, the [negligent misrepresentation] claim converts to one of *fraudulent* misrepresentation") (emphasis in original); *D & G Flooring, LLC v. Home Depot USA, Inc.,* 346 F. Supp. 2d 818, 822 (D. Md. 2004) (stating that representations regarding future conduct are not actionable under a theory of negligent misrepresentation).

To the extent that defendants address plaintiffs' negligent misrepresentation claim separately from the unfair trade practices claim, defendants contend that the congressional testimony, which represents a promissory or predictive statement, cannot be used to bring a negligent misrepresentation claim. ECF 43 at 19. But, as noted, defendants rely on the congressional testimony only to show the oft-repeated Corvias mantra, to the effect that defendants' housing meets the "gold standard." ECF 44 at 18 n.7. Defendants' argument is insufficient to warrant dismissal of the negligent misrepresentation claim.

### 3. Fraud

Plaintiffs allege a claim of fraud in Count XIII. As discussed, claims sounding in fraud are subject to a heightened pleading standard under Fed. R. Civ. P. 9(b).

Under Maryland law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'" *Sass v. Andrew*, 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted). Notably, "a cause of action for fraud" has "a strict requirement of scienter." *First Union Nat'l Bank v. Steele Software Sys. Corp.*, 154 Md. App. 97, 147, 838 A.2d 404, 433 (2003). "Recovery in a tort action for fraud or deceit in Maryland is based upon a defendant's deliberate intent to deceive." *Id.*; *see VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998); *Sass*, 152 Md. App. at 430, 832 A.2d at 260.

In an action for intentional or fraudulent misrepresentation, which is the garden variety of fraud and is often described simply as "fraud," the plaintiff ultimately must show:

(1) that the defendant made a false representation to the plaintiff;
(2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;
(3) that the misrepresentation was made for the purpose of defrauding the plaintiff;
(4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and
(5) that the plaintiff suffered compensable injury resulting from the misrepresentation."

*Nails v. S & R, Inc.,* 334 Md. 398, 415, 639 A.2d 660, 668 (1994); *accord Thomas v. Nadel*, 427 Md. 441, 451 n.18, 48 A.3d 276, 282 n.18 (2012); *Gourdine v. Crews*, 405 Md. 722, 758, 955 A.2d 769, 791 (2008); *Sass*, 152 Md. App. at 429, 832 A.2d at 260.

In Maryland, the essential elements of a claim for fraudulent concealment are as follows:

(1) the defendant owed a duty to the plaintiff to disclose a material fact;
(2) the defendant failed to disclose that fact;
(3) the defendant intended to defraud or deceive the plaintiff;
(4) the plaintiff took action in justifiable reliance on the concealment; and
(5) the plaintiff suffered damages as a result of the defendant's concealment.

*Blondell*, 413 Md. at 119, 991 A.2d at 94; *Lloyd*, 397 Md. at 138, 916 A.2d at 274; *Green v. H & R Block, Inc.*, 355 Md. 488, 525, 735 A.2d 1039, 1059 (1999).

To be actionable, a false representation "must be of a material fact." *Gross v. Sussex, Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1161 (1993). "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 152 Md. App. at 430, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows . . . [the] recipient is likely to regard . . . as important.'" *Gross*, 332 Md. at 258, 630 A.2d at 1161 (citation omitted). And, the "misrepresentation must be made with the deliberate intent to deceive." *Sass*, 152 Md. App. at 430, 832 A.2d at 260 (citing *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d

188 (1998)).  Moreover, the defendant must "know[ ] that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232, 652 A.2d 1117 (1995).

A mere failure to disclose a material fact does not constitute fraud, in the absence of a legal duty to disclose that inheres in certain types of transactions, because "Maryland recognizes no general duty upon a party to a transaction to disclose facts to the other party." *Md. Envir. Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 516 (2002).  However, "[e]ven in the absence of a duty of disclosure, one who suppresses or conceals facts which materially qualify representations made to another may be guilty of fraud." *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 239, 469 A.2d 867, *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied*, 469 U.S. 1215 (1985); *see Lubore v. RPM Associates, Incorporated*, 109 Md. App. 312, 330, 674 A.2d 547, 556 (1996).

Fraud based on active suppression or concealment of material facts or an intentional failure to disclose facts that the defendant is legally obligated to disclose is the variety of fraud referred to as "fraudulent concealment."  "Fraudulent Concealment 'is any statement or other conduct which prevents another from acquiring knowledge of a fact, such as diverting the attention of a prospective buyer from a defect which otherwise, he would have observed.'" *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108, 138, 916 A.2d 257, 274 (2007).  In other words, it describes a "situation where the defendant actively undertakes conduct or utters statements designed to, or that would, divert attention away from" a material fact.  *Id.* at 138 n.11, 916 A.2d at 274 n.11.

The Maryland Court of Appeals has said that, absent a fiduciary relationship, a plaintiff seeking to establish fraudulent concealment must prove that the defendant took affirmative

action to conceal the cause of action and that the plaintiff could not have discovered the cause of action despite the exercise of reasonable diligence . . . ." *Frederick Road Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 100 n.14, 756 A.2d 963, 976 n.14 (2000) (internal citations omitted). Maryland courts have determined that a duty to disclose "arises in certain relationships such as a confidential or fiduciary relationship." *Hogan v. Maryland State Dental Ass'n*, 155 Md. App. 556, 566, 843 A.2d 902, 908 (2004); *see Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 323-24, 389 A.2d 887 (1978) (finding a duty to disclose based on a fiduciary relationship).

"'To create a cause of action, concealment must have been intentional and effective—the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact. The affirmative suppression of the truth must have been with intent to deceive.'" *Fegeas v. Sherrill*, 218 Md. 472, 476-77, 147 A.2d 223, 225-26 (1958) (citation omitted); *accord Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 524, 958 A.2d 385, 390 (2008). As the *Rhee* Court explained, *id*. at 536, 958 A.2d at 396 (internal citation omitted) (alterations in *Rhee*):

> [T]he concealment or suppression [of a material fact] is in effect a representation that what is disclosed is the whole truth. The gist of the action [for fraud] is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant . . . .

"The tort of fraudulent inducement 'means that one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment.'" *Rozen v. Greenberg*, 165 Md. App. 665, 674, 886 A.2d 924, 929 (2005) (quoting *Sec. Constr. Co. v. Maietta*, 25 Md. App. 303, 307, 334 A.2d 133, 136 (1975)). In other words, it incorporates all of the elements of fraudulent misrepresentation or fraudulent concealment, with the added element that the defendant's fraud led the plaintiff to enter into a detrimental contractual agreement.

Maryland courts have recognized that "a promise made to induce another to execute a contract, which the promisor never intended to perform, may create liability for fraud." *Sass*, 152 Md. App. at 432, 832 A.2d at 262 (citing *Councill v. Sun Ins. Office*, 146 Md. 137, 150, 126 A. 229, 234 (1924)).  It follows that "an action for fraud may not be dismissed on this basis if the alleged fraud is based on a defendant's promise that is made with the present intention not to perform that promise." *Aloi v. Moroso Inv. Partners, LLC*, DKC-11-2591, 2012 WL 4341741, at *4 (D. Md. Sept. 20, 2012) (citing *Sass*, 152 Md. App. at 436, 832 A.2d at 264).  On the other hand, the "'failure to fulfill a promise is merely a breach of contract.'" *Kerr v. Johns Hopkins Univ.*, L-10-3294, 2011 WL 4072437, at *7 (D. Md. Sept. 12, 2011) (quoting *Sass*, 152 Md. App. at 438, 832 A.2d at 265), *aff'd*, 473 F. App'x 246 (4th Cir. 2012), *cert. denied*, 568 U.S. 1124 (2013).

"In fraudulent inducement cases," a party who is defrauded "may elect between two remedies, which are exclusive."  Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* § 3.92, at 346 (5th ed. 2013).  "Persons who discover that they have been induced into a contract by fraud must decide, or the law will decide for them, whether unilaterally to rescind the contract or to ratify the contract and seek damages, either affirmatively or by recoupment." *Sonnenberg v. Sec. Mgmt. Corp.*, 325 Md. 117, 127, 599 A.2d 820, 823 (1992).

Notably, fraud cannot be predicated on statements that are merely "'expressions as to what will happen in the future.'" *Sass*, 152 Md. App. at 438, 832 A.2d at 265 (quoting *Levin v. Singer*, 227 Md. 47, 63, 175 A.2d 423, 432 (1961)); *see Highlands Office Park Three, LLC v. GE Commercial Fin. Bus. Prop. Corp.*, WDQ-08-2972, 2009 WL 10682225, at *4, n.7 (D. Md. Feb. 25, 2009); *Cooper v. Berkshire Life Ins. Co.*, 148 Md. App. 41, 73, 810 A.2d 1045, 1064 (2002).

The Fourth Circuit has said: "It is true, as a general rule, that an action for fraud will lie only for misrepresentation of past or existing facts, and that breach of a promise to render a performance in the future is redressable only by an action in contract."  *Learning Works, Inc. v. The Learning Annex, Inc.*, 830 F.2d 541, 546 (4th Cir. 1987).

Thus, Maryland cases distinguish "between statements that are 'a prediction or an expression of expectation concerning external events' and those that are 'relate[d] to matters within the speaker's control.'"  *Carroll Co. v. Sherwin-Williams Co.*, 848 F. Supp. 2d 557, 569 (D. Md. 2012) (quoting *Gross*, 332 Md. at 272, 630 A.2d at 1169) (alteration in *Carroll*). Therefore, a predictive statement by a speaker who holds himself out as "knowledgeable in a particular field" can support a claim of fraud "where the circumstances indicate . . . that the speaker has a factual basis for his predictions so that the existence of facts is implied by the representations."  *Cooper*, 148 Md. App. at 73-74, 810 A.2d at 1064 (citation omitted); *see also Hale Trucks of Md., LLC v. Volvo Trucks North Am., Inc.* 224 F. Supp. 2d 1010, 1031-32 (D. Md. 2002).

What the Maryland Court of Special Appeals said in *Goldstein v. Miles*, 159 Md. App. 403, 436, 859 A.2d 313, 332 (2004), is apt:  "A statement that is 'vague and indefinite in its nature and terms, or is merely a loose conjectural or exaggerated statement, is not sufficient to support' either a fraud or negligent misrepresentation action, because 'such indefinite representations ought to put the person to whom they are made, upon the inquiry, and if he chooses to put faith in such statements, and abstained from inquiry, he has no reason to complain.'" (citation omitted); *see also Fowler v. Benton*, 229 Md. 571, 579, 185 A.2d 344, 349 (1962).  And, "puffing [and] related expressions of opinion that are common in sales [are] not

actionable as fraud." *Eclectic Props. East, LLC v. Marcos & Millichap Co.*, 751 F.3d 990, 100 (9th Cir. 2014).

Defendants contend that plaintiffs' fraud claim must fail because defendants have not alleged facts with the level of specificity required by Rule 9(b). ECF 43 at 21. And, defendants claim that Picerne's congressional testimony cannot support a claim for fraud because "there are no facts to support the conclusion that the congressional testimony was knowingly false or that plaintiffs relied on it to their detriment." *Id.*

Conversely, plaintiffs contend that they have pleaded with the requisite specificity multiple fraudulent representations. They point to statements made by defendants' representatives to the Bowers, who were told their home was remediated, only to discover that the problems had not been fixed and the mold was still present. ECF 44 at 19; ECF 40, ¶¶ 137, 139. And, plaintiffs point to the Chubbs, who were falsely assured by a Corvias representative that the homes on base were "well-maintained, cleaned, and inspected prior to move-in." ECF 40, ¶ 203. Moreover, plaintiffs assert that they do not rely on the congressional testimony itself to establish their fraud claim; rather, the testimony is merely evidence of the "longstanding Corvias mantra, dating back to the start of the Fort Meade project, that Defendants provided the 'gold standard' in housing and maintenance." ECF 44 at 18 n.7; *see* ECF 40, ¶ 6. They add that reliance is a fact question. ECF 44 at 19.

Plaintiffs allege that defendants knowingly made false representations to plaintiffs in the formation of the ROAs, claiming that the homes were clean and safe when they knew otherwise. They assert: "Defendants maintained a practice of moving Plaintiffs into homes which Defendants knew were infested with toxic mold." ECF 40, ¶ 507. Plaintiffs also allege that many of the families relied on these representations in choosing to live in on-base housing. And,

plaintiffs allege that defendants deliberately misrepresented the status of repairs.  They state that defendants "made false statements about the status and success of their repair and remediation work. . . ." *Id.* ¶ 508; *see also id.* ¶ 509.

Further, plaintiffs allege, *id.* ¶ 69 (emphasis added):

Corvias. . .truncated mold inspections, conducted them improperly by failing to compare samples taken inside a house with those taken from a control of outside air, *by running industrial strength air scrubbers in houses prior to testing*, *in withholding information about the results of testing from family members*, in not following up on the recommendations of the testers to remediate, and in performing haphazard and incomplete remediation.

Defendants construe the allegations in the FAC too narrowly.  Plaintiffs need only "nudge" their claims from conceivable to plausible.  *Twombly*, 550 U.S. at 570.  That standard simply "asks for more than a sheer possibility that a defendant acted unlawfully."  *Iqbal*, 556 U.S. at 678.  Moreover, the Court cannot resolve factual disputes in the context of a motion to dismiss.

The allegations are sufficient to set forth a claim of fraud.  Accordingly, I shall deny the Motion as to Count XIII.

### E.  Statutory Claims

#### 1.  Violation of ¶ 3951(a) of the Servicemembers Civil Relief Act

In Count VII, plaintiff alleges that defendants violated 50 U.S.C. § 3951, the "Servicemembers Civil Relief Act" ("SCRA").  It prohibits a landlord from evicting an active-duty service member and their dependents from a residence.

Defendants contend that the Amended Complaint does not allege eviction.  ECF 43-1 at 29.  And, they argue that there is no "statutory or case authority for the proposition that when the statute prohibits a landlord from evicting a tenant or distressing a property for rent, it also intends to reach the tenant's decision to remove himself or herself from the premises."  *Id.*

Plaintiffs argue that the SCRA should be liberally construed and should be read "'with an eye friendly to those who dropped their affairs to answer their country's call.'" ECF 44 at 22 (quoting *Gordon v. Pete's Auto Service of Denbigh, Inc.*, 637 F.3d 454, 458 (4th Cir. 2011)). And, they maintain that, "[e]ven if constructive eviction under SCRA were a 'novel legal theory,' that provides no basis for dismissal." ECF 44 at 22.

The SCRA states, in relevant part, 50 U.S.C. § 3951:

**(a) Court-ordered eviction**

**(1) In general**

Except by court order, a landlord (or another person with paramount title) may not--

> (A) evict a servicemember, or the dependents of a servicemember, during a period of military service of the servicemember, from premises--

> > (i) that are occupied or intended to be occupied primarily as a residence . . . .

At most, plaintiffs allege constructive eviction.  They provide no authority upon which this Court can conclude that constructive eviction is covered by the SCRA.  In fact, the presence of the phrase "except by court order" suggests that the statute is intended to prevent legal evictions.

Accordingly, I will grant the Motion as to Count VII.

### 2.        Violation of Md. Code, Real Property § 8-211

### a.

Count VIII asserts a violation of R.P. § 8-211.[10]  R.P. § 8-211 is titled "Repair of dangerous defects; rent escrow."  It provides, in relevant part:

(a) *Purpose.* —The purpose of this section is to provide tenants with a mechanism for encouraging the repair of serious and dangerous defects which

---

[10] As noted, Count I, which asserts a claim for negligence, also implicates R.P. § 8-211.

exist within or as part of any residential dwelling unit, or upon the property used in common of which the dwelling unit forms a part. The defects sought to be reached by this section are those which present a substantial and serious threat of danger to the life, health and safety of the occupants of the dwelling unit, and not those which merely impair the aesthetic value of the premises, or which are, in those locations governed by such codes, housing code violations of a nondangerous nature. The intent of this section is not to provide a remedy for dangerous conditions in the community at large which exists apart from the leased premises or the property in common of which the leased premises forms a part.

(b) *Sanctions and repair consistent with public policy.* — It is the public policy of Maryland that meaningful sanctions be imposed upon those who allow dangerous conditions and defects to exist in leased premises, and that an effective mechanism be established for repairing these conditions and halting their creation.

* * * * *

(e) *Serious and substantial defects and conditions.* — This section provides a remedy and imposes an obligation upon landlords to repair and eliminate conditions and defects which constitute, or if not promptly corrected will constitute, a fire hazard or a serious and substantial threat to the life, health or safety of occupants, including, but not limited to:

(1) Lack of heat, light, electricity, or hot or cold running water, except where the tenant is responsible for the payment of the utilities and the lack thereof is the direct result of the tenant's failure to pay the charges;

(2) Lack of adequate sewage disposal facilities;

(3) Infestation of rodents in two or more dwelling units;

(4) The existence of any structural defect which presents a serious and substantial threat to the physical safety of the occupants; or

(5) The existence of any condition which presents a health or fire hazard to the dwelling unit.

*****

(g) *Notice by tenant.* —In order to employ the remedies provided by this section, the tenant shall notify the landlord of the existence of the defects or conditions. Notice shall be given by (1) a written communication sent by certified mail listing the asserted conditions or defects, or (2) actual notice of

the defects or conditions, or (3) a written violation, condemnation or other notice from an appropriate State, county, municipal or local government agency stating the asserted conditions or defects.

(h) *Reasonable time for repair*. — The landlord has a reasonable time after receipt of notice in which to make the repairs or correct the conditions. The length of time deemed to be reasonable is a question of fact for the court . . . .

(i) *Refusal by landlord to make repairs or corrections; action of rent escrow.* — If the landlord refuses to make the repairs or correct the conditions, or if after a reasonable time the landlord has failed to do so, the tenant may bring an action of rent escrow to pay rent into court . . . or the tenant may refuse to pay rent and raise the existence of the asserted defects or conditions as an affirmative defense to an action for distress for rent. . . .

In effect, defendants contend that R.P. § 8-211 does not give rise to a private cause of action. ECF 43-1 at 30. Defendants also argue that plaintiffs have not presented facts that the homes in issue had defects within the purview of the statute, such as lack of heat, running water, or adequate sewage disposal. *Id.* at 29. And, they contend that R.P. § 8-211 provides a remedy only to tenants in possession. *Id.* at 30 (pointing to R.P. § 8-211(a)). In their view, the "statutory remedy of withholding rent (or being able to assert housing conditions as a defense in a nonpayment-of-rent case) has no applicability to eight of the plaintiff families." *Id.* Further, defendants contend that plaintiffs have not adequately pleaded that any of the current tenants "provided the landlord with the requisite notice under § 8-211(g)." ECF 43-1 at 13.

**b.**

Defendants' contentions implicate the principles of statutory construction. The Fourth Circuit has instructed that, when interpreting a state statute, a federal court should "apply the statutory construction rules applied by the state's highest court." *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009); *see Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007). Because Maryland "follows the general principles of statutory interpretation," *Johnson v. Mayor & City Council of Balt.*, 430 Md. 368,

80

377, 61 A.3d 33, 38 (2013), I shall also refer to federal cases.

In general, the task of interpreting a statute starts with the text.  *Murphy v. Smith*, __ U.S. ___, 138 S. Ct. 784, 787 (2018) ("As always, we start with the specific statutory language in dispute."); *accord United States v. Bryant*, 174 (4th Cir. 2020).  To ascertain a statute's meaning, "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"  *Gundy v. United States*, ___ U.S. ___, 139 S. Ct. 2116, 2126 (2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)).  Terms that are not defined are "'interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp*., 571 U.S. 220, 227 (2014) (citation omitted); *accord United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020).  Courts may also consider a statute's history and purpose to give effect to its language.  *See Gundy*, 139 S. Ct. at 2126.  However, courts may "not resort to legislative history to cloud a statutory text that is clear."  *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994); *see Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016) ("If the meaning of the text is plain . . . that meaning controls.").

In Maryland, the "'cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the General Assembly.'"  *Conaway v. State*, 464 Md. 505, 523 212 A.3d 348, 358 (2017) (citation omitted); *see Deville v. State*, 383 Md. 217, 223, 858 A.2d 484, 487 (2004).  To that end, the Maryland Court of Appeals follows a two-step approach.  *See Johnson*, 430 Md. at 377-78, 61 A.3d at 38.  Courts first examine "'the plain meaning of the statutory language[.]'"  *Id.* at 377, 61 A.3d at 38 (citation omitted).  If the language "'is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, [the] inquiry is at an end.'"  *Id.* (citation omitted). However, if the statute's "'language is ambiguous or unclear, [courts] seek to discern the intent

of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based.'" *Id.* (citation omitted).

At the first step, courts "'do not read statutory language in a vacuum,'" nor do they "'confine [their] interpretation of a statute's plain language to the isolated section alone.'" *Williams v. Peninsula Reg'l Med. Ctr.*, 440 Md. 573, 580-81, 103 A.3d 658, 663 (2014) (citation omitted); *see Gundy*, 139 S. Ct. at 2126; *Bryant*, 949 F.3d at 174. Rather, the statutory language "'must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.'" *In re J.C.N.*, 460 Md. 371, 391, 190 A.3d 329, 341 (2018) (citation omitted). And, a court should strive to "avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense." *Bellard v. State*, 452 Md. 467, 481-82, 157 A.3d 272, 280-81 (2017).

Moreover, the statute must be read "'as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'" *Conaway*, 464 Md. at 523, 212 A.3d at 358 (citation omitted); *see Bourgeois v. Live Nation Ent's, Inc.*, 430 Md. 14, 27, 59 A.3d 509, 516 (2013). As the Maryland Court of Appeals has explained, courts may "'neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute.'" *McCloud v. Dep't of State Police, Handgun Permit Review Bd.*, 426 Md. 473, 480, 44 A.3d 993, 997 (2012) (citation omitted).

Words in a statute are assigned their "ordinary meaning." *Balt. City Det. Ctr. v. Foy*, 461 Md. 627, 645, 197 A.3d 1, 11 (2018). Dictionary definitions may provide a "'useful starting point'" to determine a term's meaning in common parlance. *Montgomery Cty. v. Deibler*, 423 Md. 54, 67, 21 A.3d 191, 198 (2011) (citation omitted); *see also Foy*, 461 Md. at 645, 197 A.3d at 11; *Bottini v. Dep't of Fin.*, 450 Md. 177, 195, 147 A.3d 371, 382 (2016) (using dictionary

82

definition to construe the meaning of the term "money" in a statute).   However, dictionary definitions are not necessarily dispositive.  *Deibler*, 423 Md. at 67, 31 A.3d at 198.  And, when a court turns to a dictionary to clarify a statutory term, the court should endeavor to consult an edition that was extant at the time that the challenged statute was enacted.  *Harvey v. Marshall*, 389 Md. 243, 260 n.11, 884 A.2d 1171, 1181 n.11 (2005).

Of relevance here, Maryland courts recognize the doctrine of *expressio unius est exclusio alterius*, which means "the expression of one thing is the exclusion of another."  *See Griffin v. Lindsey*, 444 Md. 278, 288, 119 A.3d 753, 758 (2015); *see also Hudson v. Hous. Auth. of Balt. City*, 402 Md. 18, 30, 935 A.2d 395, 402 (2007) (observing that the doctrine is a "fundamental principle of construction, long recognized in Maryland").  Under this familiar interpretive canon, "statutory lists are often interpreted as exclusive, so that a court will draw the negative inference that no other items may be added."  *Potomac Abatement, Inc. v. Sanchez*, 424 Md. 701, 712, 37 A.3d 972, 978 (2012); *see Griffin*, 444 Md. at 288, 119 A.3d at 759 (discussing cases applying the canon); *see also N.L.R.B. v. SW Gen., Inc.*, ___ U.S. ___, 137 S. Ct. 929, 940 (2017); 2A SUTHERLAND STATUTORY CONSTRUCTION § 47:23 (7th ed) (describing the canon's application); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107-11 (2012).  That said, the Maryland Court of Appeals has cautioned that the doctrine is merely an interpretive tool that should "'never be applied to override the manifest intention of the Legislature.'"  *State v. Neiswanger Mgmt. Servs., LLC*, 457 Md. 441, 479, 179 A.3d 941, 964 (2018) (quoting *Kirkwood v. Provident Sav. Bank of Balt.*, 205 Md. 48, 55, 106 A.2d 103, 107 (1954)).

Maryland courts also recognize the interpretive canon of *ejusdem generis*.  In *Boyle v Maryland-National Capital Park and Planning Comm'n*, 385 Md. 142, 156, 867 A.2d 1050, 1059 (2005), the Court of Appeals explained:

> *Ejusdem generis* is a canon of statutory construction "that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same type as those listed." BLACK'S LAW DICTIONARY 556 (8th ed.2004). Quoting from 2A SUTHERLAND STAT. CONST. § 47.18, at 200 (5th ed.1992), this Court has noted that:
>
> > "The doctrine of ejusdem generis applies when the following conditions exist: (1) the statute contains an enumeration by specific words; (2) the members of the enumeration suggest a class; (3) the class is not exhausted by the enumeration; (4) a general reference supplementing the enumeration, usually following it; and (5) there is not clearly manifested an intent that the general term be given a broader meaning than the doctrine requires."
>
> *In re Wallace W.*, 333 Md. 186, 190, 634 A.2d 53, 55–56 (1993) (italics supplied). . . .

### c.

Defendants' claim of lack of notice is without merit.  Plaintiffs have amply pleaded that defendants had "actual notice of the defects or conditions," as required by R.P. § 8-211(g).

For example, Corvias commissioned an independent mold assessment of the Bowers' home, which resulted in positive results.  ECF 40, ¶¶ 122, 123.  A follow-up report indicated that mold remediation was necessary.  *Id.* ¶ 129.  Corvias subsequently noted that there was mold in the Bowers' HVAC system and that reinspection was necessary.  *Id.* ¶ 130.  Bowers had a follow-up conversation with Corvias, and Corvias sent another inspection team.  *Id.* ¶¶ 131, 132.

The Saindons reported water leaks to Corvias.  *Id.* ¶¶ 326, 327.  They also reported mold to Corvias "several times."  *Id.* ¶ 329.  A commanding officer had to intervene with Corvias to ensure remediation.  *Id.* ¶ 331.

84

The Ziemanns allegedly "submitted over one hundred work order requests to repair pervasive deficiencies in the home. . . ." *Id.* ¶ 368. The Ziemanns' home tested positive for mold twice in 2019. *Id.* ¶¶ 372, 374. Corvias was also in touch with Sergeant Ziemman's chain of command about the mold testing. *Id.* ¶ 375.

Defendants also contend that the statute applies only to current tenants. Plaintiffs maintain that R.P. § 8-211(a) "nowhere limits the statute's reach to current tenants." ECF 44 at 23. But, even if it did, the argument would not warrant dismissal of the entire suit, because it would not pertain to the claims of the Bowers, Saindons, or Ziemanns, who are "current tenants." *Id.* (citing ECF 40, ¶ 397).

I agree with defendants that the remedies provided by the statute appear to be aimed at current tenants. For example, the statute provides that a tenant "may bring an action of rent escrow to pay rent into court because of the asserted defects or conditions, or the tenant may refuse to pay rent and raise the existence of the asserted defects or conditions as an affirmative defense to an action for distress for rent or to any complaint proceeding brought by the landlord to recover rent or the possession of the leased premises." R.P. § 8-211(i). Obviously, only a current tenant would benefit from rent escrow. Even if the statute applies only to current tenants, however, several of the plaintiffs are current tenants. Therefore, this ground affords no relief to defendants.

I turn to the defense contention that mold infestation is dissimilar to the conditions expressly set forth in the statute, and thus plaintiffs have not stated a claim under the statute. Plaintiffs posit that the public policy animating the statute is to impose "'meaningful sanctions'" on landlords "'who allow dangerous conditions and defects to exist in leased premises.'" ECF

44 at 22-23 (quoting R.P. § 8-211(b)).  In plaintiffs' view, the toxic mold that "permeated their homes and that Defendants failed to remediate" is not a minor defect.  *Id.* at 23.

Applying the principles of statutory construction outlined above, defendants' argument that mold is unlike the conditions enumerated in the statute is unavailing.  R.P. § 8-211(e) specifically includes the words "including, but not limited to," indicating that it is not an exhaustive list.  The canon of *expressio unius* is thus inapplicable here, because the statute's text provides that the list is not exclusive.  Conversely, the canon of *eiusdem generis* applies here. R.P. § 8-211(e) enumerates substantial housing defects.  This enumeration suggests a class of sufficiently serious defects, and the class is explicitly non-exhaustive.  The last member of the list is a general one: "(5) The existence of any condition which presents a health or fire hazard to the dwelling unit."

Significant levels of toxic mold are defects similar in severity to a rodent infestation or lack of adequate sewage disposal, as enumerated in the statute.  Plaintiffs have pleaded with particularity that their exposure to the mold levels present in the homes created a host of medical and other difficulties for themselves, their spouses, their children, and their pets.

Accordingly, I shall deny the Motion as to Count VIII with respect to the current tenants.

### 3.        Breach of Implied Covenant of Quiet Enjoyment

Count IX asserts a claim for breach of the implied covenant of quiet enjoyment, under R.P. § 2-115.  R.P. § 2-115 states: "There is no implied covenant or warranty by the grantor as to title or possession in any grant of land or of any interest or estate in land. However, in a lease, unless the lease provides otherwise, there is an implied covenant by the lessor that the lessee shall quietly enjoy the land."

It is well settled in Maryland that "a covenant of quiet enjoyment is implied in *every* lease, absent some provision in the lease negating such an implied covenant.[]" *Bocchini*, 69 Md. App. at 7, 515 A.2d at 1182.  That precept is codified in R.P. § 2-115.  *Id.* at 8, 515 A.2d at 1183.

Defendants argue that because Corvias has no liability as a landlord, this count must be dismissed.  ECF 43-1 at 15.  However, they make no arguments regarding Meade with respect to this claim.  Because I have concluded that plaintiffs may proceed with their claims against Corvias as a *de facto* landlord, I shall deny the Motion as to this claim.

### F.   Miscellaneous Claims

#### 1.   Constructive Eviction

In Count VI, plaintiffs allege a claim of constructive eviction.  In Maryland, constructive eviction has been defined as follows, *Stevan v. Brown*, 54 Md. App. 235, 240, 458 A.2d 466, 470 (1983):

> A constructive eviction occurs when the acts of a landlord cause serious or substantial interference with the tenants' enjoyment of the property which results in the tenant vacating the premises. . . These acts must be done by the landlord with the intent and effect of depriving the tenant of the latter's use and enjoyment. *McNally v. Moser*, 210 Md. 127, 122 A.2d 555 (1956). But the requisite intent may be inferred from the nature and impact of the acts.

Defendants argue that the Amended Complaint does not establish that defendants caused a "serious or substantial interference" with the use and enjoyment of the properties for the eight plaintiffs who vacated their residences.  ECF 43-1 at 28.  They claim a lack of any causal link between defendants' actions and the decision of plaintiffs to relocate.  *Id.*  They note that some of the plaintiffs moved because they were reassigned or were transferred from Fort Meade.  *Id.*

Plaintiffs counter that they have adequately pleaded "serious or substantial interference" and adequately linked plaintiffs' displacement due to the mold in their homes.  ECF 44 at 21.

The Amended Complaint is replete with allegations that plaintiffs' homes were permeated with mold. And, plaintiffs allegedly suffered financial, physical, and emotional injuries as a result of the housing conditions. For several plaintiffs, the Amended Complaint makes an explicit connection between the condition of the homes and their exit. *See, e.g.*, the Addis, ECF 40, ¶ 108 ("After enduring the constant frustrations from dealing with Corvias and continuing to be sickened by their own home, the Addis reached their breaking point and had to move out."); the Buitragos, *id.* ¶ 178 ("Due to the continued issues with mold, leaks, flooding, and rodents, the Buitragos moved to 2519 Shea Loop in the Heritage Park neighborhood on Fort Meade, also managed by Corvias, in February 2019. The Buitragos incurred out-of-pocket expenses for this move."); the Chubbs, *id.* ¶¶, 209, 210 (noting Corvias's failed attempts to remediate the home and stating: "In August 2019, the Chubbs decided to move off of Fort Meade, even though Senior Chief Chubb was still assigned to the same unit."); and the Gerbers, *id.* ¶ 241 ("Eventually, the Gerbers had to move off of Fort Meade.").

Accordingly, I shall deny the Motion as to the claim of constructive eviction.

## 2.      Nuisance

Count XIV asserts a claim for nuisance. Defendants maintain that "plaintiffs' allegations do not support the conclusion that any of the defendants' alleged actions 'negated the value of the leased properties.'" ECF 43 at 22. And, they contend that the nuisance claim is implausible because plaintiffs continuously paid their rent. *Id.* at 23.

Plaintiffs counter that the conditions in which they lived constituted an unreasonable and substantial "interference with Plaintiffs' ability to live in their homes. . . ." ECF 44 at 20. They point to the Nunez family, whose members were "exposed to excessive moisture, mold, and

standing sewage water" and "a pronounced and pervasive odor throughout the home. . ." *Id.*; ECF 40, ¶¶ 274, 275.

And, plaintiffs claim that the BAH was automatically paid to defendants, "precluding [plaintiffs] from moving elsewhere."  ECF 44 at 20.   They argue: "Defendants' counterintuitive insinuation that prolonged exposure to a nuisance somehow defeats a nuisance claim lacks any support in Maryland law." *Id.* at 21.

The Maryland Court of Special Appeals has explained, *Blue Ink, Ltd. v. Two Farms, Inc.*, 218 Md. App. 77, 92-93, 96 A.3d 810, 820 (2014):

> Maryland courts have adopted Section 821D of the Restatement (Second) of Torts (1965), which more narrowly defines a private nuisance as "a nontrespassory invasion of another's interest in the private use or enjoyment of land." *See, e.g., Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58, 80, 642 A.2d 180 (1994); *Exxon Corp. v. Yarema*, 69 Md. App. 124, 147, 516 A.2d 990 (1986).
>
> Nuisance is not confined to physical intrusions onto another's property; rather, it broadly encompasses all tangible invasions, including noise, odor, and light. *Yarema*, 69 Md. App. at 147, 516 A.2d 990. And, although there is no requirement that a plaintiff demonstrate physical injury from an alleged nuisance, a plaintiff must demonstrate that the defendant's interference with the plaintiff's property rights is both unreasonable and substantial in order to recover for nuisance. *Exxon Mobil Corp. v. Albright* (*Albright* I ), 433 Md. 303, 409–11, 71 A.3d 30 modified on other grounds, *Exxon Mobil Corp. v. Albright* (*Albright* II), 433 Md. 502, 71 A.3d 150 (2013); *accord Exxon Mobil Corp. v. Ford*, 433 Md. 426, 485–86, 71 A.3d 105 (2013) (following *Albright* I's rationale and concluding that appellees with potable wells that had not tested positive for contamination failed to show substantial interference sufficient to sustain actions in nuisance).

In order to show unreasonable interference with plaintiffs' use and enjoyment of their homes, plaintiffs must plead that the interference caused "actual physical discomfort and annoyance to those of ordinary sensibilities, tastes, and habits. . ." which must "interfere seriously with the ordinary comfort and enjoyment of the property." *Washington Suburban Sanitary Com'n v. CAE-Link Corp.*, 330 Md. 115, 126, 622 A.2d 745, 750 (1993).  Taking the

allegations in the Amended Complaint as true, plaintiffs allegedly encountered defects in the housing that led to serious health issues and also caused substantial inconvenience.   They requested remediation, often to no avail.   And, when the defects were not corrected, they suffered hardships, both financial and to their health.

Plaintiffs have adequately alleged that the interference in their ability to enjoy their homes was substantial and unreasonable.   Accordingly, plaintiffs have stated a claim for nuisance.

### 3.      Civil Conspiracy

Plaintiffs assert a claim of civil conspiracy in Count XV.   Defendants argue that plaintiffs' claim for civil conspiracy must fail because civil conspiracy "requires proof that two or more persons agreed to accomplish an unlawful act. . . ."   ECF 44 at 23.   They contend that the Amended Complaint "fails to allege facts that can plausibly support an award of relief against Corvias Management" and thus there is no viable claim of conspiracy.   *Id.*   Plaintiffs contend that they have sufficiently pleaded the tort claims underlying their civil conspiracy claim.   ECF 44 at 24.

A claim of civil conspiracy requires proof of three elements: "(1) a confederation of two or more persons by agreement or understanding; (2) some unlawful or tortious act done in furtherance of the conspiracy or use of lawful or tortious means to accomplish an act not in itself illegal; and (3) actual legal damages resulting to the plaintiff."   *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 154, 916 A.2d 257, 284 (2007) (quoting *Van Royen v. Lacey,* 262 Md. 94, 97-98, 277 A.2d 13, 14-15 (1971)); *see also Bellezza v. Greater Havre De Grace Yacht Club, Inc.*, No. 0367 Sept. Term 2014, 2015 WL 6394418, at *9 (Md. Ct. Spec. App. Oct. 22, 2015), *cert. denied*, 446 Md. 291, 132 A.3d 194 (2016).   But, in Maryland "civil conspiracy is not a 'separate tort capable

of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.'" *Bellezza*, 2015 WL 6394418, at *9 (quoting *Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 189, 665 A.2d 1038, 1045 (1995)); *see also Alexander and Alexander, Inc. v. B. Dixon Evander & Associates, Inc.,* 336 Md. 635, 645 n.8, 650 A.2d 260, 265 n.8 (1994).

Accordingly, a plaintiff must allege that he was injured by an overt act done in pursuance of the conspiracy. *Alleco, Inc.*, 340 Md. at 190, 665 A.2d at 1045. In other words, "'it is not . . . for simply conspiring to do the unlawful act that the action [of conspiracy] lies. It is for doing the act itself, and the resulting actual damage to the plaintiff, that afford the ground of the action.'" *Id.* (quoting *Kimball v. Harman and Burch*, 34 Md. 407, 409 (1871)).

In asserting many of their claims, plaintiffs rely heavily on the claim of a close connection between Corvias and Meade. To that end, plaintiffs insist that Corvias was, in effect, the landlord. In the Fourth Circuit, "[t]he law is well-settled . . . that a conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility," *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir. 1986). Therefore, a civil conspiracy claim is barred by the intra-corporate conspiracy doctrine.

Alternatively, this claim illustrates plaintiffs' zealous overpleading. There are no facts alleged to show that the defendants engaged in a conspiracy. Therefore, plaintiffs have failed to state a claim.

Accordingly, I shall grant the Motion as to Count XV.

### G. Class Allegations

Defendants argue that plaintiffs have failed to meet the standards for class certification under Fed. R. Civ. P. 23(b)(2) and 23(b)(3). Yet, "no motion has yet been filed to certify a

class[.]" ECF 43-1 at 30.  Plaintiffs contend that these arguments are premature.  ECF 44 at 25.  I agree.

At this juncture, I need not decide "what precisely the contours of a possible class will be, or if the Court will certify a class at all."  *Weisheit v. Rosenberg & Associates, LLC*, JKB-17-0823, 2018 WL 1942196, at *5 (D. Md. Apr. 25, 2018); *see Scott v. Board of Educ. of Harford County*, 1979 WL 15339 (D. Md. Sept. 2, 1977) ("The determination of a request for a class action normally should not be predicated merely on the pleadings. . . The Court will deny this motion in order to allow the parties to conduct discovery and subsequently file the necessary papers concerning class action certification.").

## IV.  Conclusion

For the foregoing reasons, I shall grant the Motion as to plaintiffs' negligent breach of warranty claim (Count III), the SCRA claim (Count VII), and the conspiracy claim (Count XV). I shall deny the Motion as to the remainder of plaintiffs' claims.

An Order follows.


Date:   August 27, 2020                    _____/s/_____
                                           Ellen L. Hollander
                                           United States District Judge