**Holland & Knight**

Thomas J. Yoo
+1 213-896-2425
Thomas.Yoo@hklaw.com

August 25, 2021

**Via Email:** MDD_JMCchambers@mdd.uscourts.gov **& ECF**
The Honorable J. Mark Coulson
United States Magistrate Judge
U.S. District Court for the District of Maryland
101 West Lombard Street
Baltimore, Maryland 21201

   Re: *Addi, et al. v. Corvias Management – Army LLC, et al.*
      Case No. 1:19-cv-03253-ELH

Dear Judge Coulson:

  Pursuant to Your Honor's July 29, 2021 Letter to All Counsel of Record, Defendants respectfully submit the following letter.

  **Privilege Claims:** On August 4, 2021, Plaintiffs indicated that they "contest the assertion of privilege/work product over *each entry* contained in the privilege logs of ServePro, [sic] Black & Veatch, and TRC as well as the documents identified in [Defendants'] purported 'clawback' letter of July 16." (emphasis added). Plaintiffs did not point to any specific entry or suggest that the parties attempt to reach resolution on any particular entry; rather, they stated "[u]nless Corvias agrees to withdraw its claims of privilege, at a minimum, an in-camera review will be necessary." Plaintiffs argue that "[t]he vast majority of these withheld communications do not involve any attorneys," yet, the inclusion of an attorney is not dispositive. *See Bluestem Brands, Inc. v. Merkle, Inc.*, ELH-13-0185, 2014 WL 12736150, at *2 (D. Md. Nov. 19, 2014) ("[a] document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds.") (internal citation omitted); *In re. N.Y. Renu With Moistureloc Product Liab. Litig.*, MDL No. 1785, 2009 WL 2842734 (D.S.C. July 6, 2009) (same for work product privilege).

  Plaintiffs ask this Court to disregard the clear terms of the parties' agreed-to ESI Protocol, attached hereto as **Exhibit A,** which the parties negotiated for *over sixty days* and ultimately agreed to. The ESI Protocol provides a specific procedure for what documents must be logged for privilege and for making challenges to Privilege Claims. *See* §§ V, V(E) ("a Requesting Party may identify, in writing (by Bates/unique identified number), *the particular documents* that it believes require further explanation. The Producing Party shall respond to such a request within 15 days. If a Party challenges a request for further information, the Parties shall meet and confer to try to reach a mutually agreeable solution. If they cannot agree, the matter may be brought to the Court.") (emphasis added). Defendants and the Third-Party Vendors have fully complied with section V of the ESI Protocol. Plaintiffs' failure to do the same is an apparent effort to harass and increase discovery costs.

  Further, as this Court ordered regarding the Third-Party Vendors, "to the extent privilege is being asserted over any otherwise responsive documents, such documents should be included on a complian[t] privilege log absent agreement between the parties to some other arrangement." ECF No. 80 at 2. This Court has recognized that a privilege log that "identifies each document withheld, information regarding the nature of the privilege/protection claimed, the name of the person making/receiving the communication, the date and place of the communication, and the document's

general subject matter" provides "sufficient information to the reviewing court to enable a determination to be made regarding the appropriateness of the privilege/protection asserted without resorting to extrinsic evidence or *in camera* review of the documents themselves." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 264 (D. Md. 2008). The Third-Party Vendors' privilege logs accomplish this goal and demonstrate with particularity the basis for each privilege asserted by identifying the sender/recipient of the communication; date of the communication; nature of the privilege asserted; and the basis for the privilege. Plaintiffs' challenge to the logs by baldly asserting that *every entry* in the logs, without explanation, is improper should be rejected.

**Proposed Solution:** The Court should enforce the terms of the ESI Protocol. Plaintiffs should be required to provide specificity regarding the missing elements or otherwise explain the purported deficiencies for specific entries in the Third-Party logs prior to any request for *in camera* review.

**Budget-Related Documents, Incentive Fees, and Quarterly Performance Reports:** The Court ruled that the scope of document discovery is "limited to those that concern mold." ECF No. 80 at 2. Yet, during the depositions of Defendants' witnesses, Plaintiffs frequently asked questions regarding Defendants' finances and reporting in an attempt to drum up additional discovery disputes. Plaintiffs now request that Defendants "produce documents related to the Fort Meade maintenance budget, including correspondence with Meade and/or the Army regarding forecasts for and setting of that budget….", information regarding quarterly meetings between "property management" and "ownership," and incentive fees.

Defendants produced the approved budgets for the years 2017-2021 in .pdf format because that is how they are kept in the usual course of business and how they were submitted to the Army. Plaintiffs cite no support for the proposition that Defendants should be required to reproduce these documents in a different format, likely because such a requirement would be inconsistent with FRCP 34(b)(2)(E). Plaintiffs should not be permitted to skirt the discovery rules or engage in an impermissible fishing expedition of Defendants' financial records. *See In re Heparin Prods. Liab. Litig.*, 273 F.R.D. 399, 409 (N.D. Ohio 2011) (collecting cases).

**Proposed Solution:** Defendants are in the process of collecting additional financial reporting submitted to the Army for Fort Meade and will produce responsive, non-privileged information regarding maintenance, mold, and/or work order performance at Fort Meade contained within those documents.

**30(b)(6) Witnesses:** After deposing Meade Communities' ("Meade") 30(b)(6) witness Peter Sims and Corvias Management's ("Corvias") 30(b)(6) witness Holly Costello for approximately 13 hours, recorded in 557 pages of deposition transcripts, Plaintiffs now demand that more witnesses be produced for further depositions on the same topics because Mr. Sims and Ms. Costello purportedly did not answer every question to Plaintiffs' satisfaction.[1] But while Rule 30(b)(6) requires a

---

[1] Plaintiffs so far have taken 14 depositions of Defendants' current and former employees and vendors on a wide array of topics covering the entire time period from 2016 to the present, comprising thousands of pages of testimony.  Plaintiffs deposed Phil Connolly (Health and Safety Manager, 2007 to present), JC Calder (Operations Director, 2017 to 2021), Darla Humbles (Facility Services Manager from 2011-2017, Ombudsman from 2018 to present), Lazz McKenzie (Head of IT, 2013 to present), Paula LevineHeise (Director of Accounting for Property Management, 2019 to present), Camille Torres (Program Office Administrator, 2009 to present), Christie Taylor (Resident Manager, 2006 to present), Heath

conscientious good-faith endeavor to designate and prepare a witness as to the relevant subject matters, it "does not require absolute perfection in preparation." *Prowess, Inc. v. RaySearch Labs. AB*, No. 11-WDQ-1357, 2013 WL 1352276, at *4 (D. Md. April 1, 2013); *see also Brown v. W. Corp.*, No. 11-cv-284, 2014 WL 1794870, at *1 (D. Neb. May 6, 2014) ("[D]epositions under 30(b)(6) are not meant to be traps in which the lack of an encyclopedic memory commits an organization to a disadvantageous position."). Plaintiffs disingenuously argue that Mr. Sims and Ms. Costello "were unprepared to answer questions related to the time period before they began working at Corvias [2020 and 2019 respectively]."[2] The record demonstrates otherwise.

Plaintiffs cite Sims Tr. 202:9-14 and claim that Mr. Sims could not answer questions about a mold policy prior to 2018; however, Plaintiffs' questions were not about Meade (the owner/landlord), but about *Corvias* (the property manager). Mr. Sims is not a Corvias witness nor were Corvias's mold policies part of Plaintiffs' 30(b)(6) deposition notice to Meade. Indeed, **all** of Plaintiffs' deposition cites are to questions asking—over Defendants' objections that the questions exceeded the scope of the deposition notice—about *Corvias's* policies, not Meade's information, which Mr. Sims addressed throughout the day.[3] *See* 203:15-204:18 (asking about changes to Corvias's maintenance manual and witness explaining that he is not part of Corvias); 204:19-206:1 (asking about Corvias's 2016 protocol, and not citing the witness's full answer in which he explains how EPA standards and Army approval were involved); 179:16-180:14 (asking about tenant complaints to Corvias, and cutting off the beginning of the witness's answer "Again, I think you'd have to talk to the property manager to get details about the impacts of any purported reduction in scope – in staffing – or – or any increase of – of complaints. I'm not aware of any."). Mr. Sims also testified about numerous issues predating his arrival at Meade. *See* 206:8-207:22 (whether and when Meade learned that mold was an issue at Ft. Meade and Meade's experience "over 20 years"); 180:15-182:17 (2017/2018 Congressional cuts to Basic Allowance for Housing and whether it impacted resident call center, work orders, and Corvias's staffing); 44:3-11 (changes to the Resident Occupancy Agreement since 2016); 53:22-54:16 (investment of equity in Meade in 2002); 78:1-83:8 (2002 Property Management Agreement); 98:2-106:9 (2002 Ground Lease and Development Agreement); 137:12-18 (2017 budget); 228:22-229:17 (whether mold affected safe and healthy living conditions at Ft. Meade prior to 2019).

Likewise, Plaintiffs' claim that Mr. Sims "disclaimed knowledge of or involvement in [the mold remediation] project" is contradicted by the record. *See* 155:8-22 (explaining the funding for and Army's involvement in the mold remediation project); 159:4-160:8 ("Meade Communities performed the remediation and – and has a third party inspector that inspects on our behalf"… and explaining the Army's role); 211:2-212:16 (how the project started in 2019 and why world-renowned specialist TRC was engaged); 219:9-226:1 (testifying about TRC's scope of work and guidelines for

---

Burleson (Executive VP, 2018 to present), Richard Giusti (Vice President, 2011 to 2020), Terrence Callahan (Executive VP, 2016 to 2019), and Kevin Patterson (Maintenance Supervisor, at Ft. Meade 2010 to 2020).  Plaintiffs have also deposed 30(b)(6) witnesses Heath Howard and Fritz Leonard from TRC and Vance Miller from Black & Veatch, companies involved in the mold inspection and remediation project.  Plaintiffs are scheduled to take the depositions of David Campbell (Facilities Director, 2017-2020), Steve Boothe (Director of Facility Operations, 2015-2020), and Scott Kotwas (Business Director, 2013-2017).

[2] Mr. Sims and Ms. Costello prepared extensively for their depositions, including review of documents and meetings with counsel.  Naturally, privileged discussions were not disclosed by the witnesses in their depositions and omitted from answers regarding what they did to prepare.

[3] Exhibit B, Excerpts to the 30(b)(6) Deposition Testimony, will be submitted electronically for the Court's review as portions of the testimony are designated as confidential under the Stipulated Protective Order.

the project, remediation contractors, Corvias's role regarding tenants; also identifying Darla Humbles as Meade's employee with more details (*Plaintiffs subsequently deposed Ms. Humbles for two days*)).

While Plaintiffs argue that Ms. Costello was unprepared to discuss certain issues concerning the 2016-2018 time period, her 317-page, 7-hour deposition shows that she provided substantial testimony on the topics in Plaintiffs' 30(b)(6) notice to Corvias. Like Mr. Sims, the few areas that Ms. Costello stated she could not address were not noticed 30(b)(6) topics, but rather specific questions about particular details or comparisons that would require analysis of documents and data. Such questions are not questions for a 30(b)(6) witness responding to general topics. Tellingly, Plaintiffs did not show Ms. Costello any documents from 2016 or other time period about which they sought details.

For example, Plaintiffs argue (104:3-7) that Ms. Costello could not state whether Corvias in any year "determined that it needed to" ask for additional maintenance money beyond what was requested in a budget. This, however, was not a topic in Plaintiffs' 30(b)(6) notice ("Your revenues and expenditures … including… budgets…"). Nevertheless, Ms. Costello testified about the process for seeking additional funds if needed, as well as Corvias's assessment of the quality and condition of the homes at Ft. Meade since 2013. 104:7-106:5. Similarly, Plaintiffs claim that Ms. Costello could not answer from memory "how the organization of the neighborhood maintenance staff has changed since 2016." (*See also*, 172:15-17, asking whether in 2016 "each maintenance technician [had his] own vehicle"). However, such a specific question would require a comparison of maintenance employees in each neighborhood year over year and was not a 30(b)(6) topic. Yet, Ms. Costello still provided substantial testimony regarding the 2016 neighborhood maintenance staff and responsibilities, including work order requests, preventative maintenance, turnover, landscaping, and trash collection, and explained that "it has remained fairly similar over the years." *See* 173:22-178:11; 179:1-8 (she did not know "how scheduling worked for the maintenance staff in 2016"—not a 30(b)(6) topic—but still testified about Corvias's 24/7 emergency response and on-call technicians during such time period). Ms. Costello also testified about responding to work order requests, entry of data into the Yardi system, resident satisfaction procedures, and Army involvement in this process, **all in response to questions about 2016**. *See* 202:10-204:19. Other examples of questions—not specified in Plaintiffs' 30(b)(6) notice and not often within the scope of discovery—which Ms. Costello could not answer from memory on the spot include the following: how employee performance evaluations were done in 2016 (207:20-208:12), onboarding procedures for training of new employees in 2016 (209:4-7), target number of employees in 2016 (210:19-211:2), and the percentage of homes rented by service members vs. non-service members (107:2-17).

Accordingly, Plaintiffs have not shown any good cause to request additional deposition time beyond their currently allotted 75-hour total. Even if a further deposition were required, Plaintiffs should not be given additional time to cover issues they claim they could not explore and thus did not spend any time on. Further, such a request is premature at this stage as the Plaintiffs have not utilized their full deposition time and additional depositions are scheduled for witnesses employed at Ft. Meade in 2016-2018.

**Proposed Solution:** No further 30(b)(6) witnesses need be designated.

**Work Order Information and Yardi Data:** Although Plaintiffs have now deposed

The Honorable J. Mark Coulson
August 25, 2021
Page 5

numerous Corvias witnesses, Plaintiffs have not asked any of these witnesses about the specific Yardi fields utilized by Corvias. And Plaintiffs' position regarding the Yardi work order information has constantly shifted. Plaintiffs first accused Defendants of failing to produce work order data from the Yardi system. In response, Defendants identified hundreds of pages of data that had previously been produced, including Work Order Detail Reports for the Plaintiff families and for each and every property identified by TRC as having "medium-high" or "high" levels of SFG. Defendants also produced detailed custom Work Order Detail Reports including technician notes for each Plaintiff family. Now, Plaintiffs newly seek "the full YARDI information for the homes in which Plaintiffs resided while at Fort Meade, without date limitation." Defendants do not understand what Plaintiffs mean by "the full YARDI information," and this is the first time Plaintiffs have sought such broad Yardi data from Defendants. Defendants will agree to produce Work Order Detail Reports from Yardi for each of the homes in which Plaintiffs resided, from January 1, 2016 to present, which is precisely what Plaintiffs requested on the parties' meet-and-confer call last week. Defendants object to the extent Plaintiffs seek Yardi data "without date limitation," as this Court has previously ruled that the relevant scope of discovery is from January 1, 2016 to the present. Defendants also object to providing a listing of each and every available Yardi descriptive field, as Yardi is a proprietary and confidential database used for a wide array of property management functions.

**Proposed Solution:** Defendants will produce Work Order Detail Reports from Yardi for each of the homes in which Plaintiffs resided, from January 1, 2016 to present.

**TRC Documents:** Plaintiffs have requested a search for responsive text messages from three TRC employees and at least three TRC inspectors, but this request is overbroad and not justified. TRC's corporate representatives testified that TRC utilizes a Mobile Data Platform, and that the inspectors upload photos and create reports within the platform. Howard Dep. 74:15-75:22. No photos or information exist outside of the Mobile Data Platform. Furthermore, Maryland courts have recognized that a request for text messages is "overbroad," expensive, time-consuming, would impose a substantial burden and expense, and would be an "invasion of privacy." *Shackleford v. Vivint Solar Developer, LLC*, No. 19-cv-954, 2020 WL 6273892, at *5 (D. Md. Oct. 26, 2020). It is not proportional to the needs of the case and grossly overbroad to gather and produce text messages from TRC employee's cell phones.

TRC has already produced written protocols it followed while inspecting homes at Fort Meade. *See* TRC_00001051, TRC_00050247, TRC_00050157, and TRC_00050260. Mr. Howard identified one additional protocol during his deposition, and TRC will produce the document.

**Proposed Solution:** TRC will produce the written protocol referenced by Mr. Howard during his deposition which was not previously produced. TRC will generate and produce data file(s) containing the raw data from the inspections at Fort Meade. TRC will also search for and produce any slide decks for mold training and written comments related thereto, as referenced by Mr. Leonard during his deposition.

Defendants appreciate the Court's attention to these issues.

The Honorable J. Mark Coulson
August 25, 2021
Page 6

| | |
|---|---|
| Date:   August 25, 2021 | Respectfully submitted,<br><br>HOLLAND & KNIGHT LLP<br><br>   /s/   <br>Jessica L. Farmer (Bar No. 18978)<br>800 17th Street, N.W., Suite 1100<br>Washington, D.C. 20006<br>Telephone: (202) 955-3000<br>Facsimile: (202) 955-5564<br>Paul.Kiernan@hklaw.com<br>Jessica.Farmer@hklaw.com<br><br>Thomas J. Yoo*<br>400 S. Hope St., 8th Floor<br>Los Angeles, CA 90071<br>Telephone: (213) 896-2400<br>Facsimile: (415) 896-2450<br>Thomas.Yoo@hklaw.com<br>*Attorneys for Defendants*<br>*\* Pro Hac Vice* |