**COVINGTON**

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
T  +1 202 662 6000

**Via ECF**

September 10, 2021

The Honorable Mark J. Coulson
United States Magistrate Judge
U.S. District Court for the District of Maryland
101 West Lombard Street
Baltimore, MD 21201

Re: Addi, et al. v. Corvias Mgmt.-Army, LLC, et al., No. 19-cv-03253 (D. Md.)

Dear Judge Coulson:

Pursuant to the Court's September 2, 2021 Order (ECF No. 128) we address the relevant privilege issues pertaining to Corvias's withholding of hundreds of communications among and between the "independent" consultants hired to perform mold inspections and remediations on Fort Meade, and identify twenty documents to be submitted for *in camera* review. We also explain why the parties' ESI agreement does not excuse Corvias from having to provide a privilege log.

**I.    Applicable Privilege Issues and Documents Selected for *In Camera* Review**

Corvias told Fort Meade residents that "independent" inspections for and remediations of mold would be performed on Fort Meade houses. TRC performed visual inspections for mold; ServPro and East Coast Mold then did remediation work; Black & Veatch oversaw the project and assigned homes to either ServPro or ECM to remediate. Yet, Corvias has withheld over 800 communications between or among these contractors and seeks to "clawback" 35 more.

Your Honor previously held that claims of work product protection cannot stand when the consultants are performing a public, fact gathering role. *See* ECF No. 104, at 2. Corvias, however, is not following Your Honor's prior ruling.* The vast majority of the withheld communications do not involve any attorneys, yet are withheld on "work product" grounds based solely on the following two generic descriptions (or similar):

- "Confidential email correspondence discussing work performed by consultant at the direction of counsel re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation."

- "Confidential email correspondence discussing spreadsheet created by Holland & Knight and, at direction of counsel, populated by Holland & Knight-retained

---

* Corvias continues to redact substantial portions of its agreement with TRC. *See* Ex. 1. Presumably, the redacted portions refer to TRC's review of Corvias's mold procedures. Corvias has boasted publicly, and its CEO testified before Congress, that Corvias had "[h]ired a world-renowned specialist to review our mold and mildew procedures," although it now contends that this review was protected work product.

**COVINGTON**

The Honorable Mark J. Coulson
September 10, 2021
Page 2

>  consultants re: assessment and/or remediation of suspected fungal growth (SFG),
>  prepared in anticipation of litigation."

Corvias bears the burden of sustaining its privilege or work product claims. *See In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 338–39 (4th Cir. 2005) (attorney-client privilege); *Solis v. Food Emp'rs Labor Relations Ass'n*, 644 F.3d 221, 231–32 (4th Cir. 2011) (work product).

To justify a claim of attorney-client privilege, Corvias must show that the withheld document is a confidential communication between counsel and client "made primarily for the purpose of obtaining legal advice or services from the attorney." *Agropex Int'l, Inc. v. Access World (USA) LLC*, 2021 WL 3090901, at *1 (D. Md. May 20, 2021). Claims of privilege are construed narrowly. *In re Grand Jury*, 415 F.3d at 339. "Communications are not privileged merely because one of the parties is an attorney or because an attorney was present when the communications were made." *United States v. Cohn*, 303 F. Supp. 2d 672, 683–84 (D. Md. 2003).

To justify a claim of work product protection, Corvias must prove that the documents or communications at issue were created "in anticipation of litigation," and that they were prepared "by or for" Corvias "or its representative." Fed. R. Civ. P. 26(b)(3). There are two types of work product: (i) opinion work product, "the actual thoughts and impressions of the attorney," and (ii) fact work product, "a transaction of the factual events involved." *In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017). The latter may be obtained "upon a mere showing of substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship." *Id.* Corvias must prove by detailed evidence that a real and imminent prospect of litigation was the "driving force" behind the preparation of each document. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992). This means "materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes are not documents prepared in anticipation of litigation." *Id.*

We list on Appendix A the 20 documents that the Court should review *in camera*, five of which come from Corvias's "clawback" log and the other 15 of which come from the logs that Corvias provided for the contractors.

## A.   Exemplary "Clawback" Documents[†]

It is clear that Corvias cannot meet this burden with respect to the documents that it seeks to claw back.[‡]

---

[†] Documents 1–5, will be provided, but not filed by Plaintiffs to chambers concurrent with the filing of this letter.

[‡] The Protective Order (ECF No. 66) provides that if a party receiving a clawback request contests the assertions of privilege, it shall comply with and may promptly seek a judicial determination of the matter pursuant to Fed. R. Civ. P. 26(b)(5)(B). We have complied with that obligation by sequestering the materials pending Your Honor's review and herein "present[ing] the information to the court under seal for a determination of the claim" including by submitting copies of the

**COVINGTON**

The Honorable Mark J. Coulson
September 10, 2021
Page 3



referenced clawback documents to the Court via e-mail for *in camera* review.

§ This is the document about which the Court asked during the August 31 hearing.

**COVINGTON**

The Honorable Mark J. Coulson
September 10, 2021
Page 4



In short, it is clear that Corvias is asserting privilege and work product claims over documents that are not attorney-client privileged or work product.

**B.      Exemplary Documents from Contractor Privilege Logs**<sup>\*\*</sup>

For the same reasons as above, Corvias cannot meet its burden with respect to the hundreds of documents withheld by ServPro, B&V, TRC, and East Coast Mold that do not involve any attorneys, to include the person from "Aegis." (We assume that the reference in the privilege log entries to "Holland & Knight-engaged consultant" is intended to refer to Aegis, although Corvias has also referred to ServPro, B&V, and TRC as "Holland & Knight-engaged consultants.") Thus, we respectfully request that the Court examine Documents 6–20 *in camera*.

Documents 6–13 are communications and attachments withheld by Black & Veatch or ServPro as "Work Product" and/or "Attorney-Client." None of these communications include an attorney; rather, Corvias describes them as communications regarding "assessment and/or remediation of suspected fungal growth (SFG)" between Corvias and Black &Veatch and/or ServPro discussing (1) work performed "at the direction of counsel" by consultants or (2) spreadsheets "created by Holland & Knight" and populated by consultants. However, whether or not counsel directed the work, whether or not counsel created a spreadsheet or other document, and whether or not these communications reference that spreadsheet, if the communications or documents contain the results of the inspections and remediations, they are not privileged and should be produced, particularly as the spreadsheet was populated not by attorneys or the Aegis consultant, but rather by the "independent" third-party vendors doing the inspections and performing the remediations. *Cf. Agropex*, 2021 WL 3090901, at *1 (to justify a claim of attorney-client privilege, the communication must be "made primarily for the purpose of obtaining legal advice or services from the attorney"); *Union Fire*, 967 F.2d at 984 (to justify work product protection, a real and imminent prospect of litigation must be the "driving force" behind the preparation of each document).

Documents 14–20 are communications, attachments, and documents withheld by Black & Veatch, ServPro, or TRC as "Work Product." Each of these communications or documents include "Naoufal Bouamar, Esq." from "Aegis Consulting." Corvias describes these as communications or documents regarding "assessment and/or remediation of suspected fungal growth (SFG)" between Corvias and Black & Veatch and/or ServPro discussing (1) work performed "at the direction of counsel" by consultants,(2) "work product created by Holland & Knight" and populated by consultants, or (3) spreadsheets "created by Holland & Knight" and populated by consultants. As an initial matter, as above, whether or not counsel directed the work, whether or not counsel created a spreadsheet or other work product, and whether or not these

---

<sup>\*\*</sup> Because Plaintiffs do not have copies of Documents 6–20, Corvias must promptly provide Documents 6–20 to chambers.

**COVINGTON**

The Honorable Mark J. Coulson
September 10, 2021
Page 5

communications reference that spreadsheet or other work product, if the communications and documents contain the results of the inspections and remediations, they are not privileged and should be produced, particularly as the spreadsheet was populated not by attorneys or the Aegis consultant, but rather by the "independent" third-party vendors doing the inspections and performing the remediations. *Cf. Agropex*, 2021 WL 3090901, at *1; *Union Fire*, 967 F.2d at 984.

Regarding the inclusion of the Aegis consultant, Mr. Bouamar, on communications or as a document author, while Mr. Bouamar does appear to have a law degree, he does not appear to have acted as counsel for Corvias. Indeed, Mr. Bouamar was apparently a "Project Controls Engineer II" during his time at Aegis Project Controls whose role was to "build[] complex schedules tailored to each client's needs, and manage[] it throughout the life of the project, " "pinpoint spending and billing," and "identify and monitor risks to keep the schedule on track or determine the likelihood of an impact."[††] Likewise, Aegis Project Controls describes its mission as "keeping complex projects on time and on budget through project controls."[‡‡] Thus, regardless of whether Aegis was a consultant retained by Holland & Knight for Corvias, Mr. Bouamar apparently did not act in an attorney role as to Corvias and his inclusion on communications or work on documents does not act to shield production thereof. Moreover, even if Mr. Bouamar was acting as counsel to Corvias (he was not), Mr. Bouamar's inclusion on communications or work on documents does not cloak all communications as protected by work product or attorney-client privilege, particularly were, as here, Corvias's inspection and remediation efforts were performed at the request of the Army and because Corvias had an obligation to provide safe houses to residents—not because Corvias anticipated litigation. *E.g.*, *Cohn*, 303 F. Supp. 2d at 683–84 ("Communications are not privileged merely because one of the parties is an attorney or because an attorney was present when the communications were made."); *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 435 (S.D.N.Y. 2013) ("Because the [work product] protection arises only for materials prepared in anticipation of litigation, it is not enough to show merely that the material was prepared at the behest of a lawyer or was provided to a lawyer. Rather, the materials must result from the conduct of investigative or analytical tasks to aid counsel in preparing for litigation. (internal quotations and citations omitted)).

Finally, even if Corvias were somehow correct that these documents and communications could qualify as attorney work-product, Plaintiffs' substantial need for the materials to prepare their case and inability to obtain their substantial equivalent by other means warrants their production. Neither Black & Veatch or ServPro have produced anything comprehensive related to the actual work as "independent" third-party vendors hired to perform mold inspections and remediations on Fort Meade. Indeed, the facts regarding what the contractors found and did in the homes should not be insulated from discovery because they were fed into spreadsheets or other documents that a lawyer may have had a hand in creating, particularly when there is no assurance that we have otherwise received in discovery *all* of the findings and documentation regarding all of the remediation work performed (or not performed).

---

[††] https://www.linkedin.com/in/naoufal-william-bouamar-esq-cst-8827971b9

[‡‡] https://www.linkedin.com/company/consultaegis

**COVINGTON**

The Honorable Mark J. Coulson
September 10, 2021
Page 6

## II.      The Parties' ESI Agreement Does Not Exempt Corvias From Having to Provide a Privilege Log

Corvias (including both Corvias Management LLC and Meade Properties) has not logged a single privileged document in connection with its document production, which ostensibly encompasses multiple custodians and goes back to 2016. This is not because no such documents exist—rather, it is because Corvias has misread the ESI Protocol to excuse itself from having to identify *any* documents withheld on grounds of privilege.

As relevant to the dispute here, Sections V.A–B of that ESI Protocol provides (emphases added):

    **A. Production of Privilege Logs**: *Except as provided otherwise below, for any document withheld in its entirety or produced but redacted, the Producing Party will produce privilege/redaction logs* in MS Excel format or any other format that permits electronic sorting and searching.

    **B. Exclusions from Logging Potentially Privileged Documents:** The following categories of documents do not need to be contained on a Producing Party's initial privilege log, *unless good cause exists* to require that a Party do so.

        1. Information generated after the date the initial complaint was filed in the above-captioned matter.

        2. Any communications exclusively between a Producing Party and its inside counsel, outside counsel, an agent of outside counsel other than the Party, any non-testifying experts *in connection with the Litigation*, or with respect to information protected by Fed. R. Civ. P. 26(b)(4), testifying experts *in connection with the Litigation*.

        3. Any privileged materials or work product created by or specifically at the direction of a Party's outside counsel, an agent of outside counsel other than the Party, any non-testifying experts *in connection with the Litigation*, or with respect to information protected by Fed. R. Civ. P. 26(b)(4), testifying experts *in connection with the Litigation*.

Ignoring the modifier "in connection with the Litigation," Corvias reads the exception in V.B to render the parties mutual obligation to provide privilege logs in V.A a nullity. That is not a reasonable interpretation, nor is it what the parties provided nor intended. Discovery here predates this litigation by several years. If Corvias has responsive documents from before the filing of the complaint in this litigation that it is withholding on the basis of privilege or work product protection, Corvias needs to log them.

At the August 31 hearing, Corvias took the position that documents predating this litigation could be excused from the privilege log requirement because Corvias was anticipating that someone was going to sue it for the widespread mold issues on Fort Meade, and so therefore documents from before this litigation could be documents "in connection with this Litigation." That position is difficult to square with the fact that Corvias has not preserved documents from employees, such as Terry Callahan, who departed the company in 2019, but before this lawsuit was filed. But even under Corvias's incorrect reading of the ESI Protocol, there is "good cause" to require Corvias to

**COVINGTON**

The Honorable Mark J. Coulson
September 10, 2021
Page 7

log any withheld documents that predate the initiation of this litigation. Among other things, Corvias has already asserted claims of work product protection regarding its contract with TRC that were not well-taken, has redacted entries from its budgets as Attorney-Client privileged even though a budget is obviously not a communication between a lawyer and a client for the principal purpose of seeking or receiving legal advice, and it is seeking to clawback nearly 35 documents that are not privileged.

Notably, Corvias has never provided any estimate of the number of withheld documents. Plaintiffs' goal is not to create "make work" for Corvias, but rather to know whether and to what extent documents responsive to their requests are being withheld. Given that Corvias did not even begin retaining its "consultants" (which were really contractors) until March 2019, at a minimum Corvias should be required to provide a privilege log identifying any documents from prior to then that it is withholding on privilege grounds.

Respectfully submitted,

*/s/Kevin B. Collins*
Kevin B. Collins (D. Md. No. 13131)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
(202) 662-6291 (fax)

Counsel for Plaintiffs

Appendix A

| Doc # | Bates Identifier | Custodian | Author/Sender | Recipients | CC | BCC | Date Created | Date Sent | Date Received | Privilege Asserted | Basis for Privilege | Attachments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | DEF_00060193– DEF_00060194 | Corvias General | Heath Howard | Holly Costello; Leonard Fritz; Andrew Emerson, Esq. | Tim Toohey; Bill Culton, Esq.; JC Calder; Paul Manna | | 11/24/2019 | 4/6/2019 | 4/6/2019 | Attorney-Client; Work Product | Confidential email correspondence with counsel and retained consultant re: consultant work performed at the direction of counsel for assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation. | No |
| 2 | SP_00007841– SP_00007843 | Servpro | Donte Smith | Cathy Russell; Michelle Griffith; George Readinger | Darla Humbles | | 2/11/2021 | 1/7/2021 | 1/7/2021 | Work Product | Confidential email correspondence discussing attorney work product performed at the direction of Holland & Knight re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation. | No |
| 3 | SP_00008149– SP_00008310 | Servpro | John Shafer | George Readinger | | | 2/11/2021 | 11/5/2019 | 11/5/2019 | Work Product | Confidential email correspondence with attachment discussing attorney work product performed at the direction of Holland & Knight re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation. | Yes |
| 4 | TRC_00005104– TRC_00005104 | TRC | N/A | | | | 3/10/2019 | | | Work Product | Confidential draft report reflecting legal advice and containing thoughts and impressions of counsel prepared at direction of counsel by Holland & Knight retained consultant re: SFG inspection(s) in anticipation of litigation. | No |
| 5 | BV_00041455– BV_00041456 | Black and Veatch | Shafer, John | Heath Howard | Vance Miller | | 8/22/2019 | 8/22/2019 | 8/22/2019 | Work Product | Confidential email correspondence discussing attorney work product performed at the direction of Holland & Knight re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation. | No |
| 6 | BVP-00004 | Black and Veatch | Holly Costello | John Shafer; Vance E. Miller | | | 8/16/2019 | 8/16/2019 | 8/16/2019 | Attorney-Client; Work Product | Confidential chain email correspondence reflecting discussions with Holland & Knight regarding work performed by consultant at the direction of counsel re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation. | No |
| 7 | BVP-00007 | Black and Veatch | Camille Torres | Holly Costello; Donte Smith | Greta Bibbs; Vance E. Miller | | 8/22/2019 | 8/22/2019 | 8/22/2019 | Work Product | Confidential email correspondence discussing work performed by consultant at the direction of counsel re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation. | No |
| 8 | BVP-00012 | Black and Veatch | Vance E. Miller | Holly Costello | | | 6/3/2019 | 6/3/2019 | 6/3/2019 | Attorney-Client; Work Product | Confidential draft chain email reflecting discussions with Holland & Knight regarding work performed by consultant at the direction by Holland & Knight and, at direction of counsel, populated by Holland & Knight-retained consultants re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation. | Yes |
| 9 | BVP-00056 | Black and Veatch | John Shafer | Greta Bibbs; Vance E. Miller; Cindi Kirkland | | | 6/24/2019 | 6/24/2019 | 6/24/2019 | Work Product | Confidential email correspondence discussing work performed by consultant at the direction of counsel re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation. | Yes |

Appendix A

| 10 | BVP-00106 | Black and Veatch | Joel Windsor | Cecille Tynes | Vance E. Miller; Holly Costello; Darla Humbles | | 5/16/2019 | 5/16/2019 | 5/16/2019 | Work Product | Confidential email correspondence discussing work performed by consultant at the direction of counsel re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation. | Yes |
| 11 | SPP-00031 | Servpro | Vance E. Miller | Michelle Griffith; Joel Windsor; Billie Dempsey; James Wall; Stephanie D. Hill; Glen Messersmith | | 5/2/2019 | 5/2/2019 | 5/2/2019 | Work Product | Confidential email correspondence discussing work to be performed by Holland & Knight-engaged consultant and at the direction of counsel re: assessment and/or remediation of suspected fungal growth (SFG). | No |
| 12 | SPP-00035 | Servpro | Vance E. Miller | James Wall | Holly Costello | | 5/1/2019 | 5/1/2019 | 5/1/2019 | Work Product | Confidential chain email correspondence with counsel discussing  work to be performed by Holland & Knight-engaged consultant and at the direction of counsel re: assessment and/or remediation of suspected fungal growth (SFG). | No |
| 13 | BVP-00080 | Black and Veatch | Holly Costello | Vance E. Miller | | | 6/20/2019 | 6/20/2019 | 6/20/2019 | Work Product | Confidential email correspondence discussing work performed by consultant at the direction of counsel and discussing spreadsheet created by Holland & Knight and, at direction of counsel, populated by Holland & Knight-retained consultants re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation. | Yes |
| 14 | SPP-00004 | Servpro | Naoufal Bouamar, Esq. | | | | 3/29/2019 | | | Work Product | Confidential spreadsheet created by Holland & Knight and, at direction of counsel, populated by Holland & Knight-retained consultants re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation. | No |
| 15 | SPP-00026 | Servpro | Naoufal Bouamar, Esq. | James Wall; SPFM; George Readinger | Billie Dempsey; Vance E. Miller; Shizar Horace; Nick Giambra; Clairrese Ward | | 5/16/2019 | 5/16/2019 | 5/16/2019 | Work Product | Confidential email correspondence discussing work product created by Holland & Knight and, at direction of counsel, populated by Holland & Knight-retained consultants re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation. | Yes |
| 16 | SPP-00058 | Servpro | Billie Dempsey | Kevin Cutillo; Peter Littleton; Holly Costello | Naoufal Bouamar, Esq.; Shizar Horace; Mike Kelso; James Wall | | 4/16/2019 | 4/16/2019 | 4/16/2019 | Work Product | Confidential email correspondence discussing work product created by Holland & Knight and, at direction of counsel, populated by Holland & Knight-retained consultants re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation | Yes |
| 17 | BVP-00061 | Black and Veatch | Gloria Perez | Vance E. Miller; Joel Windsor; John Shafer; Michelle Griffith; Traci Price; Dustin Gray; Justin G Messersmith; Bruce Richards; Glen Messersmith; K Messersmith; R Hayden; Kevin James; Darla Humbles; Jason Smith | Naoufal Bouamar, Esq. | | 7/10/2019 | 7/10/2019 | 7/10/2019 | Work Product | Confidential email correspondence discussing work performed by consultant at the direction of counsel re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation. | Yes |
| 18 | BVP-00125 | Black and Veatch | Billie Dempsey | Joel Windsor; Naoufal Bouamar, Esq. | Vance E. Miller; Christie Taylor; Darla Humbles | | 5/8/2019 | 5/8/2019 | 5/8/2019 | Work Product | Confidential email correspondence discussing work performed by consultant at the direction of counsel re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation. | Yes |
| 19 | BVP-00177 | Black and Veatch | Michelle Griffith | Naoufal Bouamar, Esq. | Shizar Horace; Elizabeth Farinholt; Billie Dempsey; Joel Windsor; Andrew Emerson, Esq.; Vance E. Miller; Chris Rzepkowski; Nick Giambra | | 4/26/2019 | 4/26/2019 | 4/26/2019 | Work Product | Confidential email correspondence with counsel discussing work performed by consultant at the direction of counsel and discussing spreadsheet created by Holland & Knight and, at direction of counsel, populated by Holland & Knight-retained consultants re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of | Yes |

**Appendix A**

| 20 | TRCP-00022 | TRC | Naoufal Boumar, Esq. | | | 5/16/2019 | | | Work Product | Confidential spreadsheet created by Holland & Knight and, at direction of counsel, populated by Holland & Knight-retained consultants re: assessment and/or remediation of suspected fungal growth (SFG), prepared in anticipation of litigation. | No |

# EXHIBIT 1



4425 Forbes Blvd
Suite B
Lanham, MD 20706

301.306.6981 PHONE
301.306.6986 FAX

www.trcsolutions.com

March 2, 2019

Mr. Andrew Emerson
Holland & Knight LLP
800 17th Street N.W., Suite 1100
Washington, DC 20006

Re:    **Summary of** ██████████████████████████████ **Inspection for**
       **Microbiological Contamination at the Military Housing Complex**
       **Ft. Meade**
       **Columbia, Maryland**

Dear Mr. Emerson:

███████████████████████████████████████
███████████████████████████████ The key to success of this or any other project is assembling the correct team of professionals. TRC has over 45 years of experience providing clients with value added services and has the resources of over 5,000 professionals including seasoned, senior professionals with proven experience and innovative ideas to address the challenges posed by this project.

<u>BACKGROUND</u>

Based on our conversations with Holland & Knight, TRC understands that the Fort Meade housing complex consists of 2,627 single family, duplex and townhome housing units. The units were constructed in the 1930s, 1960s, 1970s and after 2006. ███████████████████████
███████████████████████████ The field investigation is intended to evaluate all 2,627 residential units for evidence of water staining/damage and visible suspect microbial growth, and if present, provide location and quantity and a work plan that will guide the remediation in the affected unit(s) in order to safeguard potentially susceptible residents. The project is expected to be completed within sixty (60) calendar days, contingent upon site conditions, unit access and findings.

<u>PROJECT APPROACH</u>



███████████████████████████████████████████

<u>Task 2</u>

To facilitate the immediate need to identify the conditions of the military housing complex related to mold, TRC will perform an initial visual assessment of existing conditions in all 2,627 homes (units).  The initial site investigation team will include:

- Program Manager with expertise in coordinating projects of this magnitude;
- Certified Industrial Hygienists (CIHs) with expertise in mold assessment, remedial strategies and mechanical systems;
- Senior Industrial Hygiene Project Managers and Field Managers to manage the field teams, providing support and resources;
- Up to 12 Field Industrial Hygienists with mold investigation experience; and
- Project Engineer/Scientists to process data and update TRC Mobile Data Solutions platform with up to date information.

Each field industrial hygienist will have the following equipment when performing the assessment:

- FLIR One/FLIR Pro (or similar) thermal imaging device (non-intrusive inspection method);
- Moisture meter (non-intrusive); and
- Direct Reading Instrument - Relative Humidity and Temperature (non-intrusive).

The initial assessment will include the following:

1) Review available drawings of the different unit layouts within the complex.  TRC will conduct an initial review of the existing drawings related to the unit layouts and review any previous sampling analysis and remedial recommendations and approaches.  Client will provide TRC with the available drawings and information upon award;

2) Perform a visual inspection of each unit documenting observations, thermal imaging and recording current temperature and relative humidity measurements.  The moisture content of building materials showing signs of moisture will be measured with a moisture meter.   This would include inspection of:

   a.  The kitchen, bathroom(s), bedroom(s), closet(s), dining room, living room, foyer, garage, and exterior;
   b.  The heating, ventilation and air conditioning (HVAC) system.  The duct system inspection would be limited to removal of the return air and supply air register and viewing into the duct(s), if feasible;
   c.  The crawl space (if present) from the point at the access door into the crawl space to determine if a vapor barrier is present.  The entire crawl space will not be inspected;
   d.  The attic space (if present) from the point at the access door into the attic to identify water intrusion.  If the HVAC system is located in the attic, the attic will be entered to view the HVAC system, if safe to do so.  The entire attic will not be inspected;
   e.  The home's exterior to identify areas of potential water intrusion.

3) If the visual inspection identifies areas of microbial growth within the areas assessed, TRC will recommend the collection of bulk or surface (tape-lift) sample for suspect fungal growth for direct microscopic examination for each area observed. Surface sampling will be utilized as screening tool that will be used to confirm the presence of suspect mold on surfaces identified during the visual inspection.  All mold or potential mold should be remediated regardless of the type or species identified, but surface sampling will be used to confirm that suspect molds are in fact mold.  Follow-up site visit when required and sampling will be invoiced on a time & materials basis pursuant to our agreed terms and conditions.

4) Client will provide the list of current residences that had documented indoor air quality concerns and submitted the concern to the management company.  The client and TRC will clarify prior to the start of this project unit/residents which had documented any indoor air quality concerns.  Based on the information provided to TRC by the client and our visual inspection, TRC will conduct air sampling during a follow-up site visit.  All laboratory costs and additional time



Holland & Knight
February 28, 2019
Page 3

required over the initial site assessment shall be invoiced on a time & materials basis pursuant to our agreed terms and conditions.

5) TRC will prepare a report for each unit. If additional investigation or remediation is warranted, the report will recommend the need for additional investigation and the preparation of a work plan that will guide the additional investigation and/or remediation. The report will also outline any observed issues related to mold with documentation on location and quantities.

6) It is currently anticipated that all of the five different unit types (1 Bedroom House, 2 Bedroom House, 3 Bedroom House, 1 Bedroom Duplex and 2 Bedroom Duplex) within the complex will be evaluated.

7) Concurrent with the finalization of the inspection report and following the receipt of any laboratory results, if performed, a Remedial Work Plan that defines the recommended scope of remediation work for each unit will be provided. The remedial work plan will define the scope of work, project specific requirements, site and work area engineering and administrative controls, clearance protocols, etc. to effectively implement the work.

*In order to facilitate the efficient implementation of this project, TRC will utilize our customizable Mobile Data Solution to collect, analyze, manage and report data efficiently and effectively. This approach substantially increases project efficiencies and significantly reduces potential for errors over traditional approaches. In addition to increasing the overall speed, efficiency, accuracy, consistency and quality of the information provided, this system provides a much more effective tool for managing each project.*

## SCHEDULE AND FEE

TRC is prepared to begin work on this project within 1 week upon receipt of written authorization to proceed and agreement of the terms and conditions. TRC anticipates that the initial visual inspection of each unit will take sixty (60) days. Initial visual assessments will be captured within the TRC Mobile Data Solutions platform to provide instantaneous access to field assessment data and site condition photographs.

A general Remedial Work Plan will be developed by TRC for the units where remediation is recommended and each assessment report will detail the locations and quantities of materials that need to be remediated. However, additional investigation or assessment may be required to fully characterize the remediation effort which would include additional HVAC inspection, sampling for asbestos and lead, etc. These specific unit report will be final once the full scope of work is known, if additional inspection and sampling is required.

TRC proposes to perform the above defined work based on the costs listed below:

- 
- **Task 2-  $998/unit**
- 



Holland & Knight
February 28, 2019
Page 4

REQUIREMENTS AND ASSUMPTIONS

The following assumptions provide the basis upon which TRC's proposed costs were developed for the project:

- In order to coordinate this effort, TRC requests one to two weeks to plan, notify and assemble staff, obtain any equipment, obtain sample media, etc. prior to the 60 day schedule initiating.
- TRC will complete the initial assessments within 60 days of the project start date. Reports will follow with mutually agreed upon schedule for delivery with the Client.
- The Client will provide a floor plan depicting each unit type that will be assessed for the project.
- The Client will provide an excel spreadsheet or csv file that lists each unit to be assessed and the details for each unit (unit address, size of the unit in square feet, number of bedrooms, number of bathrooms, and other rooms, and the floor plan type). This spreadsheet of addresses will be provided to TRC upon authorization to proceed and one week prior to mobilization.
- No delays beyond TRC's control are encountered in performing the scope of work and all areas of the unit(s) are available for access during the scheduled site visit.
- TRC will have timely, complete and unobstructed access to each unit, as applicable to perform the requested scope of work. Timely access to each residential unit will be critical to completing the assessments within 60 days. TRC will provide the Client with a master schedule that the Client will use to notify each tenant of the planned date for the initial unit assessment. In addition, the Client will provide a property maintenance person to provide access to each unit.
- Units will be scheduled by street and in sequential order by address number. All resident communication in relation to scheduling of the project will be conducted by the Client.
- Inspection of the HVAC system in each unit will not involve disassembly of the unit. If the initial inspection indicates a potential issue related to mold growth within the HVAC system, TRC will make recommendations in the report to have a follow-up inspection be performed by a licensed mechanical contractor.
- The fee does not include the collection or analysis of any wipe, tape or air sample for mold as part of the visual inspection.
- The fee does not include any asbestos and lead bulk sampling, sample analysis or survey work. Note that if remediation is recommended, asbestos and lead surveys may be required prior to disturbing these materials.
- Although attempts will be made to keep the damage minimal, minor damages to building materials and finishes will likely occur. TRC will not accept responsibility for damages, whether in the present or that which may occur later, stemming from our work proposed herein.
- Hidden and/or inaccessible areas may not be identified or inspected due to constraints created from construction. Destructive access or demolition of certain components of buildings may be required in order to inspect such areas. TRC assumes Client does not desire such destructive investigation and therefore excludes such methods from our proposed scope of work identified above.
- Clients' maintenance personnel will provide access to areas within each housing unit to be inspected (i.e. crawlspaces, attics, etc.). TRC's proposal is limited to elevations accessible using a standard six foot ladder.
- Below Grade Exclusions: TRC's assessment methods do not include an evaluation of concealed crawlspaces, underground water or sewage piping, underground steam lines, or subsurface foundation damp-proofing that may be present at the unit(s) unless Client provides specific access to the areas.
- Field inspections assume 4 units per person per day will be completed, approximately two hours per unit inspection.
- Any activities beyond those specified in the scope of work will be considered supplemental services and will be invoiced on a time-and-materials basis or covered under a separate, written proposal. However, no such services will be undertaken without Client's authorization.

CLOSING

If this proposal is acceptable to you, please sign this proposal in the authorization blocks below and at the end of the attached "General Terms and Conditions" which are a part of this proposal. The receipt of the signed documents by TRC will serve as our authorization to proceed with the scope of work described in this proposal.

Thank you for allowing TRC the opportunity to serve Holland & Knight. If you have any questions regarding this proposal, please feel free to contact me directly at 617-838-7823.



Holland & Knight
February 28, 2019
Page 5

Sincerely,

**TRC ENVIRONMENTAL CORPORATION**

Paul J. Manna
Building Science, Practice Leader

David Tiernan
Senior Vice President

Cc:     Andre Steuer
        Heath Howard
        Fritz Leonard

Attachments:

TRC Rate Schedule
TRC Terms and Conditions
TRC Resumes

Holland & Knight hereby authorizes TRC to proceed with the above scope of services as set forth in this proposal in accordance with the attached schedule of rates and terms and conditions.

_____                    _____ 3/2/19
Signature                                     Date

_____
        Partner
Title

Meade Communities, LLC hereby authorizes TRC to proceed with the above scope of services as set forth in this proposal in accordance with the attached schedule of rates and terms and conditions.

_____                    _____
William E. Culton, Jr.                        Date
General Counsel, Corvias Group, LLC
Its: Authorized Representative



Sincerely,

**TRC ENVIRONMENTAL CORPORATION**

Paul J. Manna
Building Science, Practice Leader

David Tiernan
Senior Vice President

Cc:     Andre Steuer
        Heath Howard
        Fritz Leonard

Attachments:

TRC Rate Schedule
TRC Terms and Conditions
TRC Resumes

_____

Holland & Knight hereby authorizes TRC to proceed with the above scope of services as set forth in this proposal in accordance
with the attached schedule of rates and terms and conditions.


_____                    _____
Signature                                       Date


_____
Title

Meade Communities, LLC hereby authorizes TRC to proceed with the above scope of services as set forth in this proposal
in accordance with the attached schedule of rates and terms and conditions.

_____                    3/2/19
William E. Culton, Jr.                          Date
General Counsel, Corvias Group, LLC
Its: Authorized Representative

DEF_00145713



**4425 Forbes Blvd**
**Suite B**
**Lanham, MD 20706**

301.306.6981 PHONE
301.306.6986 FAX

www.trcsolutions.com

March 7, 2019

Mr. Andrew Emerson
Holland & Knight LLP
800 17th Street N.W., Suite 1100
Washington, DC 20006

Re:    **Change Order-** ███████████████████████
███████ **Bioaerosol Sampling & Laboratory Analysis of 100% of the properties and post**
**remediation inspection and sampling at the Military Housing Complex, Ft. Meade**
**Columbia, Maryland**

Dear Mr. Emerson:

TRC Environmental Corporation (TRC) is pleased to provide Holland & Knight (the Firm) with the
additional project approach, scope of work and cost for bioaerosol sampling for microbial spores at
2,627 units and a post remediation inspection and sampling, as required, for the military housing complex
located at Ft. Meade in Columbia, Maryland. We are prepared to add these services to the ongoing
inspectional services outlined in this proposal.

BACKGROUND



Scope

To facilitate the immediate need to collect bioaerosol samples at this military housing complex, TRC will
make every attempt to conduct this air sampling while conducting our initial assessment of existing
conditions in all 2,627 properties (units). We anticipate that providing this additional work during our site
investigation will reduce the amount of properties our inspectors can survey in one day and cause the
need to extend our original estimated deadline of 60 days to 120 days.

- The initial assessment will include the collection of bioaerosol samples for total mold spores in two
  (2) indoor locations, including a sample from each floor or in different sections of the larger cape
  style houses. For comparison purposes, three (3) outdoor samples will be collected each day by each
  team. For quality control purposes, a field blank will be prepared per box as well.

DEF_00145714

Holland & Knight
March, 7, 2019
Page 2

*Once the laboratory results are received TRC will incorporate these results into our Mobile Data Solutions platform which will be used for the efficient collection, management and reporting of project information. TRC proposes to utilize our TRC Mobile Data Solutions platform to efficiently capture project assessment, remediation, and schedule data in real-time utilizing mobile devices in the field.*

SCHEDULE AND FEE

TRC is prepared to begin work on this project immediately upon receipt of written authorization to proceed with this change order. TRC will add the scope included in this proposal, to the inspectional services being conducted at this time by TRC and we anticipate that the initial unit assessment, and bioaerosol sampling as described above, will be completed in approximately one hundred and twenty (120) days.

Once the laboratory results are received a final report will be generated within 2 weeks.

The additional cost to provide the background bioaerosol sampling services described in this scope will be $503/unit which will increase our initial unit cost to a total cost of $1,501/unit.

The **$1,501/unit** covers the visual inspection and one bioaerosol sampling event, even if not conducted during the initial inspection. If aerosol sampling is not conducted during the initial inspection, the unit price will be **$998**.

TRC will also provide trained personnel to conduct a visual inspection and clearance bioaerosol sampling following remediation at each property required. The cost for this visual inspection will be **$685/unit.** *This unit price is for a single inspection and does not cover the cost of a follow up inspection if required, which will be an additional $685.*

The same requirements and assumptions from our initial proposal apply to this change order.

CLOSING

If this change order is acceptable to you, please sign this proposal in the authorization block below. The previously agreed upon General Terms and Conditions from our original proposal apply to this proposal. The receipt of the signed documents by TRC will serve as our authorization to proceed with the scope of work described in this proposal.

Thank you for allowing TRC the opportunity to serve Holland & Knight. If you have any questions regarding this proposal, please feel free to contact me directly at 617-838-7823.

Sincerely,
**TRC ENVIRONMENTAL CORPORATION**



DEF_00145715

Holland & Knight
March, 7, 2019
Page 3

Paul J. Manna                                           David Tiernan
Building Science, Practice Leader                       Senior Vice President

Holland & Knight hereby authorizes TRC to proceed with the above scope of services as set
forth in this proposal in accordance with the attached schedule of rates and terms and conditions.

_____          March 12, 2019
Signature                                   _____
                                            Date

_____
Title


**Meade Communities, LLC**
**By: Meade-Picerne Partners, LLC**
**Its: Managing Member**
**By: Corvias Military Living, LLC**
**Its: Member**

_____          3-11-19
                                            _____
William E. Culton, Jr.                      Date
General Counsel, Corvias Group, LLC
Authorized Representative





DEF_00145717

**TRC SOLUTIONS, INC.**
**AGREEMENT FOR CONSULTING SERVICES**

This Service Agreement is made this <u>2nd</u> day of March, 2019 by and between Holland & Knight LLP on behalf of Corvias Military Living, LLC for Meade Communities, LLC, a Delaware Limited Liability Company ("Client"), and TRC Environmental, Inc., a Connecticut corporation ("Consultant"). Client and Consultant are hereinafter referred to individually as "Party" and collectively as "Parties."

In consideration of the faithful performance of the Terms and Conditions set forth in this Service Agreement, Client and Consultant agree as follows:

**1.     SCOPE OF WORK AND CONSULTANT FEES**

The Consultant's Fees (Unit costs, labor and personnel rates, equipment travel expenses and material costs, etc.) for services to be performed under this Service Agreement and scope of work ("Work") are provided in the executed Proposal (the "Proposal") attached as Exhibit A. The Work includes ██████████████████████████████████████████████████████████ performing an initial visual assessment of existing conditions in 2,627 homes, particularly for the presence of mold at the Fort Meade military housing facility in MD ("Site"),   and ████ ████████████████████████████████████████████████████████████████████████████

**2.     TERM**

This Service Agreement shall become effective as of the above date and shall remain valid until December <u>31</u>, 2019, unless terminated earlier under Section 22, Termination.

**3.     TERMS AND CONDITIONS**

Consultant acknowledges and agrees to abide by and comply with the Terms and Conditions, including all Exhibits, which include the Proposal and Invoicing Procedures, and are incorporated herein.

**4.     GOVERNING LAW**

This Service Agreement shall be interpreted and enforced in accordance with the laws of the State of Connecticut.

**5.     INDEPENDENT CONTRACTOR**

Consultant and consultant's employees and subcontractors shall be an independent contractor of Client in all its operations and activities hereunder. All employees or subcontractors furnished by Consultant to perform the Work shall be deemed to be Consultant's employees exclusively, and

1

DEF_00145718

shall be paid by Consultant for all services in this connection.  This Service Agreement does not constitute, nor will it be construed as constituting or creating an employment relationship between Consultant and Client for any purpose whatsoever.  Consultant is not authorized to represent Client or otherwise bind Client in any dealings between Consultant and any third parties.

**6.     COMPENSATION AND PAYMENT CONDITIONS**

**A.**     Client shall compensate the Consultant for the Work in accordance with the Consultant Fees set forth in Exhibit A of this Service Agreement.

**B.**     The labor rates are all inclusive and shall include, but are not limited to the following: wages, taxes, insurance, fringe benefits, compliance with drug and alcohol testing requirements, cost of equipment (hard hats, safety glasses, etc.) needed to comply with safety requirements of field work and all cost associated with complying with all local, state, and federal regulations, overhead and profit.

**C.**     Payment shall in no way relieve the Consultant of liability for its obligations or for faulty or defective work discovered after final payment or Final Acceptance.

**D.**     Client shall pay Consultant within thirty (30) days after Client's receipt of an invoice from Consultant for the Work.  If an invoice is incomplete, Client may return the invoice wholly or partially unpaid.

**E.**     Client will notify Consultant within twenty-one days of the receipt of an invoice if it has a dispute with an invoice through a written objection delivered electronically. In the event that there is a dispute over an invoice, Client agrees to pay any undisputed portion of the invoice.  The Parties will attempt to resolve any disputes concerning invoices as quickly as possible.

**F.**     For a period of at least three (3) years from the date of issuance Consultant shall keep on file and make available as may be requested by Client, a copy of all records and documentation, including individual time sheets, for each final invoice sent to Client for payment.  Client may, at its sole discretion, audit these documents.

**7.     MODIFICATION TO WORK**

**A.**     Client may at any time, by written order to Consultant, make changes (hereinafter "Modifications") in the Work, including but not limited to, increasing or decreasing the Work, changing specifications, or directing acceleration in the performance of Work.  If a Modification causes any increase or decrease in the cost of the Work, an equitable adjustment shall be made through a subsequent written proposal to be executed by the Parties, and which will constitute an Amendment to this Service Agreement.

**B.**     No Modification shall be binding on either Client or Consultant unless issued in writing and signed by Client and Consultant.

**8.     ASSIGNMENT AND SUBCONTRACTING**

2

DEF_00145719

The Consultant shall not assign this Service Agreement or subcontract or the whole or any part of the Work to be performed by Consultant without Client's prior written consent which may be withheld in Client's sole and absolute discretion.  Client's consent to any such assignment or subcontract shall not relieve Consultant of any liability for the full and faithful performance of this Service Agreement according to its terms and conditions. Client may assign all or any portion of its rights and title to all goods and services provided under this Service Agreement to the Client or any subsidiary of Client.

**9.      ACCOUNTING AND AUDITS**

Consultant shall maintain full and detailed accounting records in accordance with generally accepted accounting principles and practices consistently applied to substantiate all invoiced amounts.  Upon reasonable notice, Client, or its respective representatives, shall be allowed to audit or inspect Consultant's records, books, correspondence, instructions, drawings, receipts, vouchers, and other data relating to the Work and services. Consultant shall preserve such records and offer access to Client for a period of four (4) years after final payment.  Client and its respective representatives shall have the right to reproduce any of the information referred to above.

**10.    INSURANCE**

Consultant from the inception of the Work until Final Acceptance of the Work shall provide at its own cost and expense, including the payment of any deductibles, and maintain in effect the following types and amounts of insurance with terms and with insurance companies satisfactory to Client:

**A.**      Workers' Compensation Insurance including Occupational Disease coverage in accordance with the laws in the jurisdiction of the Work area and Employer's Liability Insurance with a limit of not less than $1,000,000 per person per accident.

**B.**      Commercial General Liability Insurance, including Contractual Liability and Products Completed Operations coverage with available limits of not less than $1,000,000 per occurrence and $2,000,000 general aggregate and containing no XCU exclusions.

**C.**      Automobile Liability Insurance covering owned, non-owned and hired vehicles used by Consultant with limits of not less than $1,000,000 combined single limit.

**D.**      If Consultant's Commercial General Liability Insurance and Automobile Liability Insurance are combined forming one policy and one limit of liability, the limits shall be not less than $2,000,000 combined single limit.

**E.**      Client's Pollution Liability Insurance where applicable with limits of not less than $2,000,000 per claim and annual aggregate.

**F.**      Excess Liability/Umbrella Liability Insurance of $2,000,000 per occurrence and annual aggregate.

DEF_00145720

**G.**     Professional Liability Insurance (errors & omissions) where applicable with limits of not less than $2,000,000 per claim and in the aggregate covering Consultant against all sums which Consultant may become obligated to pay on account of any professional liability arising out of its performance under this Agreement.

**H.**     Other Requirements

(1)     Additional Insured: As to insurance set out in above sub-paragraphs B, C, D (if applicable), E, and F, Client shall be added as an additional insured without any disclaimers.

(2)     Waiver of Subrogation: All policies shall be endorsed to provide that underwriters and insurance companies of Consultant shall not have any right of subrogation against Client, or any of its respective parents, affiliates, or subsidiaries and each of their respective officers, directors, shareholders, members, partners, employees, agents, invitees, servants, Consultants (other than the Consultant), insurers, underwriters and such other parties as they may designate.

(3)     Primary Insurance: To the extent permitted by such insurance policies, each policy shall be endorsed to provide that, with respect to the Work, Consultant's insurance shall always be primary coverage and non-contributory with respect to any insurance that may be maintained by Client.

(4)     Notice of Cancellation: All policies shall be endorsed to provide that thirty (30) days prior written notice shall be given to Client in the event of cancellation or non-renewal of the policies.

(5)     Certificates: Consultant shall furnish Client with an acceptable Certificate of Insurance evidencing the insurance and other requirements required hereunder before the start of any Work or services and as a condition to payment.  Certificates of Insurance shall include the TRC Project number.  Consultant shall send Certificates of Insurance to Client as follows: To Client's Manager of Property and Development, to the addresses indicated in Section 30 hereof.  Consultant shall maintain, update, and renew the Certificate for the duration of this Agreement. In the event an acceptable Certificate of Insurance becomes outdated, Client may withhold payment of invoices, suspend Work or services or take other appropriate action until an acceptable and properly dated Certificate is received by Client.

DEF_00145721

**11.    COMPLIANCE WITH LAWS AND REGULATIONS**

**A.**     Consultant, its employees, and representatives, shall at all times comply with any and all applicable laws.

**B.**     Consultant shall comply with all Applicable Laws, concerning nondiscrimination in employment (including the Equal Opportunity clause of Section 202, Executive Order 11246, dated September 24, 1965) 38 U.S.C. 2012, as amended by Section 402 of the Vietnam Veterans Readjustment Assistance Act of 1974 and Section 503 of the Rehabilitation Act of 1973, which are hereby incorporated herein by reference.

**12.    HEALTH AND SAFETY**

Consultant shall place the highest priority on employee and worker health and safety, and shall maintain a safe working environment during performance of the Work.  In addition to, and without by way of limitation, Consultant shall comply, and shall secure compliance by its employees, agents, and Consultants, with all applicable health, safety, and security laws and regulations including, without limitation, federal, state and local laws and regulations.  Compliance with such requirements shall represent the minimum standard required of Consultant.

**13.    CONSULTANT RESPONSIBILITIES**

**A.     Professional Quality**

The standard of care for Work performed by Consultant shall be the care and skill ordinarily exercised by members of Consultant's profession practicing under the same or similar conditions at the same time and in the same locality. The Work rendered hereunder shall be rendered competently and by qualified personnel and in accordance with standard industry practice.  This warranty is in lieu of all other warranties, either express or implied. Consultant shall be responsible for the professional quality of the Work, and Consultant warrants that:

(1)    The Consultant will use reasonable care to perform the Work in accordance with prevailing professional standards and ethics, and that the Work shall be of high quality;

(2)    The Consultant now possesses and shall maintain at all times for the duration of this Service Agreement, all licenses and certifications required for the Work.  Consultant shall present evidence thereof, upon request by Client, and shall notify Client immediately after any decertification or revocation of any license or certification.

**B.     Communication**

Consultant shall not communicate with Site Owner/Operator without prior written authorization from Client. Consultant is not responsible for any project delays while waiting authorization.

DEF_00145722

C.      **Supervision and Work Force**

Consultant shall employ only competent and skilled personnel to perform the Work.

14.     **TIME OF PERFORMANCE/FORCE MAJEURE**

A.      Time is of the essence in the performance of Consultant's obligations under this Service Agreement.  The time schedule for the implementation and completion of the Work shall be mutually agreed upon between Client and Consultant prior to the start of the Work. Client and Consultant may mutually agree to update or revise the time schedule if necessary as the Work progresses in accordance with Section 7, Modifications to Work.

B.      Any delay or failure of performance by either Party pursuant to this Service Agreement shall be excused only if, and only to the extent that the delay or failure was caused by occurrences beyond the control of the Party affected, including acts of God, extreme and unusual weather conditions, floods, fires and explosions, riots, war, rebellion, and sabotage and not due to the affected Party's fault or negligence, provided:

(1)     That the foregoing shall not be considered a waiver of either Party's obligations under this Service Agreement;

(2)     That the Party seeking relief shall promptly notify the other in writing of the time and starting and ending of any such occurrence, and describe the nature of the occurrence and its anticipated effect on the performance of this Service Agreement.

15.     **REPRESENTATIONS AND WARRANTIES**

A.      Consultant represents and warrants that all work shall (i) strictly comply with the provisions of this Service Agreement and all specifications referred to in this Service Agreement or thereafter furnished by Client. Consultant further represents and warrants that all materials, equipment and supplies furnished by Consultant for the Work shall be of the most suitable grade in accordance with all specifications and fit for the purposes contemplated by this Service Agreement.

B.      Without limitation of any other rights or remedies of Client, if there is any defect in the Work, Consultant shall upon receipt of written notice of such defect within one (1) year after completion of its services, promptly furnish, at no cost to Client, all labor, equipment and materials at the Site necessary to correct such defects and cause the Work to comply fully with the foregoing warranties.

16.     **LIENS, ENCUMBRANCES, AND CLAIMS**

A.      With respect to all Work provided by Consultant pursuant to this Service Agreement: (1) no liens or other encumbrances shall be filed by Consultant; and (2) Consultant expressly waives and relinquishes any and all rights to such liens or encumbrances.

B.      Consultant shall promptly pay, when due, all wages of laborers and employees, all bills for materials used in the Work, all claims of any lower-tier Consultants, and all statutory

DEF_00145723

withholdings.  Provided that Client has made payments due hereunder, Consultant agrees to indemnify and defend Client and hold it, the Site, and the Work harmless from and against any and all liens, claims for labor, services, and materials and agrees to forthwith discharge and pay any and all liens and claims in any way resulting from Consultant's performance of the Work.  If such a lien is filed, Consultant shall, within five (5) working days after notification by Client, (i) pay such lien and obtain a Release of Lien, or (ii) post a Release bond to lift the lien, and (iii) shall duly record such Release of Lien or Release Bond in the appropriate county real estate records and provide Client with a copy of the recorded Release of Lien or Release Bond.  Failure to do so shall be deemed to be a material breach of this Service Agreement.  Client at its discretion may withhold any monies due Consultant and use said money to satisfy any liens or past due amount.

C.      Client may, as a condition precedent to any payment, require Consultant to furnish complete waivers or releases of any and all such liens, charges, encumbrances and claims. Waivers or releases must be furnished by Consultant covering all liens, charges, encumbrances and claims as a condition to final payment.

## 17.     CONSULTANT'S INDEMNIFICATION OF CLIENT

To the fullest extent permitted by law, Consultant shall defend, indemnify and hold harmless Client, its employees, subsidiaries, successors and assigns, from and against any and all liabilities, claims, demands, judgments, loss, damages, or costs, including, without limitation, settlement sums, reasonable attorney fees, consultant and expert fees (liabilities), to the extent caused by Consultant's negligent acts, omissions or willful misconduct in the performance of its services  for (1) personal injury, disease or death to any person and/or damage to property (public or private), or contamination of or adverse effects on the environment, (2) workers' compensation assessments or claims involving employees of Consultant and/or its subcontractors, (3) violations of Environmental Laws and/or Natural Resource Damages, (4) violation by Consultant of any Applicable Laws. Under no circumstances shall Consultant be liable for special, indirect, consequential, punitive or exemplary damages or for damages caused by Client's failure to perform its obligations.  The total liability in the aggregate of Consultant to Client or anyone claiming by, through or under Client on all claims of any kind (excluding claims of death or bodily injury, gross negligence or third party claims for which Consultant has indemnification responsibilities hereunder) shall not exceed the total compensation received by Consultant under this Agreement or $50,000 whichever is higher.

## 18.     CONFIDENTIALITY

Consultant shall treat the details of this Service Agreement and any information or data about the Work and Project as private and confidential, and shall not publish, release or disclose information regarding this Service Agreement, the Work, and Project to any person or party other than Client, Client's authorized representatives, and persons designated by Client.  This provision shall not apply to information and data, which are in the public domain, or were previously known to Consultant or which were acquired by Consultant independently from third parties not under any obligation to Client to keep said information and data confidential.  Nor shall it be interpreted to in any way restrict Consultant from complying with an order to provide information or data when such order

DEF_00145724

is issued by a court, administrative agency or other legitimate authority with proper jurisdiction; but if such request is made, Consultant will, when legally permissible, give Client notice of said request prior to disclosure. Consultant shall not make any public announcement or publicity releases without Client's prior written authorization. Consultant agrees that all communications with the press or other media regarding the Project shall be by Client, unless otherwise instructed by Client.

Without limiting the generality of the foregoing, Consultant shall not use, disclose, or transfer across borders any information that is processed for Client or Client that may identify an individual (Personal Data), except to the extent necessary to perform under this Service Agreement; and Consultant shall comply with all applicable data privacy laws and regulations, implement and maintain appropriate technical and other protections for the Personal Data, report any breaches of protection of Personal Data, and cooperate fully with Client's requests for access to, correction of, and destruction of personal data in Consultant's possession.

Consultant shall also require all of its employees and sub-contractors to comply with this Section.

## 19.   OWNERSHIP OF DOCUMENTS

All deliverables and documents including, without limitation, data, reports, notes, specifications, drawings, plans, tracings, materials, and files produced, prepared, or collected by Consultant, whether completed or in progress, under this Service Agreement ("Deliverables") shall become and be the property of Client upon payment therefor. Consultant agrees to and shall deliver to Client any Deliverable upon request.  Consultant grants Client a fully paid-up, perpetual, non-exclusive, royalty free license to use any Consultant preexisting information as contained in any Deliverable for the purposes contemplated under this Service Agreement.

## 20.   PATENTS

Consultant shall defend all suits and claims against Client and shall hold Client free and harmless, and hereby indemnifies, defends and holds harmless Client from all liability, damages, costs and royalties, including without limitation reasonable attorney fees, from any infringement or alleged infringement of any patent, copyright, or other intellectual property right, or for the misuse of any of the foregoing, by Consultant and its employees or sub-contractors in the performance of the Work.

## 21.   SUSPENSION OF WORK

A.   Client may, at any time, suspend performance of all or any part of the Work by giving not less than twelve (12) hours' notice (by phone or via email) to Consultant.

B.   Client shall not be liable for damages of any kind including, but not limited to, direct or consequential damages, anticipated profits, or costs incurred with respect to suspended Work during any period of suspension, except for the out of pocket cost that are incurred for the purpose of safeguarding the work materials and equipment in transit or at the Site.

DEF_00145725

22.   **TERMINATION**

A.   Default: Client may terminate this Service Agreement by written notice to Consultant for any of the following events:

    (1)   Consultant fails to commence its Work or services hereunder, or any portion thereof, within the specified time, or fails to complete its services within the specified time, or otherwise fails to comply with any term of this Service Agreement, provided that Client has given Consultant written notice of such failure and the Consultant fails to remedy such failure within three (3) working days, or present to Client a mutually acceptable plan to implement such remedy.  Client may also terminate Consultant's right to proceed with the Work or such part of the Work where defaults have occurred;

    (2)   Consultant becomes insolvent, petitions for any bankruptcy court proceeding, or has an involuntary bankruptcy proceeding for it filed by any creditor or group of creditors;

    (3)   Consultant fails to make prompt payment to its Consultants or suppliers; or

    (4)   Consultant fails to maintain proper quality control, Health & Safety procedures and required licenses and certifications.

B.   Convenience: Client may terminate this Service Agreement by three (3) days prior written notice to Consultant.  Such termination shall be effective in the manner specified in the notice and shall be without prejudice to any claims that Client or Client may have against Consultant.

C.   After receipt of a termination notice pursuant to the sub-paragraphs above, Consultant shall, unless the notice directs otherwise, immediately discontinue the Work.

D.   In the event of a termination for default, Consultant shall not be entitled to receive any further payment, if any may then be due, until all of the Work is completed by or on behalf of Client.

E.   In the event this Service Agreement is terminated for convenience, the obligations of this Service Agreement shall continue as to approved work already performed.  Consultant shall be entitled to relative proportions of the agreed Contract Price for the portions of the Work done before the effective date of termination.  Consultant shall not be entitled to any profit, fee or overhead on unperformed Work.

23.   **NOTICE OF THIRD PARTY CLAIMS AGAINST THE CONSULTANT**

Consultant shall give Client immediate notice of any suit or action filed, or any actual or threatened claims made, against Consultant arising out of, or in any way related to, the performance of this Service Agreement or any lower-tier subcontracts (if any).  Consultant

DEF_00145726

shall furnish immediately to Client copies of all documents received by Consultant pertinent to such actions, suits or claims.

24. **DISPUTES**

For all claims or disputes between the Parties under this Service Agreement, the Parties shall endeavor to settle disputes as a condition precedent to litigation.  The Parties will follow the following dispute procedures:

**A.**     In no event shall a dispute be raised after the date when such claim, dispute or other matters in question would be barred by the applicable statute of limitations.

**B.**     The Parties agree to make a good faith effort to mutually resolve any dispute as quickly as practicable.

**C.**     If, however, the Parties have not so resolved the dispute, the Parties' representatives shall submit the dispute to one of their senior-level executives for review and simultaneously notify the other Party in writing thereof.  A meeting shall be held within five (5) business days after such notice of submission attended by such senior-level executives of the Parties and any necessary representatives to attempt in good faith to negotiate a resolution of the dispute.

**D.**     If, within five (5) business days after such meeting, the Parties have not succeeded in negotiating a resolution of the dispute, either Party may institute suit in the superior Court of the State of California.

**E.**     The Parties consent to personal jurisdiction and venue in the courts referenced above.  The Parties specifically waive their right to a jury trial to resolve any and all claims, including but not limited to those sounding in contract, tort or statute, against the other arising out of or connected in any way to the project or this Agreement.  Any and all claims and/or causes of action between the Parties arising out of this Agreement shall be brought by either Party within three (3) years of substantial completion of the services rendered pursuant to this Agreement or termination of this Agreement whichever is sooner.

**F.**     During the pendency and conduct of any dispute or litigation, Consultant shall continue to perform the Work.

**G.**     The rights and obligations of the Parties under this provision shall survive completion or termination of this Service Agreement.

25. **RIGHTS, REMEDIES AND WAIVER**

The rights and remedies provided in this Service Agreement to Client shall be cumulative with and in addition to the rights and remedies otherwise available at law or elsewhere provided for herein.  No waiver of any provision of this Service Agreement shall be effective unless such waiver is in writing and signed by the Client and this provision cannot

DEF_00145727

be orally waived.  Failure to enforce any provision of this Service Agreement or to require at any time performance of any provision hereof shall not be construed to be a waiver of such provision, or to affect the validity of this Service Agreement or the right of Client to enforce each and every provision in accordance with the terms hereof.  No waiver of any provision of this Service Agreement shall affect the right of Client or Client thereafter to enforce such provision or to exercise any right or remedy available to it in the event of any other default involving such provision or any other provision.  Making payment or performing pursuant to this Service Agreement during the existence of a dispute shall not be deemed to be and shall not constitute a waiver of any claims or defenses of the Client.

## 26.    NON-SOLICITATION

Each Party agrees that during the term of this Service Agreement, it shall not directly solicit or recruit or hire any employee of the other Party.  Nothing herein shall be deemed to prohibit either Party from conducting generalized solicitations or generalized advertisements for employment or hiring any employee of the other Party who has responded to a generalized solicitation or generalized advertisement for employment.

## 27.    SEVERABILITY

If any provision in this Service Agreement is determined to be void or unenforceable, such determination shall not affect the validity of any other provision.

## 28.    ENTIRE AGREEMENT

This Service Agreement, together with all exhibits, documents, specifications, and drawings incorporated herein by reference, constitutes the entire agreement between Client and Consultant, and there are no terms, conditions, or provisions, either oral or written, between the Parties other than those herein contained, and this Service Agreement supersedes any and all oral or written representations, inducements, or understanding of any kind or nature between the Parties relating to the Work.

## 29.    HEADINGS

The Headings in this Service Agreement are for convenience only and are not intended to be used in interpreting or construing the terms, covenants, and conditions herein.

## 30.    NOTICES

DEF_00145728

Notices required hereunder shall be in writing and deemed given if sent by certified mail return receipt requested or recognized overnight courier to the following duly authorized representatives:

| **Client** | **Consultant** |
|---|---|
| Bonni F. Kaufman, Esq. | Mark A. Robbins |
| Holland & Knight LLP | President |
| 800 17th Street N.W., Suite 1000 | Environmental Sector |
| Washington, DC 20006 | TRC Solutions, Inc. |
| Tel.: (202) 419-2549 | 505 E. Huntland Drive, suite 250 |
| Fax: (202) 955-5564 | Austin, TX 78752 |
| bonni.kaufman@hklaw.com | Tel.: (512) 684-3107 |
| | mrobbins@trcsolutions.com |

The Parties may change their duly authorized representatives at any time by providing written notice to the other Party.

**AGREED AND ACCEPTED TO BY:**

Holland & Knight LLP

_____
Signature

_Bonni Kaufman_____
Name

_Partner_____
Title

_3/5/19_____
Date

TRC SOLUTIONS, INC.

Mark A. Robbins
President

Digitally signed by Mark A. Robbins, President
DN: cn=Mark A. Robbins, President, o=TRC, ou=EV Sector, email=mrobbins@trcsolutions.com, c=US
Date: 2019.03.02 13:57:06 -06'00'
Signature

_Mark A. Robbins_____
Name

_President, EV Sector_____
Title

March 2, 2019_____
Date

12

DEF_00145729

**EXHIBIT A**

**EXECUTED PROPOSAL**

DEF_00145730

**EXHIBIT B**

**INVOICING PROCEDURES**

The Consultant shall use the methods described below for preparing and sending invoices for the Work performed under the Agreement.  The Client may, at any time, require additional or different methods for invoicing.

A.    Send one original invoice to the Client.
B.    Send the invoice via e-mail to: Bill.Culton@corvias.com with copy to bonni.kaufman@hklaw.com and andrew.emerson@hklaw.com.
C.    The invoice must include an invoice date on or after the date when the work was performed by Consultant.
D.    The invoice must include a unique invoice number.
E.    The invoice must include the time period during which the work was performed.
F.    The invoice must contain the correct remittance address.
G.    The invoice must include Consultant's complete name as it should appear on Client's remittance.
H.    The invoice must include Consultant's telephone number.
I.    The invoice must include the Client's contact names.
J.    The invoice must include any account coding provided by Client.
K.    The invoice must show the units expended, or Time & Material, if that applies.
L.    Any specific Material and Equipment charges must be identified.
M.    The invoice must show any other specific information required by the Work.
N.    Labor categories and rates on the invoice must correspond to those included in the Proposal.
O.    Reference TRC Project #330483.0000  .

*Invoices received without TRC' s Project Number will be returned for proper processing.*

DEF_00145731

## TRC Environmental 2019 Rate Schedule

| CODE | TRC LABOR CLASSIFICATION/CATEGORY | HOURLY LABOR RATE |
|------|-----------------------------------|-------------------|
| | **Project Support/Clerical** | |
| G1 | Level I | $58 |
| G2 | Level II | 69 |
| G3 | Level III | 95 |
| G4 | Level IV | 110 |
| | **Drafting/CADD/GIS** | |
| F1 | Level I | $69 |
| F2 | Level II | 81 |
| F3 | Level III | 105 |
| F4 | Level IV | 122 |
| | **Designer/Technician/Inspectors** | |
| E1 | Level I | $46 |
| E2 | Level II | 69 |
| E3 | Level III | 91 |
| E4 | Level IV | 105 |
| | **Scientist/Planner/Engineer** | |
| D1 | Level I | $80 |
| D2 | Level II | 110 |
| D3 | Level III | 105 |
| D4 | Level IV | 122 |
| | **Senior Scientist/Planner/Engineer** | |
| C1 | Level I | $127 |
| C2 | Level II | 153 |
| C3 | Level III | 177 |
| C4 | Level IV | 200 |
| | **Project Manager** | |
| B1 | Level I | $150 |
| B2 | Level II | 162 |
| B3 | Level III | 190 |
| B4 | Level IV | 208 |
| | **Principal/Principal Scientist/Principal Engineer** | |
| A1 | Level I | $213 |
| A2 | Level II | 232 |
| A3 | Level III | 261 |
| A4 | Level IV | 298 |
| | **- MICROBIAL** | |
| | Air Samples-Total Fungal Spores (72Hours) | $45.00 |
| | Next-Day Rush Analysis | $65.00 |
| | Same-Day Rush Analysis | $75.00 |
| | Tape and Bulk Samples-Direct Microscopic Examination (72 Hours) | $45.00 |
| | Next-Day Rush Analysis | $65.00 |
| | Same-Day Rush Analysis | $75.00 |

*Litigation and expert witness time will be billed at 1.5 times the standard.

DEF_00145732

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2021, I caused a copy of the foregoing

Letter to be served on all counsel of record via the Court's CM/ECF system.


/s/ *Kevin B. Collins*

Kevin B. Collins (D. Md. No. 13131)

*Counsel for Plaintiffs*