IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**Joseph Addi, et al.,**            *

               *

      **vs.**            Case No 1:19-cv-03253-ELH

               *

**Corvias Management-Army, LLC et al,**

               *
             ******

## **MEMORANDUM AND ORDER**

This putative class action involves claims by members of the military and their families that the housing provided to them at Fort Meade was substandard in that it contained mold which, in turn, caused health problems. Defendants are Corvias Management-Army, LLC ("Corvias") and Meade Communities, LLC ("Meade") who managed the properties as part of the U.S. Army's Military Housing Privatization Initiative ("MHPI") whereby the U.S. Army contracted with private property management companies to manage and maintain housing at Fort Meade and other bases around the country. The case has been referred to me by Judge Hollander for discovery and all related scheduling. (ECF No. 71.)

This is not the first such case alleging mold-related injuries filed against MHPI providers like Defendants. Similar cases with similar claims have been filed in various other state and federal courts. *See, e.g., Federico, et al. v. Lincoln Military Housing*, LLC, et al., No. 12-CV-80 (E.D.Va. 2012); *Venvertloh v. Lincoln Mil. Housing, LLC*, et al., No. 18-00008 (E.D.Va. 2018); *Charvat v. Lincoln Mil. Prop. Mgmt*, No. 37-2018-00002360 (San Diego Cnty. Sup. Ct. (2018); *Pate v. Hunt Southern Group*, LLC, No. 18-46 (S.D. Miss. 2018). Such claims also attracted understandable media attention, including stories by The Military Times[1] and Reuters.[2] The Reuters' story included interviews with eight families from Fort Meade, although it is unknown whether any of those families are named Plaintiffs or potential members of the class.

According to Defendants, beginning in the Fall of 2018, some of those who would ultimately become named Plaintiffs in this suit began to make complaints to Defendants and others, including the Army Inspector General, the Garrison Commander of Fort Meade, and the Senate Armed Services Committee. (ECF No. 130 at 2.) Congressional hearings were held in early 2019. *Id.* This suit was filed in the Fall of 2019.

---

[1] Shawn Snow, *Military Families Battle Mice, Mold, and Mushrooms at the Mercy of Private Landlords*, MILITARY TIMES (November 4, 2018) www.militarytimes.com/news/2018/11/04/military-families-battle-mice-mold-and-mushrooms-at-the-mercy-of-powerful-private-landlords/

[2] Joshua Schneyer and Andrea Januta, *As U.S. Soldiers Battle Landlord, Confidential Records Shines Light on His Lucrative Business*, REUTERS (December 27, 2018) www.reuters.com/investigates/special-report/usa-military-developer

Against this backdrop, Defendants indicate that they hired Holland & Knight in the Fall of 2018 given the potential for litigation similar to what was unfolding in other jurisdictions. *Id*. Holland & Knight, in turn, hired TRC, ServPro and Black & Veatch as consulting experts to assist Holland & Knight in its assessment of Defendants' legal risk related to mold in the military housing units Defendants managed at Fort Meade by inspecting and collecting data from those units. *Id*. Specifically, TRC was hired to visibly inspect the housing units for mold to assess the scope of the problem. (ECF No. 130 at 6.) ServPro was hired to consult with respect to the scope of potential remediation. *Id*. at 7. Black & Veatch was hired presumably to assess the feasibility and logistics of undertaking such an effort.[3] *Id*. at 8. Holland & Knight also hired Aegis Project Controls ("Aegis") to compile and aggregate the raw data collected for Holland & Knight by TRC, ServPro and Black & Veatch. *Id*. at 3. Aegis created and updated a master spreadsheet compiling this data for Holland & Knight's use in advising Defendants. *Id*.

Eventually, however, Defendants asked TRC, ServPro, Black & Veatch and Aegis to wear a second hat. In addition to their consulting expert role in gathering data for Holland & Knight's use, TRC, ServPro, Black & Veatch and Aegis also got involved in scheduling and performing the mold inspections and remediation taking place at Fort Meade beginning in March of 2019. *Id*. That is, TRC performed inspections of the units so that ServPro could then perform the remediation, with the entire project being coordinated by Black & Veatch and, to a lesser extent, Aegis (for the Spring and Summer of 2019). (ECF No. 130 at 6-8; ECF No. 131.) Nonetheless, TRC, ServPro, Black & Veatch and Aegis also periodically continued providing expert consulting services to Holland & Knight. *Id.*

This dual role as both consulting litigation experts and schedulers/inspectors/remediators has led to a dispute as to whether and how to treat information generated by and exchanged between TRC, ServPro, Black & Veatch, Aegis, Holland & Knight, and Defendant Corvias for purposes of both the attorney-client privilege and the work product doctrine. The parties also dispute the meaning and effect of certain provisions of their agreed-to Electronically-Stored Information ("ESI") Protocol with regard to exceptions to the privilege log requirement that would otherwise attend to documents withheld on that basis.

In order to address this dispute, on September 2, 2021, in the context of addressing other discovery disputes, the Court directed the parties to each file a position statement with supporting authority and to each choose twenty documents from Defendants' privilege log for in camera review. (ECF No. 128). This they have done. (ECF Nos. 129, 130 and 131.) The Court's opinion follows.

**I.  Legal Standard**

To justify a claim of attorney-client privilege, the withholding party must show that the withheld document is a confidential communication between counsel and client "made primarily for the purposes of obtaining legal advice or services from the attorney." *Agropex Int'l. Inc. v. Access World (USA) LLC*, 2021 WL 3090901 at *1 (D. Md. May 20, 2021). As noted by Plaintiffs, the mere participation or presence of an attorney by itself does not necessarily render a document

---

[3] The scope of Black and Veatch's original consulting work is not entirely clear, but given its ultimate role as project manager in what became the public inspection and remediation effort, the Court assumes that the "certain issues" Defendants are talking about would be similar.

privileged if the primary purpose was not obtaining or conveying legal advice or services. (ECF No. 129 at 2, citing *United States v. Cohn*, 303 F. Supp. 2d 672, 683-84 (D. Md. 2003).)

The work product doctrine is broader, and protects documents prepared in anticipation of litigation by a party, its attorneys, or its consultants and agents. FRCP 26(b)(3); *See Nicholas v. Bituminous Cas.Corp.,* 235 F.R.D. 325, 332 (N.D.W.Va. 2006) (in holding that loss reserves generated by "line" claims personnel of insurer were protected, court observing, "[i]mportantly, the work-product doctrine is not confined solely to information and materials gathered or assembled by a lawyer, but also covers materials gathered by any consultant, surety, indemnitor, insurer, agent, or even the party itself"). Unlike attorney-client privilege, the test for work product protection is less focused on the participants and content of the communication, and instead looks to the motivating force behind the preparation of the document—whether it was prepared or obtained because of the prospect of litigation, by the client, an attorney, or an agent of either. Of course, one situation falling squarely within the protection is where such work is directed by the attorney in anticipation of litigation, such as when consulting experts analyze technical data on the attorney's behalf so that the attorney can, in turn, properly advise the client. *See, e.g.*, *In re Marriott Int'l., Inc*. 2021 WL 2222715 at *5 (D. Md. June 2, 2021) (report and recommendation adopted June 17, 2021).

When appropriate, courts draw a distinction between opinion work product and fact work product. "Fact work product is a transaction of the factual events involved," whereas opinion work product "represents the actual thoughts and impressions of the attorney." *In re Grand Jury Subp.*, 870 F.3d 312, 316 (4th Cir. 2017) (internal quotations omitted). Opinion work product is afforded more stringent protections. *Id.* Fact work product can be obtained upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship. FRCP 26(b)(3).

## II. Analysis

The challenged documents here largely implicate the work product doctrine. If TRC, ServPro, Black & Veatch and Aegis had remained solely in their original role of retained consulting experts, the analysis would be straightforward: their gathering, analysis and reporting of technical information to assist Holland & Knight in its representation of Defendants, and the surrounding communications, would be protected from disclosure absent a showing of substantial need and inability to obtain the information from another source without undue hardship. However, the analysis is more complicated once TRC, ServPro, Black & Veatch and Aegis take on the additional role as the entities scheduling and undertaking the actual inspection and remediation program and, in so doing, becoming fact witnesses for whom no protection would apply as to those activities. For example, as the Court has observed in a previous dispute involving production of agreements between Holland & Knight and TRC:

> [W]hen Defendants made the decision to have TRC expand its role to perform public fact gathering, a role, in part, defined in the "Requirements and Assumptions" contained in the two documents sought, the documents lost some of that protection. While it may be appropriate to redact some of those documents to the extent they contain information limited to TRC's consulting expert role, the

3

documents should otherwise be produced to disclose the scope, methods, assumptions, requirements and/or assumptions used for TRC's later work.

(ECF No. 104 at 2.)

The concern for the Court, as previewed on the record at the August 31, 2021 status conference with the parties, is that the raw information collected by TRC, ServPro and Black & Veatch regarding the presence and extent of mold, the remediation efforts undertaken, and, as to Aegis and Black & Veatch, the logistics and coordination of that effort is highly relevant, and any protection to which it might otherwise be afforded—had it remained within the confines of a consulting expert relationship— is lost to the extent TRC, ServPro, Black and Veatch and Aegis assumed public facing roles in assessing and trying to correct the mold issues at Fort Meade. Moreover, even if work product protection could be said to apply, such data would fall squarely within the "substantial need" exception found in Fed. R. Civ. P. 26(b)(3)(ii). Additionally, to the extent any of these entities is merely providing operational business support to Defendants not primarily motivated by the litigation—such as Aegis assisting in the scheduling of the inspection and remediation work (when not otherwise being prioritized based primarily on litigation concerns)—work product is not implicated. *See, e.g., Union Fire Ins. co. of Pittburgh, Pa. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992).

To their credit, Defendants recognize this and assure the Court that all raw data, reports, logs, and electronic files have been produced by TRC, ServPro and Black & Veatch, as well as information from Aegis in its role as scheduler (to the extent such scheduling was not prioritized based primarily on litigation concerns), to include the following:

- Initial Visual Inspection Reports (including photos)
- TRC's summary of inspection results and recommendations for remediation
- Limited Mold Assessment reports (to include air sampling, mold observations, and temperature/humidity measurements inside and out)
- Lab Results
- Inspection Protocols
- Spreadsheets containing all raw data for each home within the previously-defined scope of discovery
- Remediation Letters for each home
- Materials list of remediation materials and equipment
- ESI regarding the scheduling and coordination for the remediation

(ECF No. 130 at 6-8; ECF No. 131.)

The Court would also instruct Defendants to expand this to include (to the extent not already produced) other information from any of these consultants being exchanged for purely operational purposes, such as providing Corvias leasing office personnel a list of properties that had been remediated and are now available to offer for lease. (*See, e.g.*, BVP 00007.)

By contrast, in assessing the extent to which the work product doctrine applies, the Court is mindful of Justice Jackson's quote from the seminal case of *Hickman v. Taylor*, that the very purpose of the work product doctrine is to prevent the requesting party from "perform[ing] its functions…on wits borrowed from the adversary." 329 U.S. 495, 516 (1947). Thus, to the

4

extent that Holland & Knight (or Defendants' in-house counsel), itself or through its litigation support consultant Aegis, requested subsets of the universe of information provided to Plaintiffs in discovery that it thought were particularly relevant in advising the client and preparing the defense, or made its own compilations of data otherwise provided to Plaintiffs in discovery, that decision-making is protected.

Further, to the extent TRC, ServPro and Black & Veatch provided opinions regarding such information to assist in advising the client or preparing the defense, such information is protected. Finally, to the extent communications constitute operational assistance, some of those communications *may be* protected if the primary motivation was based on strategic litigation considerations (e.g., communications about prioritizing a remediation for a homeowner judged by counsel to be particularly litigious).

Plaintiffs, of course, are free to use the information produced for their own litigation purposes, selecting whatever subset of data they think are helpful as they prepare their case. However, because Plaintiffs have already been provided with the data itself, Plaintiffs cannot satisfy either the "substantial need" or "undue hardship" standards of Fed. R. Civ. P. 26(b)(3)(ii) in trying to leverage Holland & Knight's work in analyzing that data to advise its client.

With that framework in mind, the Court turns its attention to the documents respectively selected by the parties for *in camera* review. Together with the guidance provided above, Defendants are instructed to use the Court's comments below in reviewing their privilege log and producing such documents as being outside the articulated protections.

    a. **Plaintiffs' Selections**
          i. *Clawback documents*

In light of the discussion above, the Court concludes as follows: Document 1 should largely escape clawback except for the "forwarding" portion if the Court is correct in its conclusion that such portion reflects TRC asking for guidance from Defendants and counsel as to how to proceed regarding lost air samples in its capacity as Holland & Knight's consulting expert. The remainder of the email, however, is not protected as it concerns communications between TRC employees and its testing lab regarding certain lost samples at a time when TRC was acting beyond simply its consulting expert capacity and assisting in coordinating the actual remediation efforts. If this portion has not been previously produced, it should not be clawed back.

Document 2 also escapes clawback as it concerns sending raw information to Defendants for inclusion in reporting at a time when ServPro had added its direct role in the remediation to its consulting role and appears to the Court as acting more in the former than the latter.

Documents 3 and 4 should be returned as they seem to concern the collection of data done on behalf of Holland and Knight so that it could advise Defendants. Document 3 references data being tracked by Aegis, acting as Holland & Knight's consultant. While the data itself is not protected (and, the Court assumes, has been produced), Aegis' decisions on how it will collect, report and use the data on behalf of Holland & Knight are protected. Document 4 also appears to the Court to be data being collected on behalf of Holland and Knight previous to the consulting

experts' significant expansion of its role in the actual remediation. Of course, the dates of the various inspections should already be available to Plaintiffs in other documents produced.

Finally, Document 5 should be produced as it is from August of 2019, well into the actual remediation and is between those performing and coordinating that work, rather than data being collected at the direction of Holland & Knight or Aegis.

### ii. *ServPro, TRC and Black and Veatch documents (Documents 6-20)*

As indicated in their correspondence dated September 15, 2021 (ECF No. 131), which was submitted after Plaintiffs prepared their list of documents review, Defendants should de-designate and produce any documents reflecting communications concerning Aegis' role in distribution of schedules to inspection and remediation vendors during the Spring and Summer of 2019. Additionally, as noted above, to the extent these consultants were simply providing operational information to Defendant Corvias for its normal business operations (except to the extent the information primarily related to a strategic litigation purpose directed by Holland & Knight), such documents are not protected. Collectively, these conclusions by the Court would appear to deny protection to SPP 4, SPP 26, SPP 31, SPP 35, SPP 58, BVP 7, BVP 12, BVP 56, BVP 61, BVP 106, and BVP 177.

As to the remainder, Plaintiffs argue that these documents are not protected because "whether or not counsel directed the work, whether or not counsel created a spreadsheet or other documents, and whether or not these communications reference that spreadsheet, if the communications or documents contain the results of the inspections and remediations, they are not privileged and should be produced, particularly as the spreadsheet was populated not by attorneys or the Aegis consultant, but rather by the 'independent' third-party vendors doing the inspections and performing the remediations." (ECF No. 129 at 4.) The Court disagrees. This gets to the very heart of the distinction the Court drew above. While it is true that the data itself is not protected and should be produced (as the Court assumes it has, given Defendants' representations), the particular subset of that data that Holland & Knight chooses to collect from this larger data universe to advise its client and formulate the defense, the format in which it chooses to maintain it and report it, or the conclusions it is seeking to draw from it, are all its work product when forwarded by its retained consultants, either directly or through Aegis. In that role, the retained consultants are not acting as third-party vendors doing the inspections and performing the remediations, but rather forwarding to Holland & Knight that part of the data deemed important by Holland & Knight. Stated otherwise, so long as the universe of data collected by these third-parties has been produced, documents that speak to the subset of that data being requested, communicated, reported, or used by Holland & Knight or its agent, Aegis, remain protected as work product.

### b. **Defendants' Selections**

After carefully reviewing Defendants' submission, the Court concludes that the privileges and protections claimed over the sampling of documents provided is justified unless Defendants

determine that they should be produced in accordance with the guidance above. That does not appear to be the case based on the Court's review, but the Court will rely on Defendants' greater familiarity with the documents and their underlying circumstances to verify the Court's conclusion.

### c. The Parties' Dispute Regarding Obligations Under the Agreed-to ESI Protocol

The parties dispute the extent to which Defendants are required to prepare a privilege log for documents withheld for privilege based on Section V.B of their agreed-to ESI Protocol. Section V.B reads as follows:

*The following categories of documents do not need to be contained on a Producing Party's initial privilege log, unless good cause exists to require that a Party do so.*

1. *Information generated after the date the initial complaint was filed in the above-captioned matter.*
2. *Any communications exclusively between a Producing Party and its inside counsel, outside counsel, an agent of outside counsel other than the Party, and non-testifying experts in connection with the Litigation, or with respect to information protected by Fed. R. Civ. P. 26(b)(4), testifying experts in connection with the Litigation*
3. *Any privileged materials or work product created by or specifically at the direction of a Party's outside counsel, and agent of outside counsel other than the Party, any non-testifying expert in connection with the Litigation, or with respect to information protected by Fed. R. Civ. P. 26(b)(4), testifying experts in connection with the Litigation.*

Plaintiffs argue that this provision only excuses the privilege log requirement for information generated after the lawsuit's initial filing date (November 12, 2019), and that Section V.B(2) and (3)'s delimiter "in connection with the Litigation" is further support for that position. (ECF No. 129 at 6-7.) Defendants respond that if interpreted as urged by Plaintiffs, V.B(2) and (3) become superfluous in light of V.B(1), which already establishes a comprehensive category for information generated after the lawsuit's initial filing, such that "in connection with the Litigation" must be read to expand the safe harbor contained in V.B(1). (ECF No. 130 at 9-10.)

The Court comes to a third conclusion. The Court agrees that Sections V.B(2) and (3)'s "in connection with the Litigation" language potentially expands the safe harbor to a period of time before the filing of the initial complaint if those provisions are to have meaning. However, the Court also agrees with Plaintiffs that such expanded period is not synonymous with the period when litigation was reasonably anticipated, which is so broad as to swallow the provision. Instead, the Court concludes that "in connection with *the Litigation*" refers to *this* lawsuit by these named Plaintiffs (or any one of them) or, in the case of the Class, a specifically articulated reference to *this* lawsuit which, theoretically, could have occurred before the November 12, 2019. That is, the safe harbor does not include privileged communications about *some* litigation or the potential for future litigation, but only to *this* Litigation.

By way of example only, if a lawyer for a named Plaintiff sent Defendants a draft of the Complaint in advance of filing, or specifically referenced to Defendants or in another public setting that a class action lawsuit was being prepared for filing against Defendants, privileged

7

communications between Defendants and their inside or outside counsel concerning the impending lawsuit would not need to be logged. By contrast, privileged communications that were otherwise relevant but triggered instead by a news story about conditions at military bases and litigation taking place in other jurisdictions would not be within Section V.B's safe harbor and would need to be logged if they occurred before the filing of this lawsuit. Similarly, otherwise relevant privileged communications spurred by Congressional hearings, requests for remediation, angry letters to Army hierarchy, etc. would also not be excused from the logging requirement if generated prior to the filing of this lawsuit.

To be clear, such communications would also need to be relevant and responsive to trigger a privilege log obligation. Additionally, nothing in the Court's analysis above is meant to define when litigation was or should have been reasonably anticipated for purposes of attorney-client or work product protection, or preservation obligations. Rather, this analysis is meant solely for interpreting Section V.B's "in connection with the Litigation" language as it pertains to excusing the privilege log requirement that would otherwise apply.

### III. Conclusion

In light of the above, Defendants should review their privilege logs (and those of their retained consultants) and produce any documents not previously produced consistent with the Court's guidance. This production should take place within ten (10) days of this Order. Additionally, Defendants should create a privilege log for any documents not previously logged that are relevant, responsive, and consistent with the Court's interpretation of the parties' ESI protocol within fourteen (14) days of this Order.

9/21/2021
Date

J. Mark Coulson
United States Magistrate Judge